**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BRYAN DAVIS & ETHAN SAM, directly on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIDELITY MANAGEMENT & RESEARCH COMPANY LLC, ABIGAIL P. JOHNSON, JENNIFER TOOLIN MCAULIFFE, CHRISTINE J. THOMPSON, ELIZABETH S. ACTON, LAURA M. BISHOP, ANN E. DUNWOODY, ROBERT GARTLAND, ROBERT W. HELM, MICHAEL E. KENNEALLY, MARK A. MURRAY, CAROL J. ZIERHOFFER, JOHN ENGLER, ARTHUR E. JOHNSON, MARIE L. KNOWLES, LAURA M. DEL PRATO, JOHN J. BURKE III, CHRISTOPHER M. GOUVEIA, AND KENNETH B. ROBINS. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CASE NO. 24 CIV. 8142** **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Bryan Davis and Ethan Sam, on behalf of themselves and all other similarly situated investors (the "Class Shareholders," as defined below), bring this action as holders of shares in the Fidelity Government Money Market Fund (the "Government Fund") of the Fidelity Hereford Street Trust (the "Trust") against the following Defendants: (i) Fidelity Management & Research Company LLC ("Fidelity"), (ii) current and former Trustees of the Government Fund, Abigail P. Johnson, Jennifer Toolin McAuliffe, Christine J. Thompson, Elizabeth S. Acton, Laura M. Bishop, Ann E. Dunwoody, Robert Gartland, Robert W. Helm, Michael E. Kenneally, Mark A. Murray, Carol J. Zierhoffer, John Engler, Arthur E. Johnson, and Marie L. Knowles (the "Trustee Defendants"), and (iii) the President of the Government Fund, Laura M. Del Prato, the

Chief Financial Officer of the Government Fund, John J. Burke III, and the current and former Chief Compliance Officers of the Government Fund, Christopher M. Gouveia and Kenneth B. Robins (the "Officer Defendants," and together with the Trustee Defendants, the "Trustee and Officer Defendants"). Plaintiffs allege as follows:

## I.    NATURE AND SUMMARY OF THE ACTION

1.      The Government Fund is the largest and most popular money market mutual fund in the Fidelity Investments[1] portfolio, with about $351 billion in net assets. The Trustee and Officer Defendants are the caretakers of the Government Fund and owe fiduciary and contractual duties to the fund's shareholders. This case is about how they breached those duties by failing to act in the best interests of a group of Government Fund shareholders, as required. The Trustee and Officer Defendants allow certain shareholders of the fund's "retail" share class (SPAXX) to needlessly incur higher expenses even when they are eligible for the fund's lower-expense, but otherwise identical, "premium" share class (FZCXX). These unnecessary expenses cost these shareholders millions of dollars each year, reducing their return on investment in the Government Fund and unjustly enriching Fidelity.

2.      The Government Fund's retail class and premium class shares are identical except for (1) the minimum required to initially invest in the shares and (2) the above-discussed operating expenses charged to shareholders. Retail class shareholders who meet the investment minimum for premium class shares, yet are charged the higher expenses of retail class shares, are referred to as "Class Shareholders."

---

[1] "Fidelity Investments" refers collectively to FMR LLC (the sole parent of Fidelity) and all of FMR LLC's subsidiaries.

3.      The Trustee and Officer Defendants could easily remedy this overcharging through share class conversion—the commonplace practice of automatically converting an eligible investor's shares from one share class to another lower-expense class within the same mutual fund. Auto-conversion is common in the mutual fund industry. The Trustee and Officer Defendants themselves provide for auto-conversion in *other* Fidelity mutual funds for shareholders who meet the investment minimum for a lower-expense class—but they do not do so for shareholders in the Government Fund. Outside of Fidelity, comparable mutual funds from Fidelity's primary competitors, like Vanguard and T. Rowe Price, similarly provide for auto-conversion of eligible shareholders to lower-expense share classes.

4.      As the Trustee and Officer Defendants' own practices and competitors' practices demonstrate, it is well within the power and capabilities of mutual fund trustees and officers to automatically convert eligible shareholders to a lower-expense class in the same fund or otherwise charge eligible shareholders the lower expenses for which they qualify—and a reasonably prudent trustee or officer in their position unquestionably would do so.

5.      Share class conversion does not harm shareholders, the Government Fund, or the Trust. It is a non-taxable transaction that only benefits eligible shareholders by reducing the expenses they pay for an identical investment in the fund. The savings to the Class Shareholders would be substantial: expenses for the Government Fund's premium class are typically 24% lower than expenses for the retail class. The savings to the Class Shareholders realized by share class conversion would not even come at a cost to the Government Fund or the Trust, but rather to the fund's contracted investment manager, Defendant Fidelity, which collects the expenses paid by shareholders as its management fee. Conversion (or a functional equivalent) is therefore an obvious and necessary decision for the fund's Trustees and Officers to implement in order to act

in the best interests of the Class Shareholders. Instead, the Trustee and Officer Defendants have continued to allow Fidelity to extract higher expenses from shareholders, whose interests they are charged with protecting.

6.     As fiduciaries, the Trustee and Officer Defendants are required to operate the Government Fund in the best interests of its shareholders. Despite their knowledge, experience, and capability to provide share class conversion, the Trustee and Officer Defendants have not done anything to ensure that the Class Shareholders pay the lower expenses to which their holdings entitle them. Their inaction demonstrates gross neglect or reckless disregard for the best interests of the Class Shareholders. Either the Trustee and Officer Defendants have been recklessly uninformed of these massive overcharges that cause significant losses to the Class Shareholders, or have known about the issue and inexcusably failed to take action to remedy it. Either way, their conduct was and is outside the bounds of reason. The Trustee Defendants' inaction also constitutes a breach of the implied covenant of good faith and fair dealing in the applicable trust agreement by which the Trustee Defendants are bound.

7.     One party has profited handsomely from this inaction: the Government Fund's investment manager, Defendant Fidelity. The vast majority of expenses charged to Government Fund shareholders are management fees paid to Fidelity, and upon information and belief, Fidelity currently collects more in fees annually from the Government Fund than from any other mutual fund in the Fidelity mutual fund complex. In the past three fiscal years, it has collected approximately $1.95 billion in fees from the Government Fund. The overcharges to Class Shareholders improperly increase these fees. Fidelity has knowingly aided and abetted the Trustee and Officer Defendants' fiduciary duty breaches and makes unjustified profits from the excess expenses that should remain in the Class Shareholders' pockets.

8.     Certain Trustee and Officer Defendants have a motivation not to remedy this inaction: they profit from it. The Chairman of the Government Fund's Board of Trustees (Defendant Abigail Johnson), the other "interested" trustees of the Government Fund (Defendants Jennifer Toolin McAuliffe and Christine Thompson), and the fund's officers (Defendants Laura Del Prato, John Burke, Christopher Gouveia, and Kenneth B. Robins) are each stakeholders in Fidelity—whose gain from overcharged expenses is the Class Shareholders' loss. Defendant Johnson, with her family, is the 49% owner of FMR LLC (which wholly owns Fidelity), so she is directly enriched at the Class Shareholders' expense. The other interested trustees and the officers are employed by Fidelity or compensated by Fidelity for their service to the Government Fund.

9.     The Trustee and Officer Defendants' dereliction of their fiduciary and contractual duties, with Fidelity's assistance, has resulted in enormous losses for the Class Shareholders. Plaintiffs, on behalf of themselves and the Class Shareholders, seek compensation for the millions of dollars in damages that Plaintiffs and the Class Shareholders have suffered and continue to suffer and seek injunctive relief to stop this ongoing harm.

## II.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d). This is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. Defendant Fidelity is incorporated in Delaware and has its principal place of business in Massachusetts. The Class consists of shareholders of the Government Fund who are citizens of states including New York.

11.     This Court has personal jurisdiction over each Defendant because they transact business within the state of New York. Among other activities, Defendant Fidelity provides investment services, maintains investment accounts, and facilitates transactions to and from New York for customers based in New York, like Plaintiffs. Furthermore, Defendant Fidelity manages

and oversees the Government Fund's assets and records, located in New York with the Bank of New York Mellon, which serves as the fund custodian.

12.     The Trustee and Officer Defendants likewise transact business in New York as fiduciaries to Government Fund investors based in New York, including Plaintiffs. The Trustee and Officer Defendants have authority over the Government Fund and direct the Government Fund's activities for the benefit of investors based in New York. The Trustee Defendants also have caused the Trust to enter into contracts with Defendant Fidelity under which the latter provides investment management services to Government Fund investors based in New York. The Trustee Defendants further have caused the Trust to enter into a contractual relationship with the Bank of New York Mellon, headquartered in New York, which acts as the custodian responsible for the safekeeping of Government Fund assets. Defendants' contractual and fiduciary duty breaches (including Defendant Fidelity's aiding and abetting the same) have caused injury to persons and property located within New York.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' causes of action occurred in this District, including the overcharging of Plaintiff Davis and other class members based in this District, and because a substantial part of the property that is the subject of the action is situated in this District.

### III.    THE PARTIES

14.     Plaintiff Bryan Davis is a resident of New York, New York. Plaintiff Davis is an accountholder of both a Fidelity retirement account and a Fidelity taxable brokerage account. He holds Retail Class shares of the Government Fund in both of these accounts. During the class period, Plaintiff Davis' Government Fund holdings in his retirement account exceeded the investment minimum ($10,000) qualifying him to pay the lower expenses of Premium Class shares instead of Retail Class shares of the fund. Likewise, his Government Fund holdings in his

brokerage account exceeded the investment minimum ($100,000) qualifying him to pay the lower expenses of Premium Class shares instead of Retail Class shares of the fund. Plaintiff Davis maintained the requisite holdings in each account for at least several months during the class period.

15.     Plaintiff Ethan Sam is a resident of Ridgewood, New York, in the New York City borough of Queens. Plaintiff Sam is an accountholder of a Fidelity retirement account. He holds Retail Class shares of the Government Fund through that account. During the class period, Plaintiff Sam's Government Fund holdings have exceeded the investment minimum ($10,000) qualifying him to pay the lower expenses of Premium Class shares instead of Retail Class shares of the fund. Plaintiff Sam maintained the requisite amount of holdings for at least several years during the class period.

16.     Defendant Fidelity Management & Research Company LLC ("Fidelity") is a company incorporated under the laws of Delaware and headquartered in Massachusetts. It is a wholly-owned subsidiary of non-party FMR LLC. Defendant Abigail Johnson, her family members, and family trusts together own a controlling 49% interest in FMR LLC. Thus, through their ownership of FMR LLC, they are the owners of Fidelity, solely owned by FMR LLC.

17.     Defendant Abigail Johnson, a resident of Massachusetts, has served as an interested Trustee of the Government Fund since 2009. She is an interested Trustee by virtue of her affiliation with the Trust and entities under common control with Fidelity, in particular, due to her significant ownership of Fidelity's sole parent, FMR LLC. Johnson is the Chairman (since 2016), Chief Executive Officer (since 2014), and Director (since 2007) of FMR LLC.  She has also served as the Chairman and Director of Defendant Fidelity since 2011. Defendant Fidelity compensates Johnson for her service as an interested Trustee of the Government Fund.

18.     Defendant Jennifer Toolin McAuliffe, a resident of Massachusetts, has served as an interested Trustee of the Government Fund since 2016. McAuliffe is an interested Trustee by virtue of her affiliation with the Trust and entities under common control with Fidelity. She was previously employed for over 14 years at Fidelity Investments, including as an executive at the subsidiary, Fidelity Investments Limited. Defendant Fidelity compensates Defendant McAuliffe for her service as an interested Trustee of the Government Fund.

19.     Defendant Christine J. Thompson, a resident of Massachusetts, has served as an interested Trustee of the Government Fund since 2023. Since 2018, Thompson has been employed by Fidelity Investments as Leader of Advanced Technologies for Investment Management. Thompson served as Chief Investment Officer in the bond group at Defendant Fidelity from 2010 to 2018. Defendant Fidelity compensates Defendant Thompson for her service as an interested Trustee of the Government Fund.

20.     Defendant Elizabeth S. Acton, a resident of Texas, is an independent Trustee of the Government Fund and has served in this role since 2013.

21.     Defendant Laura M. Bishop, a resident of Texas, is an independent Trustee of the Government Fund and has served in this role since 2023. Bishop was a Member of the Advisory Board of the Government Fund from 2022 to 2023.

22.     Defendant Ann E. Dunwoody, a resident of Florida, is an independent Trustee of the Government Fund and has served in this role since 2018.

23.     Defendant Robert Gartland, a resident of New York, is an independent Trustee of the Government Fund and has served in this role since 2010.

24.     Defendant Robert W. Helm, a resident of Maryland, is an independent Trustee of the Government Fund and has served in this role since 2023. Previously, Helm was a Member of the Advisory Board of the Government Fund from 2021 to 2023.

25.     Defendant Michael E. Kenneally, a resident of Florida, is an independent Trustee of the Government Fund and has served in this role since 2009.

26.     Defendant Mark A. Murray, a resident of Michigan, is an independent Trustee of the Government Fund and has served in this role since 2016.

27.     Defendant Carol J. Zierhoffer, a resident of Washington, D.C., is an independent Trustee of the Government Fund and has served in this role since 2023. Zierhoffer was a Member of the Advisory Board of the Government Fund in 2023.

28.     Defendant John Engler, a resident of Ohio, served as an independent Trustee of the Government Fund from 2014 to 2023.

29.     Defendant Arthur E. Johnson, a resident of Virginia, served as an independent Trustee of the Government Fund from 2008 to 2023.

30.     Defendant Marie L. Knowles, a resident of California, served as an independent Trustee of the Government Fund from 2008 to 2022.

31.     Defendant Laura M. Del Prato, a resident of Massachusetts, is an Officer of the Government Fund and serves as the President and Treasurer. She has been in this role since 2018. She is an employee of Fidelity Investments.

32.     Defendant John J. Burke III, a resident of Massachusetts, is an Officer of the Fund and serves as the Chief Financial Officer. He has been in this role since 2018. He is an employee of Fidelity Investments.

9

33.     Defendant Christopher M. Gouveia, a resident of New Hampshire, is an Officer of the Fund and serves as the Chief Compliance Officer. He has been in this role since 2023.

34.     Defendant Kenneth B. Robins, a resident of Massachusetts, was an Officer of the Fund and served as the Chief Compliance Officer from 2020 until 2022.

## IV.     FACTUAL ALLEGATIONS

### A.     The Fidelity Government Money Market Fund.

35.     Fidelity Investments is a multinational financial services company which, through its subsidiaries, maintains mutual funds and manages assets.  Fidelity Investments is "one of the world's largest providers of financial services."[2] It "was established in 1946 to manage one of America's first mutual funds."[3] Today, Fidelity Investments is controlled and 49%-owned by Defendant Abigail Johnson, her family, and related family trusts.

36.     Fidelity Investments is a self-described "world leader in mutual funds" and an "industry leader" in the money market mutual fund industry, "managing over $900 billion in total money market assets" for millions of customers.[4] Mutual funds are a type of professionally managed investment vehicle that pools assets of various investors to invest in a portfolio of target securities. A money market mutual fund is one subspecies of mutual funds whose investment focus is low-risk short-term debt securities, like government bonds and Treasury bills, *i.e.* debt instruments that become fully due in the near term.

37.     Fidelity Investments' money market mutual funds are "a low-risk, short-term savings alternative that provide easy access to your cash."[5] Fidelity Investments' flagship, largest

---

[2] Fidelity Government Money Market Fund Prospectus (June 29, 2024), https://www.sec.gov/Archives/edgar/data/0000917286/000091728624000074/filing7591.htm
[3] *Id.*
[4] "Fidelity Mutual Funds," https://www.fidelity.com/mutual-funds/fidelity-funds/overview
[5] *Id.*

money market mutual fund is the Fidelity Government Money Market Fund, with about $351 billion total in investment assets. The Government Fund is popular among retail investors.

38.    The Government Fund's objective is to "Seek[] as high a level of current income as is consistent with preservation of capital and liquidity."[6] At least 99.5% of the Government Fund's total assets are typically invested in cash, U.S. Government securities, and/or repurchase agreements that are fully collateralized. According to the Government Fund's April 2024 Annual Report, its current investment breakdown is 34.5% U.S. Treasury Debt, 24.2% U.S. Government Agency Debt, and 42% U.S. Treasury Repurchase Agreements.[7]

39.    The Government Fund is managed to maintain a stable $1.00 share price (net asset value (NAV) per share) for each share class, which is calculated once daily on business days at the close of business of the New York Stock Exchange. Transactions to purchase or redeem shares in the Government Fund are likewise effected once daily on business days once the NAV has been calculated.

40.    The Government Fund is structured as a "Series" (i.e., one of the funds under) the Fidelity Hereford Street Trust. The Trust is organized as a statutory trust under Delaware law and is an investment company registered under the Investment Company Act of 1940 ("ICA"). The Trust was initially established pursuant to a trust instrument executed in 1993. The May 15, 2002

---

[6]  Monthly Fact Sheet for Fidelity Government Money Market Fund (SPAXX), https://fundresearch.fidelity.com/mutual-funds/fundfactpdf/31617H102?appcode=RETAIL; Monthly Fact Sheet for Fidelity Government Money Market Fund Premium Class (FZCXX), https://fundresearch.fidelity.com/mutual-funds/fundfactpdf/31617H706?appcode=RETAIL.
[7] Fidelity Government Money Market Fund Annual Report, https://institutional.fidelity.com/app/literature/annual-report/703529/government-money-market.html.

Amended and Restated Trust Instrument, as amended on February 16, 2005 (the "Trust Agreement"), governs the Trust and funds thereunder, including the Government Fund.[8]

***Trustees of the Government Fund***

41.    The Trust Agreement is governed by Delaware law and executed by the Trust's initial trustees. Under the Trust Agreement, the trustees of the Trust hold legal title to and exercise control over the assets of the Trust on behalf of beneficial interest-holders (i.e., the shareholders) of the Trust. The shareholders have agreed to be bound by the terms of the Trust Agreement through purchasing shares of funds formed under the Trust Agreement.

42.    The Trust Agreement provides that the Trust and each of its Series are governed by a Board of Trustees. The members of the Trust's Board of Trustees serve as trustees of each of the Trust's various Series or mutual funds.

43.    The current members of the Government Fund's Board of Trustees are Defendants Abigail Johnson, Jennifer McAuliffe, Christine Thompson, Elizabeth Acton, Laura Bishop, Ann Dunwoody, Robert Gartland, Robert Helm, Michael Kenneally, Mark Murray, and Carol Zierhoffer. The former Trustees, who have also served as trustees during the class period, are Defendants John Engler, Arthur Johnson, and Marie Knowles. Since 2019, 12 of the 14 current and former Trustees have reported beneficial ownership of shares in the Government Fund, as documented in the fund's proxy statements.

44.    The Government Fund's Trustees – and the Trustee Defendants here – include both "Interested" and "Independent" trustees. The "Interested Trustees" are those who have

---

[8] Trust Agreement,
https://www.sec.gov/Archives/edgar/data/917286/000091728602000008/a1.htm.

"affiliation[s] with the trust or various entities under common control with [Defendant Fidelity]."[9] Interested Trustees include trustees who have held equity in Fidelity's sole owner (FMR LLC) or have received compensation and other benefits from Fidelity. Because of their financial, ownership, or employment connections to Fidelity, the Interested Trustees lack independence from the company.

45.    The Interested Trustees are Defendants Abigail Johnson, Jennifer McAuliffe, and Christine Thompson. Johnson has served as Chairman (since 2016), Chief Executive Officer (since 2014), and Director (since 2007) of Fidelity Investments and as Chairman and Director of Defendant Fidelity since 2011. Until 2018, Defendant Thompson was employed as the Chief Investment Officer at Fidelity.

46.    The remaining Trustee Defendants are the current and former Independent Trustees.[10] They have received compensation directly from the Government Fund, rather than from Defendant Fidelity, during the class period.

47.    As stated in the Trust's proxy materials, trustees are elected to the Board to serve as "fund shareholders' representatives."[11] The Government Fund's Trustees are "fiduciaries" of the Trust, the Government Fund, and its shareholders.[12] The Trustees have a fiduciary "obligation to serve the best interests of shareholders, including consideration of policy changes."[13] The purpose of the Board of Trustees is to "ensure that shareholders' best interests are protected in the

---

[9] June 2024 Prospectus,
https://www.sec.gov/Archives/edgar/data/0000917286/000091728624000074/filing7591.htm.
[10] Independent Trustees are trustees who are not an "interested person" of the Trust as defined in the ICA.
[11] Proxy Statement (Aug. 21, 2023),
https://www.sec.gov/Archives/edgar/data/917286/000113322823004904/fiaa-html6681_def14a.htm#tocpro_001.
[12] *Id.*
[13] *Id.*

operation of a mutual fund."[14] "The Board of Trustees has established various committees" to ensure that "the best interests of the funds and their shareholders" are met.[15] These fiduciary obligations apply to all Trustee Defendants.

48.    The Officer Defendants likewise owe fiduciary duties to the Trust, the Government Fund, and its shareholders, as the delegees of the Trustee Defendants. Specifically, the Trust Agreement provides the Trustees with the "power and authority" to "delegate such authority as they consider desirable to any officers of the Trust and any investment adviser [or] manager [i.e., Defendant Fidelity]."[16] Delaware law governing statutory trusts (the Delaware Statutory Trust Act ("DSTA")) – to which the Trust Agreement expressly states it is subject – provides that officers, managers, and other delegees and appointees of the trustees, exercising authority delegated by the trustees, owe the same duty of care to shareholders as the trustees do.

49.    Though Delaware law permits a trust to eliminate, or exculpate, trustees' and officers' liability for duty of care breaches in the governing trust documents, the Trust Agreement does not. It specifically allows for such liability against trustees and officers under the governing legal standard for a duty of care breach (i.e., gross negligence or reckless disregard): "…nothing contained herein or in the Delaware [Statutory Trust] Act shall protect any Trustee or any officer of the Trust against any liability to the Trust or to Shareholders to which he would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of the office of Trustee or Officer hereunder."[17]

---

[14] Proxy Statement (Mar. 20, 2015),
https://www.sec.gov/Archives/edgar/data/917286/000119312515099717/d876979d485bpos.htm.
[15] June 2024 Prospectus,
https://www.sec.gov/Archives/edgar/data/0000917286/000091728624000074/filing7591.htm.
[16] Trust Agreement, https://www.sec.gov/Archives/edgar/data/917286/000091728602000008/a1.htm.
[17] Id.

50.     The Trust Agreement sets forth the powers and duties of the Government Fund's trustees, including the power to control and manage the business of the Trust. The Trust Agreement authorizes the Government Fund's trustees to issue an unlimited number of shares, create a multiple-class structure, set applicable investment minimums for each class, appoint and contract with an investment manager for the fund, negotiate and review the investment manager's fees and expense caps, and direct and oversee the fund's investment strategy. Trustee Defendant Abigail Johnson, as the Chair of the Board of Trustees, "shall be responsible for the execution of policies established by the Trustees and the administration of the Trust."[18]

51.     Under the Trust Agreement, the "Trustees shall have exclusive and absolute control over the Trust Property and over the business of the Trust . . . , but with such powers of delegation as may be permitted by this Trust Instrument," including to Trust officers and investment managers.[19] Here, the Trustee Defendants have delegated certain management responsibilities for the Government Fund to the Officer Defendants and Defendant Fidelity.

**Officers of the Government Fund**

52.     The Trust's Bylaws establish the roles of certain officers of the Trust, including the President, Treasurer, and Chief Financial Officer. The President is selected by the Trustees and "shall be the sole chief executive officer of the Trust and, subject to the direction of the Trustees, shall have general administrative responsibilities for the Trust, but shall not have responsibility for the provision of any investment advisory service or management service that is the subject of a management agreement between the Trust (or any Series within the Trust) and an adviser or sub-adviser."[20] The Treasurer "shall make annual reports regarding the business and condition of the

---

[18] *Id.*

[19] *Id.*

[20] Bylaws of Fidelity Delaware Statutory Trusts,
https://www.sec.gov/Archives/edgar/data/28540/000002854009000002/b1.htm.

Trust . . . and shall furnish such other reports regarding the business and condition of the Trust as the Trustees may from time to time require."[21] The Chief Financial Officer, "together with the President, shall be responsible for the design, establishment, maintenance and evaluation of internal controls," among other responsibilities.[22] In addition, the Trust Agreement and the Trust's Bylaws permit the Trustees to establish other officer roles, including the Chief Compliance Officer.

53.    Defendant Del Prato, as President and Treasurer of the Trust, is the principal executive officer of the Trust and owes fiduciary duties to the Government Fund's shareholders. She has executed management and expense contracts with Fidelity on behalf of the Government Fund.

54.    Defendant Burke, as Chief Financial Officer of the Trust, is an officer of the Trust and owes fiduciary duties to the Government Fund's shareholders. Burke assists the Trustees in overseeing the Government Fund's financial performance and planning and the accuracy of its financial reporting.

55.    Defendant Gouveia, as Chief Compliance Officer of the Trust, and Defendant Robins, as former Chief Compliance Officer of the Trust during the class period, are officers of the Trust and owe fiduciary duties to the Government Fund's shareholders. In their role, Defendants Gouveia and Robins regularly report to and assist the Trustee Defendants in overseeing the risks, operations, and financial auditing of the Government Fund.

56.    The officers of the Trust, including Defendants Del Prato, Burke, Gouveia, and Robins, are compensated by Defendant Fidelity for their service to the Trust—not by the Trust or the Government Fund.

---

[21] *Id.*
[22] *Id.*

***Fidelity's Role as the Government Fund's Investment Manager***

57.    The Trust Agreement authorizes the Trustees to enter into investment advisory or management contracts with an investment manager who will provide management and advisory services to the Government Fund, and to delegate authority to that investment manager.

58.    The Trustees have delegated investment management and advisory services for the Government Fund to Defendant Fidelity, pursuant to periodically renewed management contracts, negotiated and approved by the Trustees and executed by Defendant Del Prato on the fund's behalf. The operative management contract, dated January 1, 2020, is referred to as the "Advisory Contract."

59.    As the Government Fund's June 2024 Prospectus explains, "Under the terms of its management contract with each fund, [Fidelity] acts as investment adviser and, subject to the supervision of the Board of Trustees, has overall responsibility for directing the investments of the fund in accordance with its investment objective, policies and limitations, compensates all officers of the fund and all Trustees who are interested persons of the trust or of [Fidelity], and compensates all personnel of the fund or [Fidelity] performing services relating to research, statistical and investment activities. In addition, [Fidelity], subject to the supervision of the Board of Trustees, provide[s] the management and administrative services necessary for the operation of each fund."[23]

60.    Fidelity's responsibilities under the Advisory Contract for the Government Fund include "providing facilities for maintaining the fund's organization; supervising relations with custodians, transfer and pricing agents, accountants, underwriters and other persons dealing with the fund; preparing all general shareholder communications and conducting shareholder relations; maintaining the fund's records and the registration of the fund's shares under federal securities

---

[23] June 2024 Prospectus,
https://www.sec.gov/Archives/edgar/data/0000917286/000091728624000074/filing7591.htm.

laws and making necessary filings under state securities laws; developing management and shareholder services for the fund; and furnishing reports, evaluations and analyses on a variety of subjects to the Trustees."[24] Fidelity also performs services related to research, statistical, and investment activities of the Government Fund. Fidelity is tasked with "investigating the development of and developing and implementing, if appropriate, management and shareholder services designed to enhance the value or convenience of the [Government Fund] as an investment vehicle."[25] Fidelity also participates in the regular review, negotiation, and renewal of the Advisory Contract with the Trustees, which involves analysis of competitor funds.

61.    In exchange for its services for the Government Fund, Fidelity is paid a management fee. The fee is calculated as a percentage of the value of each shareholder's investment. The Trust pays this fee to Fidelity monthly, and the fee is included in the expenses paid by shareholders "each year as a % [percentage] of the value of [their] investment."[26]

62.    During the class period, Fidelity has collected an annual management fee of 0.25% of the value of all Government Fund shareholders' investments in the fund. Fidelity currently collects more in management fees from the Government Fund than from any other mutual fund in the Fidelity mutual fund complex.  For the fiscal years ended April 30, 2024, 2023, and 2022, Fidelity collected a total of approximately $1.95 billion in management fees from expenses charged to shareholders in the Government Fund.

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

| Fiscal Years Ended April 30, | Management Fees Paid to Fidelity as Investment Adviser |
|---|---|
| 2024 | $736,101,954 |
| 2023 | $618,050,470 |
| 2022 | $594,179,632 |

63.    The Trustees have the authority and responsibility to negotiate these expenses, regularly review the expenses and Fidelity's performance, and determine whether to renew the Advisory Contracts with Fidelity and on what fee terms. In considering whether to renew the Advisory Contracts, the Trustees consider how Fidelity's competitors approach expenses for comparable funds, including the "competitiveness relative to peer funds of the fund's management fee and the total expense ratio of a representative class (the retail class . . .)" and the "broad range of investment choices available to shareholders from [Fidelity's] competitors."[27]

***The Government Fund's Retail and Premium Classes***

64.    As authorized by the Trust Agreement, the Trustees have created and maintained a multi-class structure for the Government Fund and have issued shares for each class within the Government Fund.

65.    Two of the classes within the Government Fund are the Retail Class (SPAXX) and the Premium Class (FZCXX). The vast majority of the Government Fund's $351 billion in assets are held in these two classes. As of September 30, 2024, about $323 billion of the Government Fund's assets are held in Retail Class shares with another $11.4 billion held in Premium Class shares.

---

[27] October 2023 Semi-Annual Report of the Fidelity Government Money Market Fund, https://www.sec.gov/Archives/edgar/data/917286/000091728623000097/filing7164.htm.

66.    The Government Fund's Retail Class and Premium Class share a common investment portfolio and investment objective. The shares issued by each class are identical except for (1) the investment minimum required to initially invest in the class and (2) the expense ratio, or set percentage of each shareholder's investment, that Fidelity collects as expenses for holding the shares. The expenses collected across shareholders are the Government Fund's annual operating expenses. The expense ratio therefore reduces each shareholder's distributions from the Government Fund and return on investment.

67.    As shown in the table below, the Retail Class has no investment minimum and charges shareholders an expense ratio of up to 0.42% of the value of their investment. The Premium Class has an "minimum initial investment" of $10,000 for retirement accounts and $100,000 for taxable brokerage accounts and charges shareholders an expense ratio of up to 0.32% of the value of their investment.[28]

| Class | Retail | Premium |
|---|---|---|
| **Symbol** | SPAXX | FZCXX |
| **Investment Minium** | None | $10,000 for retirement accounts<br>$100,000 for taxable brokerage accounts |
| **Expense Ratio Cap** | 0.42% | 0.32% |

68.    The majority of expenses collected through the expense ratio cover the management fees paid to the Government Fund's investment manager, Defendant Fidelity. During the class period, Fidelity has collected an annual management fee of 0.25% of the value of all Government Fund shareholders' investments in the fund. The amounts collected above 0.25% – up to the

---

[28] June 2024 Fidelity Government Money Market Fund – Premium Class, Summary Prospectus, https://www.sec.gov/Archives/edgar/data/917286/000091728624000077/filing7583.htm

expense ratio caps in the tables above – cover the other operating expenses of the Government Fund.[29]

69.    Pursuant to expense contracts executed by Defendant Del Prato on the Government Fund's behalf, Fidelity has contractually agreed to cap the overall expense ratios at 0.42% for the Retail Class and 0.32% for the Premium Class. At the cap levels, the Premium Class expense ratio is 24% lower than the Retail Class expense ratio. Fidelity is contractually required to reimburse any expenses passed on to shareholders that exceed the expense ratio caps.

70.    Fidelity may also on occasion waive a portion of expenses to reduce shareholders' expenses below those caps. For example, Fidelity did so for the fiscal year ending April 30, 2022—when investment returns were so low that charging the full expense cap would have resulted in negative returns on investment for Premium Class and Retail Class shareholders.

71.     However, the expense ratio for the Premium Class has always been lower than the expense ratio for the Retail Class throughout the class period. So, the return on investment for Premium Class shareholders has always exceeded the return on investment for Retail Class shareholders throughout the class period. At no point during the class period would a Retail Class shareholder, who was eligible for the Premium Class, have been better off continuing to hold Retail Class shares instead of Premium Class shares.

**B.    The Government Fund Has No Mechanism to Convert Qualifying Retail Class Holders to the Lower-Expense Premium Class.**

72.    Share class conversion is a common feature of mutual funds with multi-class structures. Share class conversion refers to the conversion of an investor's shares from one share class to another class within the same mutual fund. Such conversions are non-taxable events.

---

[29] Other operating expenses for the Government Fund include printing and mailing of proxy materials, prospectuses, and reports to shareholders, as well as interest and taxes.

Mutual funds that provide for share class conversion frequently do so automatically upon the occurrence of specified events, such as when a shareholder in a higher-expense class meets the investment minimum for a lower-expense class, or when a shareholder has held shares in a higher-expense class for a specified period of time and therefore qualifies for a loyalty-based conversion to a lower-expense class.

73. The Trustees of the Government Fund have not established any mechanism for converting a shareholder's Retail Class shares to Premium Class shares (or otherwise ensuring that the shareholder is charged lower expenses) if that shareholder has a sufficient investment in the Government Fund to qualify for the Premium Class.

**C.    Defendants Provide Automatic Share Class Conversion for Shareholders of Other Fidelity Mutual Funds.**

74. Defendants are well aware of their authority and capability to provide automatic share class conversion from higher-expense to lower-expense share classes within the same mutual fund, as well as the benefits of doing so for qualifying shareholders.

75. In addition to serving as trustees of the Trust, the Trustee Defendants are or were also on the Boards of Trustees for the Fidelity California Municipal Trust II, the Fidelity Massachusetts Municipal Trust, the Fidelity Court Street Trust II, and the Fidelity New York Municipal Trust II (together, the "Fidelity Municipal Trusts"). In addition to serving as officers of the Trust, Defendant Del Prato serves as President and Defendant Burke as Chief Financial Officer of each of the Fidelity Municipal Trusts. Defendant Fidelity serves as investment manager and adviser to each of the Fidelity Municipal Trusts.

76. Each of the Fidelity Municipal Trusts maintains a single mutual fund. The Fidelity California Municipal Trust II maintains the Fidelity California Municipal Money Market Fund. The Fidelity Massachusetts Municipal Trust maintains the Fidelity Massachusetts Municipal

Money Market Fund. The Fidelity Court Street Trust II maintains the Fidelity New Jersey Municipal Money Market Fund. The Fidelity New York Municipal Trust II maintains the Fidelity New York Municipal Market Fund. Together, these mutual funds are referred to as the "Fidelity Municipal Funds."

77.     Like the Government Fund, the Fidelity Municipal Funds each have higher-expense and lower-expense share classes distinguished by their initial investment minimums. The Fidelity Municipal Funds automatically convert the higher-expense shares to the lower-expense shares once a shareholder meets the investment minimum requirement.[30] The prospectuses for the Fidelity Municipal Market Funds each describe these "automatic conversions" of qualifying shareholders to the lower-expense class as follows: "The fund may conduct periodic reviews of account balances and may convert your [higher-expense] Premium Class shares to [lower-expense] Institutional Class shares if you meet the eligibility requirements for the Institutional Class." The prospectuses also explain that share class conversion between classes within the same fund is a non-taxable event.

78.     Through administering and operating the Fidelity Municipal Funds, Defendants have experience providing and executing automatic share class conversion for mutual fund shareholders based on minimum-investment criteria. Defendants cause those funds to implement and maintain a periodic review-and-conversion process to ensure qualifying shareholders in higher-expense share classes pay the lower expenses associated with another share class in the same fund once they become eligible. Accordingly, Defendants have the knowledge, capability, and infrastructure to execute automatic share class conversions for Class Shareholders.

---

[30] Here, the higher-expense class at issue has a $25,000 investment minimum while the lower-expense has a $1 million investment minimum.

79.    Other funds within the Fidelity mutual funds complex have employed automatic share class conversion based on other quantitative criteria. For example, six "Fidelity Disruptor Funds" within the Fidelity Summer Street Trust employed a multi-class structure with automatic conversion to lower-expense classes after shareholders held their shares for certain periods of time.[31] The Fidelity Disruptor Funds' share classes included a "retail" class, a lower-expense "Loyalty Class 1," and a lowest-expense "Loyalty Class 2." Shareholders who held retail shares in the same Disruptor Fund for one year had their shares automatically converted to Loyalty Class 1 shares. Shareholders who held their shares for three years had their shares automatically converted to Loyalty Class 2 shares.

80.    Defendant Fidelity served as the investment manager of the Fidelity Disruptor Funds, and Officer Defendants Del Prato and Burke served as officers of the funds. Through their experience with the Fidelity Disruptor Funds, Defendants Fidelity, Del Prato, and Burke have the knowledge, capability, and infrastructure to execute automatic share class conversions for Class Shareholders.

81.    For the Government Fund itself, Defendants employ automatic conversion for one specific non-retail share class based on non-quantitative criteria. Non-retail Class K6 shares (representing only 1% of the Government Fund's total assets) are only available to certain employer-sponsored retirement funds. In the event that an investor's plan is no longer eligible to offer Class K6 shares, the Government Fund may automatically convert existing Class K6 shares to another class of shares within the Government Fund.

---

[31] Those funds are the Fidelity Disruptive Automation Fund, Fidelity Disruptive Communications Fund, Fidelity Disruptive Finance Fund, Fidelity Disruptive Medicine Fund, Fidelity Disruptive Technology Fund, and Fidelity Disruptors Fund (collectively, the "Disruptor Funds"). In 2023, the Disruptor Funds were converted to actively managed exchange-traded funds ("ETFs"). *See* https://newsroom.fidelity.com/pressreleases/fidelity-investments--announces-plans-to-convert-six-thematic-mutual-funds-to-etfs/s/c91da3ef-bd95-44df-a8b0-9e322c8074b2.

**D.    Competitor Money Market Funds Provide Automatic Share Class Conversion for Shareholders.**

82.    Competitor funds outside Fidelity, which the Trustee Defendants consider in negotiating and approving expense policies for the Government Fund, also provide for automatic share class conversion to serve the best interests of their shareholders. Mutual funds from Vanguard and T. Rowe Price, two of Fidelity Investments' chief competitors, automatically convert qualifying investors' shares to lower-expense classes based on minimum-investment criteria.

83.    Multiple funds in the Vanguard mutual fund complex have multi-class structures that include a higher-expense "Investor Shares" (retail) class and a lower-expense "Admiral Shares" (premium) class. These Vanguard funds monitor account balances, notify qualifying shareholders of eligibility, and then automatically convert an eligible holder's shares to the lower-expense class: [32]

**Here are our most asked questions about share class conversions:**

**What happens during the conversion?**    ^

We'll move all of the money you have in an eligible Investor Shares mutual fund into the same fund's lower-cost Admiral Shares. You'll receive a transaction confirmation once the conversion is complete.

In addition, your cost basis information will carry over.

**You may be converted automatically**

We periodically review your Investor Shares mutual fund investments to see if you're eligible for Admiral Shares. If you are, we'll give you plenty of time to opt out before we convert you automatically.

---

[32] "Share classes of Vanguard mutual funds," https://investor.vanguard.com/investor-resources-education/mutual-funds/share-classes-of-vanguard-mutual-funds#:~:text=Benefits%20of%20owning%20Admiral%20SharesTM%20include%3A.

84.    Vanguard funds periodically review a shareholder's holdings to determine eligibility for the lower-expense Admiral Shares class to effect an automatic conversion of that shareholder's shares. Shareholders whose holdings are converted to the Admiral Shares class enjoy "expense ratios that are, on average, 52% lower than our standard Investor Share class."[33]

85.    T. Rowe Price funds similarly have an automatic conversion process for eligible shareholders from their retail ("Investor") to premium ("I Class") shares. The I Class shares have expenses that are 20% lower than the Investor Class shares. As the T. Rowe Price website explains, "except for accounts held by clients outside of the United States, who must call us to convert shares," a shareholder's "shares will automatically be converted to I Class when eligible – no further action is necessary."[34]

---

**Do I have to take any action for my Investor Class shares to convert to I Class?**

In most cases, your shares will automatically be converted to I Class when eligible - no further action is necessary (except for accounts held by clients outside of the United States, who must call us to convert shares).

---

**Will I be notified if my account is eligible for I Class shares?**

We will make reasonable efforts to notify you when one or more of your mutual fund accounts is eligible for I Class. Most accounts will be converted automatically on a quarterly basis. Accounts held by clients outside of the United States are notified once per calendar year and clients must contact us to process a conversion.

---

[33] *Id.*
[34] T. Rowe Price, Frequently Asked Questions, https://www.troweprice.com/personal-investing/about/client-benefits/faqs.html.

E.    **The Government Fund's Lack of Automatic Conversion Has Contributed to an Artificially High Concentration of Shareholder Assets in the Retail Class.**

86.    The Government Fund's shareholder assets are overwhelmingly concentrated in the Retail Class rather than the Premium Class—far more so than comparable funds with automatic conversion of eligible shareholders. As of September 30, 2024, the Retail Class has net assets of about $323 billion, and the Premium Class has net assets of about $11.4 billion. Between the two classes, this translates to a ratio of 96.6% of shares held by the Retail Class and only 3.4% of shares held by the Premium Class.

87.    In comparable competitor mutual funds that invest in government securities—the type of funds that the Trustee Defendants review and consider, as the Government Fund's Prospectus discloses—lower-expense (premium) classes make up a far greater proportion of the funds' assets, even when the investment minimums for those classes are higher than for the Government Fund's Premium Class. These competitor funds provide auto-conversion of eligible shareholders to lower-expense share classes.

88.    One example is the Vanguard Cash Reserves Federal Money Market Fund (formerly known as the Vanguard Prime Money Market Fund) (the "Vanguard Federal Fund"). It holds similar types of underlying securities as the Government Fund and has a multi-class structure with an "Investor Shares" (retail) class and "Admiral Shares" (premium) class. The Government Fund and the Vanguard Federal Fund had comparable assets as of 2019:[35] $123.6 billion for the Vanguard Federal Fund and $109.1 billion for the Government Fund. But the Vanguard Federal Fund had a $3,000 investment minimum for its retail Investor Shares class and a $5 million investment minimum for its premium Admiral Shares class. The Vanguard Federal Fund's $5

---

[35] After August 2019, the minimum investment for the Admiral Shares class of the Vanguard Federal Fund was lowered to equal the minimum investment of the Investor Shares class, making the fiscal year ending August 31, 2019 the most apt year for comparison.

million investment minimum for its premium class was 50- to 500-times higher than the Government Fund's Premium Class, depending on account type (taxable or retirement). Despite the significantly more exclusive premium class in the Vanguard Federal Fund, the proportion of assets in this fund's premium class was still more than four times higher than in the Government Fund's as of 2019:[36]

| Fund: | Fidelity Government Fund | Vanguard Federal Fund |
|---|---|---|
| **Retail/Investor Class Assets:** | 96.2% | 84.7% |
| **Premium/Admiral Class Assets:** | 3.8% | 15.3% |

89.    As another example, two of T. Rowe Price's money market mutual funds hold similar types of underlying securities as the Government Fund: the T. Rowe Price Government Money Fund and the T. Rowe Price U.S. Treasury Money Fund. Both T. Rowe Price funds offer "Investor Class" (retail) shares with a minimum investment of $2,500 for taxable accounts and $1,000 for retirement accounts, and "I Class" (premium) shares with a default $500,000 minimum investment (lowered to $50,000 for T. Rowe Price brokerage customers with at least $500,000 in their brokerage account). The T. Rowe Price funds monitor investor holdings and automatically convert eligible Investor Class holders to the premium I Class shares quarterly. The latest asset numbers for 2024 show that the assets of the T. Rowe Price funds are 8- to 14-times as heavily concentrated in their premium classes than the Government Fund despite higher investment minimums for the T. Rowe Price funds:[37]

---

[36] https://www.sec.gov/Archives/edgar/data/106830/000168386319003149/f2215d1.htm.
[37] https://www.sec.gov/Archives/edgar/data/316968/000114554924063347/xslN-MFP3_X01/primary_doc.xml;
https://www.sec.gov/Archives/edgar/data/853437/000114554924063353/xslN-MFP3_X01/primary_doc.xml.

| Fund: | Fidelity Government Fund | T. Rowe Price Government Fund | T. Rowe Price U.S. Treasury Fund |
|---|---|---|---|
| **Retail/Investor Class Assets:** | 96.6% | 72.8% | 56.8% |
| **Premium/I Class Assets:** | 3.4% | 27.2% | 43.2% |

90.    Plaintiffs and the Class Shareholders belong in the Premium Class by virtue of their qualifying level of investment holdings in the Government Fund. The Government Fund's lack of a mechanism to convert eligible Retail Class shareholders like Plaintiffs and the Class Shareholders contributes to an artificially high concentration of assets in the Retail Class that is out of line with comparable funds and has resulted in millions of dollars in overcharged expenses reducing Plaintiffs' and the Class Shareholders' return on investment in the Government Fund.

**F.    Defendants' Inaction Demonstrates Disregard For The Best Interests of The Class Shareholders.**

91.    Despite their experience, knowledge, and authority, Defendants have taken no action to remedy the overcharging of shareholders of the largest and most popular money market fund in the Fidelity complex of funds.

92.    The Trustee Defendants control the Government Fund's share-class structure and share class investment minimums, and negotiate the fund's management and expense contracts with Fidelity, including Fidelity's management fee, the expenses allocated to each share class, and the classes' expense ratio caps. The Officer Defendants and Defendant Fidelity have been delegated management, operational, and certain strategic responsibilities for the Government Fund. The Officer Defendants advise the Trustees on financial and compliance matters, certify financial and other regulatory disclosures, and assist the Trustees in their review and design of Government Fund policies and operations. Defendant Fidelity is tasked with, among other responsibilities, running the day-to-day operations and administration of the Government Fund,

working with sub-advisers of the Government Fund, maintaining shareholder records, furnishing reports on fund operations, and monitoring other funds and making policy recommendations to the Trustees.

93.     Defendants have access to all material information necessary to identify that the Class Shareholders have investments that meet the requirements for the Premium Class yet are being charged the higher expenses of the Retail Class. Defendants have the experience, knowledge, and technical capability to implement auto-conversion—just as they do for other mutual funds— to remedy these overcharges.

94.     Despite all this, Defendants failed to take any action to ensure that Class Shareholders were properly classified within this structure, implemented and controlled by the Trustees themselves, so Class Shareholders could receive the lower expenses the Trustees negotiated for investors with the qualifying investment minimum in the Premium Class. By virtue of Defendants' experience and expertise in administering mutual funds, they were best situated to remedy this situation on a class-wide basis to protect and serve the best interests of Class Shareholders. Instead of taking reasonably available, commonplace steps to convert the Class Shareholders' shares into the available lower-expense shares of the Premium Class, Defendants did nothing.

95.     A reasonably prudent fiduciary in the Trustee and Officer Defendants' position, armed with their experience, knowledge, and authority, would recognize the overcharging of Class Shareholders and remedy the situation by implementing a process to convert the shares of eligible shareholders into the lower-expense, otherwise identical, Premium shares, or would otherwise take steps to ensure Class Shareholders received the lower expenses for their qualifying investments.

96.     Defendant Fidelity specifically also has the experience, knowledge, and responsibility over the operations of the Government Fund and other mutual funds to recognize the overcharging of Class Shareholders and recommend, implement, and execute a structure or process to convert eligible shareholders to the Premium Class.

97.     The Trustee Defendants' inaction is even more egregious in light of their own personal investment holdings in the Government Fund. At least 12 of the 14 Trustee Defendants have themselves beneficially owned shares of the Government Fund. Of those, over half of the 14 trustees have, in the past five fiscal years, had Government Fund holdings in a sufficient amount to make them eligible for the Premium Class, even under the higher $100,000 minimum investment for taxable accounts.

98.     It is unclear whether each Trustee's holdings were in the Retail Class or Premium Class—but no matter the case, their inaction in the face of their personal holdings reinforces their dereliction of their fiduciary duties to shareholders. Given that their holdings qualified them for the Premium Class, each Trustee Defendant either (1) acquired Premium Class shares, meaning they executed manual transactions to purchase those shares, or (2) did not acquire Premium Class shares, and instead held Retail Class shares and needlessly continued paying the higher expenses of that share class. If the former, that demonstrates their knowledge that similarly situated, eligible investors like Plaintiffs and the Class Shareholders are overpaying expenses when they remain in the Retail Class. If the latter, that demonstrates the Trustee Defendants are recklessly uninformed of their personal entitlement to lower fees, not to mention that of the Class Shareholders.

99.     Regardless of whether the Trustee and Officer Defendants were recklessly uninformed of the overcharges to the Class Shareholders, knew and inexplicably failed to act, or

knew but were motivated financially by personal ties to Fidelity not to act, their inaction was and is outside the bounds of reason and amounts to a breach of their duties.

### G.    As a Result of Defendants' Inaction, Class Shareholders Are Needlessly Overcharged Expenses.

100.    The Class Shareholders have been, and are currently being, needlessly overcharged expenses for their investment in the Government Fund. All Class Shareholders have held Retail Class shares during the class period in amounts (at least $10,000 for retirement accounts or $100,000 for taxable brokerage accounts) that qualify them to hold lower-expense Premium Class shares instead.

101.    In a typical year, where the expense ratio is 0.42% for the Retail Class and 0.32% for the Premium Class respectively, the amount of expenses overcharged to each Class Shareholder annually is the difference between these two ratios: 0.10%, or 10 basis points, of the Class Shareholder's investment in Retail Class shares. The overcharge in turn reduces the income Class Shareholders earn from their investments and the distribution received—for example, for the fiscal year ending April 30, 2024, Class Shareholders earned income and received a distribution of 5.05% of their investment, rather than the 5.15% that they would have received in the Premium Class.

102.    Each Class Shareholder suffered, and continues to suffer, the same type of harm resulting from Defendants' conduct in the form of expense overcharges that reduce their return on investment. The estimated harm to all Class Shareholders from past and ongoing overcharges is in the millions of dollars and will increase as the overcharges continue.

103.    For example, during the class period, Plaintiffs have maintained investment balances in the Government Fund over the qualifying $10,000 threshold for Premium Class shares, but held these amounts as Retail Class shares (SPAXX), in their Fidelity retirement accounts. Plaintiff Davis also had an investment balance in the Government Fund over the qualifying

$100,000 threshold for Premium Class shares, but held this amount as Retail Class shares, in his Fidelity taxable brokerage account. Thus, even though Plaintiffs qualified to hold their shares as Premium Class shares (FZCXX) and pay the lower associated expenses, they were each charged the higher expense ratios associated with Retail Class shares.

104.    Retail Class shareholders whose holdings were not substantial enough to qualify for Premium Class shares were not overcharged and have suffered no harm. The Government Fund and the Trust likewise have not been harmed by the overcharges, because operating expenses, including Fidelity's management fee, are passed through to shareholders, directly paid for by shareholders, and reduce only these shareholders' income from their Government Fund investments. Because the Class Shareholders specifically suffered the harm from these overcharges, they—and not any other shareholders, the Government Fund, or the Trust—will directly receive the benefit of any recovery.

**H.    Fidelity Profits from the Overcharges of Class Shareholders.**

105.    Defendants' inaction has benefited, and continues to benefit, one party in particular to the detriment of the Class Shareholders: Defendant Fidelity. Fidelity profits by having Plaintiffs and the Class Shareholders remain in the Retail Class where they are charged the higher expenses of that share class.

106.    Because Fidelity is contractually obligated to reimburse expenses to Premium Class shareholders to bring expenses down to that class's lower expense ratio cap, Fidelity directly profits from having the Class Shareholders continue to hold higher-expense Retail Class shares when they are eligible for lower-expense Premium Class shares.

107.    As discussed above, pursuant to its expense contracts with the Government Fund, Fidelity has agreed to cap the overall expense ratios for the Government Fund's shareholders at 0.42% for the Retail Class and 0.32% for the Premium Class.

108.     If total annual operating expenses for a share class exceed the cap, Fidelity must reimburse the difference to the shareholders of the class so that their expense ratio is lowered to be equal to the cap. For example, for the fiscal year ending April 30, 2024, actual operating expenses for the Premium Class amounted to 0.36% of the value of each shareholder's investment. To meet the 0.32% expense cap, Fidelity was required to reimburse Premium Class shareholders $3,781,410 to reduce their expenses. For that same year, actual expenses for the Retail Class amounted to 0.42% of the value of each shareholder's investment. Because actual expenses were equivalent to the Retail Class expense cap, no reimbursements were made to Retail Class shareholders.

109.     For the fiscal years ended April 30, 2024, 2023, and 2022, Fidelity made expense reimbursements to Premium Class shareholders of approximately $7.6 million. Had Plaintiffs' and the Class Shareholders' holdings been converted to Premium Class shares, Fidelity's contractually required reimbursements would have been millions of dollars higher, and its profits would have been millions of dollars lower. Fidelity instead unjustly retained these would-be reimbursements as profits, and continues to do so.

110.     Fidelity has directly and unjustly profited, and continues to profit, from Plaintiffs and the Class Shareholders being overcharged expenses through their Retail Class holdings, depriving them of the benefit of the lower-expenses of Premium Class shares for which they qualify.

## V.     CLASS ALLEGATIONS

111.     Plaintiffs bring this action individually and on behalf of a class under Rule 23 of the Federal Rules of Civil Procedure. The class consists of:

> All record and beneficial owners of Retail Class (SPAXX) shares, who (1) have held such shares at any time between three years prior to the filing date of this action through the

present and (2) whose Retail Class investment was $10,000 or greater (if held in a

retirement account) or $100,000 or greater (if held in a taxable brokerage account) at any

point during this period.

The class does not include Defendants, Defendant Fidelity's officers and directors, members of

Defendants' immediate families, and the heirs, successors, or assigns of any of the foregoing.

112.    The harm of overpayment of expenses is personal to each Government Fund

shareholder meeting the criteria discussed above (referred to as the "Class Shareholders").

113.    This action is properly maintainable as a class action.

114.    A class action is superior to other available methods of fair and efficient

adjudication of this controversy.

115.    The class is so numerous that joinder of all members is impracticable.  The number

of class members is believed to be in the tens, if not hundreds, of thousands, and they are likely

scattered across the United States.  Moreover, damages suffered by individual class members may

be small, making it overly expensive and burdensome for individual class members to pursue

redress on their own. The identities and addresses of class members can be readily ascertained

from business records maintained by Defendants.

116.    There are questions of law and fact which are common to all class members and

which predominate over any questions affecting only individuals, including, without limitation:

a.  Whether the Trustee and Officer Defendants' failure to prevent the Class

Shareholders from being charged the higher expenses of the Retail Class when

those shareholders were eligible for the lower-expense Premium Class constitutes

a breach of these defendants' fiduciary duty of care;

b.  Whether the Trustee and Officer Defendants' inaction amounts to gross negligence;

c.   Whether the Trustee and Officer Defendants were recklessly uninformed of or recklessly disregarded the overcharging of the Class Shareholders;

d.   Whether the Trustee Defendants' conduct breaches the implied covenant of good faith and fair dealing in the Trust Agreement;

e.   Fidelity's role in managing and operating the Government Fund;

f.   Whether Fidelity aided and abetted the Trustee and Officer Defendants' fiduciary duty breaches;

g.   Whether Fidelity was unjustly enriched at class members' expense;

h.   The proper remedy for these violations;

i.   The existence and extent of any injury to the class or Plaintiffs caused by any violations.

117.   Plaintiffs' claims and defenses are typical of the claims and defenses of other class members, and Plaintiffs have no interests antagonistic or adverse to the interests of other class members. Plaintiffs will fairly and adequately protect the interests of the class.

118.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

119.   Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

120.   Defendants have acted in a manner that affects Plaintiffs and all members of the class alike, thereby making appropriate any injunctive relief and/or corresponding declaratory relief with respect to the class as a whole.

121.   The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the

class, which would establish incompatible standards of conduct for Defendants. Likewise, adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**AGAINST THE TRUSTEE AND OFFICER DEFENDANTS**

122.    Plaintiffs reallege and incorporate the allegations of the paragraphs above.

123.    Plaintiffs assert this claim directly on behalf of themselves and the Class Shareholders.

124.    Under Delaware law, the trustees and officers of a statutory trust registered as an investment company under the ICA have the same fiduciary duties as the directors and officers of a private corporation.

125.    The Trust is a registered investment company under the ICA and the Trustee and Officer Defendants owe fiduciary duties of care to Plaintiffs and the Class Shareholders by virtue of their roles as trustees and officers of the Trust and the Government Fund thereunder.

126.    As fiduciaries to Plaintiffs and the Class Shareholders, the Trustee and Officer Defendants are required to act in the best interests of the shareholders. It is not in Plaintiffs' and the Class Shareholders' best interests to be charged the higher expenses of the Retail Class when they have had holdings in the Government Fund that qualified them for the lower-expense Premium Class. This result has no benefit to the Class Shareholders, the Government Fund, or the Trust.

127.    The Trustee and Officer Defendants breached their fiduciary duties of care because they failed to act in the best interests of Plaintiffs and the Class Shareholders by allowing them to continue paying higher expenses as Retail Class shareholders and taking no action to provide for

auto-conversion of their shares (or the functional equivalent) to the Government Fund's lower-expense, otherwise identical Premium Class. Their inaction was and is outside the bounds of reason because providing auto-conversion to a lower-expense, otherwise identical share class for qualifying shareholders is commonplace and purely beneficial and non-taxable for those shareholders.

128.    The Trustee and Officer Defendants were grossly negligent or recklessly uninformed of the effects of their inaction on Plaintiffs and the Class Shareholders. The Trustee and Officer Defendants failed to act as reasonable and prudent trustees and officers would under the circumstances as evidenced by, among other things, (1) their implementation of auto-conversion of qualifying investor holdings to lower-expense classes for shareholders of other Fidelity mutual funds that these defendants administer and (2) the auto-conversion conducted by comparable mutual funds from Fidelity's competitors. The Trustee and Officer Defendants are knowledgeable about, and experienced with, auto-conversion and have the technical and administrative capabilities to facilitate such conversion, but the Trustee and Officer Defendants failed to use this reasonably available mechanism to discharge their duties of care owed to Plaintiffs and the Class Shareholders.

129.    As a direct and proximate result of the Trustee and Officer Defendants' breaches, Plaintiffs and the Class Shareholders were harmed in the form of overpayment of expenses, sustaining damages that are continuing in nature, in an amount to be determined at trial.

130.    The Trustee and Officer Defendants are each jointly and severally liable for the harm to Plaintiffs and the Class Shareholders.

## COUNT II
## BREACH OF THE IMPLIED CONVENANT OF GOOD FAITH AND FAIR DEALING
## AGAINST THE TRUSTEE DEFENDANTS

131.    Plaintiffs reallege and incorporate the allegations of the paragraphs above.

132.    Plaintiffs reassert this claim directly on behalf of themselves and the Class Shareholders.

133.    The Trustee Defendants are bound by the Trust Agreement.

134.    Under the Trust Agreement, the Trustee Defendants hold title to the Government Fund assets in trust for the benefit of the fund's beneficial owners: the shareholders, including Plaintiffs and the Class Shareholders.

135.    The Trust Agreement provides that the Trustee Defendants are liable to shareholders for misconduct arising to a breach of their fiduciary duties to shareholders.

136.    The Trust Agreement authorizes the Trustee Defendants to create a multi-class structure, set expenses for each class of shareholders, and set the qualifications for being in a given class. The Trust Agreement does not have an express term requiring the Trustee Defendants to avoid operating the Government Fund in a manner where they or their delegees are collecting higher expenses from shareholders than required for those shareholders to make the identical investment in a fund, under the policies set by the Trustee Defendants.

137.    Such a term is so obvious that it need not be expressly stated, and is implicit in the Trust Agreement, especially where, as here, the Trustee Defendants are fiduciaries to the shareholders and must protect their best interests.

138.    The Trustee Defendants violated this implied covenant by failing to operate the Government Fund in a way that avoids Plaintiffs and the Class Shareholders being needlessly overcharged expenses.

139. As a direct and proximate result of the Trustee Defendants' breach, Plaintiffs and the Class Shareholders have been harmed in the form of overpayment of expenses, sustaining damages that are continuing in nature, in an amount to be determined at trial.

140. The Trustee Defendants are each jointly and severally liable for the harm to Plaintiffs and the Class Shareholders.

**COUNT III**
**AIDING AND ABETTING FIDUCIARY DUTY BREACHES**
**AGAINST DEFENDANT FIDELITY**

141. Plaintiffs reallege and incorporate the allegations of the paragraphs above.

142. Plaintiffs assert this claim directly on behalf of themselves and the Class Shareholders.

143. The Trustee and Officer Defendants owe fiduciary duties to Plaintiffs and the Class Shareholders under Delaware law.

144. The Trustee and Officer Defendants breached those duties for the reasons identified above.

145. Fidelity knowingly aided and abetted those breaches by the Trustee and Officer Defendants. As the investment manager and adviser to the Government Fund, Fidelity has access to all the necessary information showing that the Class Shareholders have holdings that meet or exceed the investment minimums for the Premium Class, yet that these shareholders are needlessly paying the higher expenses of the Retail Class. Fidelity provides substantial assistance to the Trustee and Officer Defendants in breaching their fiduciary duties through its management and operation of the Government Fund, including through its calculation and deduction of expenses from shareholder accounts. Fidelity is also responsible for advising the Trustee and Officer Defendants on fund policies and processes. It serves as the investment manager and advisor for

other funds, overseen by the exact same Trustee and Officer Defendants, that provide auto-conversion to shareholders based on investment minimum criteria. Fidelity knows that the Trustee and Officer Defendants fail to provide the same for the Class Shareholders in the Government Fund. Despite its knowledge and experience with mutual fund operations and policies and with auto-conversion, Fidelity has taken no action to remedy the situation.

146.    Because Fidelity is contractually obligated to reimburse expenses to Premium Class shareholders to bring expenses down to the expense ratio caps, Fidelity directly profits from having the Class Shareholders continue to hold Retail Class shares even though they are eligible for Premium Class shares. Fidelity has a financial motivation to aid and abet the Trustee and Officer Defendants' breaches of fiduciary duty through their allowing the Class Shareholders to remain in the Retail Class.

147.    As a direct and proximate result of the fiduciary breaches aided and abetted by Fidelity, Plaintiffs and the Class Shareholders have been harmed through their needless overpayment of expenses, sustaining damages that are continuing in nature, in an amount to be determined at trial.

148.    Because it aided and abetted the fiduciary duty breaches by the Trustee and Officer Defendants, Fidelity is jointly and severally liable alongside the Trustee and Officer Defendants for the harm arising out of those breaches.

**COUNT IV**
**UNJUST ENRICHMENT AGAINST DEFENDANT FIDELITY**

149.    Plaintiffs reallege and incorporate the allegations of the paragraphs above.

150.    Plaintiffs assert this claim directly on behalf of himself and the Class Shareholders.

151.    Defendant Fidelity was unjustly enriched because it obtained an improper benefit from Plaintiffs and the Class Shareholders' overpayment of expenses.

152.    Pursuant to its expense contracts with the Government Fund, Fidelity has contractually agreed to cap the overall expense ratios for the Government Fund's shareholders at 0.42% for the Retail Class and 0.32% for the Premium Class. If total operating expenses for a share class exceed the cap, Fidelity must reimburse the difference to the shareholders of the class, so that their expense ratio is lowered to be equal to the cap. During the class period, Fidelity has made expense reimbursements to Premium Class shareholders in the millions, but has made no expense reimbursements to Retail Class shareholders.

153.    Had Plaintiffs' and the Class Shareholders' holdings of Retail Class shares been properly converted to Premium Class shares, Fidelity's required reimbursements would have been millions of dollars higher, and its profits would have been millions of dollars lower. Fidelity instead unjustly retained these would-be reimbursements as profits, and continues to do so.

154.    Plaintiffs and the Class Shareholders suffered an impoverishment in the form of paying higher expenses than were necessary or warranted for the size of the investments they had made in the Government Fund.

155.    Fidelity enjoyed an improper enrichment by retaining these millions of dollars in unwarranted profits from not making expense reimbursements that they otherwise should have to Plaintiffs and the Class Shareholders, had their Retail Class shares been properly converted to Premium Class shares.

156.    Because Fidelity retained profits from overcharged expenses collected from Plaintiffs and the Class Shareholders, the impoverishment of Plaintiffs and the Class Shareholders is directly related to and led to the enrichment of Fidelity.

157.    Fidelity has no justification for having been compensated with additional profits from the expenses that Plaintiffs and the Class Shareholders needlessly overpaid.

158.    Equity and good conscience require restitution and/or disgorgement of the benefits Fidelity obtained at the expense of Plaintiffs and the Class Shareholders.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A. The Court determines that litigation may be maintained as a class action under Fed. R. Civ. P. 23, and that Plaintiffs be named representatives of the Class in which they are members.

B. Judgment in favor of Plaintiffs and the Class on all claims.

C. Damages, including punitive damages where applicable, in an amount to be proven at trial.

D. Restitution, disgorgement, or other equitable relief as this Court deems just and proper, in an amount to be proven at trial.

E. Injunctive relief prohibiting Defendants from continuing to engage in the conduct harming Class members alleged herein.

F. Pre-judgment and post-judgment interest.

G. Reasonable attorneys' fees and costs.

H. Any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs and the Class Shareholders hereby demand a trial by jury as to all issues so triable.

Dated: New York, New York
October 25, 2024

**SUSMAN GODFREY L.L.P.**

_____
Shawn J. Rabin
Lisa X. Jing
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
srabin@susmangodfrey.com
ljing@susmangodfrey.com

Halley W. Josephs
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
hjosephs@susmangodfrey.com