# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRYAN DAVIS & ETHAN SAM, directly on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY LLC, ABIGAIL P. JOHNSON, JENNIFER TOOLIN MCAULIFFE, CHRISTINE J. THOMPSON, ELIZABETH S. ACTON, LAURA M. BISHOP, ANN E. DUNWOODY, ROBERT GARTLAND, ROBERT W. HELM, MICHAEL E. KENNEALLY, MARK A. MURRAY, CAROL J. ZIERHOFFER, JOHN ENGLER, ARTHUR E. JOHNSON, MARIE L. KNOWLES, LAURA M. DEL PRATO, JOHN J. BURKE III, CHRISTOPHER M. GOUVEIA, and KENNETH B. ROBINS,<br><br>Defendants. | Case No. 24-cv-8142 (MMG)<br><br>**ORAL ARGUMENT REQUESTED** |

## INDEPENDENT TRUSTEE DEFENDANTS' MEMORANDUM
## IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Marc De Leeuw
Stephen Ehrenberg
Matthew T. Souza
Joe Hong
Maximilian Y.M. Frank
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendants Elizabeth S. Acton, Laura M. Bishop, Ann E. Dunwoody, John Engler, Robert Gartland, Robert W. Helm, Arthur E. Johnson, Michael E. Kenneally, Marie Knowles, Mark A. Murray, and Carol J. Zierhoffer*

January 28, 2025

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ALLEGATIONS OF THE COMPLAINT....................................................................................4

    A.    The Government Fund ....................................................................................4

    B.    The Parties ......................................................................................................6

    C.    Plaintiffs' Claims ...........................................................................................8

        1.    Count I:  Breach of Fiduciary Duty ...............................................9

        2.    Count II:  Breach of the Implied Covenant of Good Faith and
               Fair Dealing ..................................................................................10

STANDARD OF REVIEW ...................................................................................................11

ARGUMENT ......................................................................................................................11

I.     THE COURT SHOULD DISMISS COUNT I BECAUSE THE TRUSTEES DO
      NOT HAVE A FIDUCIARY DUTY TO REQUIRE AUTO-CONVERSION.................11

    A.    Plaintiffs' Asserted Fiduciary Duty Is Contrary to Delaware Law........................12

        1.    Plaintiffs Seek to Impose on Trustees an Obligation to a Subset of
               Shareholders That Is Not Supported by Delaware Law...........................12

        2.    Plaintiffs' Proposal Is Contrary to the Interests of
               Other Shareholders.........................................................................14

    B.    Plaintiffs' Asserted Fiduciary Duty Is Contrary to the Trust Instrument ..............16

II.    THE COURT SHOULD DISMISS COUNT II BECAUSE PLAINTIFFS'
      ASSERTED IMPLIED COVENANT WOULD IMPERMISSIBLY ALTER
      THE EXPRESS TERMS OF THE TRUST INSTRUMENT .............................................17

    A.    The Implied Covenant of Good Faith and Fair Dealing Can Only
        "Fill a Gap" in a Contract ...........................................................................17

    B.    The Implied Covenant Asserted by Plaintiffs Would Alter the
        Express Terms of the Trust Instrument.....................................................18

III.    THE COURT SHOULD DISMISS COUNTS I AND II BECAUSE PLAINTIFFS
        DO NOT PLAUSIBLY ALLEGE THAT THE TRUSTEES ACTED WITH
        WILLFUL MALFEASANCE, BAD FAITH, GROSS NEGLIGENCE, OR
        RECKLESS DISREGARD...............................................................................................19

        A.    The Trust Instrument Requires Plaintiffs to Allege Willful Malfeasance,
              Bad Faith, Gross Negligence, or Reckless Disregard ...........................................19

        B.    The Complaint Alleges No Facts Representing the Extreme Departure
              From the Ordinary Standard of Care Required for Gross Negligence...................21

IV.    THE COURT SHOULD DISMISS COUNTS I AND II BECAUSE THEY ARE
        PREEMPTED BY THE '40 ACT'S REGULATORY REGIME......................................24

CONCLUSION...................................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen* v. *El Paso Pipeline GP Co.*,
113 A.3d 167 (Del. Ch 2015), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) ...............2, 17, 19

*Allied Cap. Corp.* v. *GC-Sun Holdings*,
910 A.2d 1020 (Del. Ch. 2006)..................................................................................................19

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)....................................................................................................................11

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)........................................................................................................4, 6

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)................................................................................................................11, 15

*Benihana of Tokyo, Inc.* v. *Benihana, Inc.*,
891 A.2d 150 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006)........................................3, 23

*Blaustein* v. *Lord Baltimore Cap. Corp.*,
84 A.3d 954 (Del. 2014) ...........................................................................................................17

*Brehm* v. *Eisner*,
746 A.2d 244 (Del. 2000) .....................................................................................................21, 23

*Citadel Equity Fund Ltd.* v. *Aquila, Inc.*,
168 F. App'x 474 (2d Cir. 2006) .................................................................................................6

*Citadel Sec. Americas LLC* v. *Portofino Techs. AG*,
2024 WL 4635452 (S.D.N.Y. Oct. 31, 2024).........................................................................16

*City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) .....................................................................................................11

*Costabile* v. *N.Y.C. Health & Hosps. Corp.*,
951 F.3d 77 (2d Cir. 2020)........................................................................................................15

*Dixon* v. *von Blanckensee*,
994 F.3d 95 (2d Cir. 2021).........................................................................................................11

*Fisk Ventures, LLC* v. *Segal*,
2008 WL 1961156 (Del. Ch. May 7, 2008) ............................................................................17

**Page(s)**

*Geier* v. *Am. Honda Motor Co.*,
   529 U.S. 861 (2000)..................................................................................................4, 25, 26

*Gilbert* v. *El Paso Co.* (*Gilbert I*),
   1988 WL 124325 (Del. Ch. Nov. 21, 1988), *aff'd*, 575 A.2d 1131 (Del. 1990) .....2, 12, 13, 14

*Gilbert* v. *El Paso Co.* (*Gilbert II*),
   575 A.2d 1131 (Del. 1990) ..................................................................................12, 13

*Greenfield* v. *Miles*,
   211 A.3d 1087 (Del. 2019) ............................................................................3, 20, 21, 22

*Guttman* v. *Huang*,
   823 A.2d 492 (Del. Ch. 2003)..................................................................................21

*Hecksher* v. *Fairwinds Baptist Church, Inc.*,
   115 A.3d 1187 (Del. 2015) ...................................................................................20, 21

*Hum. Servs. Council of N.Y.* v. *City of New York*,
   2024 WL 4792004 (S.D.N.Y. Nov. 14, 2024)..............................................................24

*Klaassen* v. *Allegro Dev. Corp.*,
   2013 WL 5967028 (Del. Ch. Nov. 7, 2013) ...............................................................12, 13

*Kramer* v. *Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)........................................................................................6

*Kuroda* v. *SPJS Holdings, L.L.C.*,
   971 A.2d 872 (Del. Ch. 2009)....................................................................................18

*Lanier* v. *Bats Exch., Inc.*,
   838 F.3d 139 (2d Cir. 2016)......................................................................................24

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013).......................................................................................24

*In re McDonald's Corp. S'holder Derivative Litig.*,
   289 A.3d 343 (Del. Ch. 2023)..............................................................................20, 21, 24

*McMillan* v. *Intercargo Corp.*,
   768 A.2d 492 (Del. Ch. 2000)....................................................................................21

*Nemec* v. *Shrader*,
   991 A.2d 1120 (Del. 2010) ....................................................................................18, 19

*New Enter. Assocs. 14, L.P.* v. *Rich*,
   295 A.3d 520 (Del. Ch. 2023)....................................................................................16

**Page(s)**

*In re: Old Bpsush, Inc.*,
    2021 WL 4453595 (D. Del. Sept. 29, 2021)................................................................23

*Rothstein* v. *UBS AG*,
    708 F.3d 82 (2d Cir. 2013)................................................................................11

*Singh* v. *Deloitte LLP*,
    123 F.4th 88 (2d Cir. 2024) ..........................................................................3, 22

*Tigani* v. *Tigani*,
    2021 WL 1197576 (Del. Ch. Mar. 30, 2021), *aff'd*, 271 A.3d 741 (Del. 2022)...............12, 14

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013)................................................................................13

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).............................3, 20, 21, 23

*Winshall* v. *Viacom Int'l, Inc.*,
    55 A.3d 629 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013)...........................................3, 18

*Zimmerman* v. *Crothall*,
    2012 WL 707238 (Del. Ch. Mar. 5, 2012).................................................................20

**Statutes**

15 U.S.C. § 80a-2(c) ..............................................................................................25, 26

Del. Code Ann. tit. 12, § 3303 ...........................................................................2, 16, 17, 20

Del. Code Ann. tit. 12, § 3806 ................................................................................2, 12

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...............................................................................................11

Fed. R. Evid. 201 .......................................................................................................6

17 C.F.R. § 270.18f-3 ...............................................................................................25, 26

*Exemption for Open-End Management Investment Companies Issuing Multiple
    Classes of Shares*, 60 Fed. Reg. 11876 (Mar. 2, 1995)..................................................4, 25, 26

SEC, *Money Market Fund Statistics, Filings Through December 11, 2024*,
    https://www.sec.gov/files/investment/mmf-statistics-202411-.pdf.........................................10

Defendants Elizabeth S. Acton, Laura M. Bishop, Ann E. Dunwoody, John Engler, Robert Gartland, Robert W. Helm, Arthur E. Johnson, Michael E. Kenneally, Marie Knowles, Mark A. Murray, and Carol J. Zierhoffer (collectively, the "Independent Trustees") respectfully submit this memorandum in support of their motion to dismiss the complaint ("Complaint").

## PRELIMINARY STATEMENT

Plaintiffs are two individuals holding "retail" class shares of the Fidelity Government Money Market Fund (the "Government Fund" or "Fund"). Although Plaintiffs allegedly have sufficient holdings that qualify them to purchase shares in the Fund's "premium" class (which pays somewhat lower operating expenses), they did not purchase premium-class shares nor exchange their shares by redeeming their retail-class shares and using the proceeds to purchase premium-class shares. Instead, Plaintiffs allege in this action that the Independent Trustees have a fiduciary duty (Count I) and are under an implied covenant (Count II) to require the Fund to automatically convert retail- into premium-class shares whenever a shareholder's holdings exceed the premium class's investment minimum. But the Independent Trustees do not have the legal duty to override a shareholder's investment decision to invest in the retail class.

The Complaint is notable for what it does *not* allege. Plaintiffs do not contend that the Fund's prospectuses or marketing materials misled any shareholders. They could not, because those materials describe the Fund, each of the Fund's multiple share classes (which, in the case of the retail class, does not include any feature for auto-conversion of shares), and each class's expense ratio. Plaintiffs also do not assert that implementing auto-conversion would be in the best interests of the Fund's shareholders *as a whole* or that the Independent Trustees breached any fiduciary duty owed to *all* shareholders. They allege only that providing auto-conversion would benefit a *subset* of the Fund's shareholders—*i.e.*, the purported class of retail-class shareholders who are eligible to purchase premium shares but did not. In fact, the Complaint

acknowledges that auto-conversion would create additional costs for the Fund and thus may result in higher expenses for all shareholders. (Compl. ¶¶ 78, 104.) Nor do Plaintiffs argue that the Fund is unique in not offering auto-conversion. Filings with the Securities and Exchange Commission (the "SEC")—of which the Court may take judicial notice—show that many other mutual funds do not offer the type of auto-conversion sought by Plaintiffs.

What the Complaint *does* allege falls substantially short of what is required to state a claim under applicable Delaware law and the Fund's governing trust instrument. For at least five reasons, Plaintiffs' claims against the Independent Trustees are meritless.

***First***, Delaware law makes clear that trustees' "fiduciary duty runs to the [entity] and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups." *Gilbert* v. *El Paso Co.* (*Gilbert I*), 1988 WL 124325 at *9 (Del. Ch. Nov. 21, 1988), *aff'd*, 575 A.2d 1131 (Del. 1990). Contrary to Plaintiffs' assertion, the Independent Trustees have no obligation under Delaware law to take actions in response to the many divergent goals, interests, and circumstances of each of the many particular subsets of the shareholder base—such as the subset of retail-class shareholders that Plaintiffs seek to represent here. *See infra* Section I.A.

***Second***, Delaware law provides that a fund's governing instrument may "restrict" or "vary" a fiduciary's duties and standard of care. Del. Code Ann. tit. 12, § 3303; *see also id.* § 3806(c). Here, the Fund's trust instrument gives the Independent Trustees "sole discretion" to determine the relative "rights and privileges" of a class, including any right to auto-conversion. (Ex. 1 (incorporated by reference in Compl. ¶ 40 n.8) §§ 2.06, 4.01(o).) *See infra* Section I.B.

***Third***, no implied covenant of good faith and fair dealing applies if "the language of the contract expressly covers a particular issue." *Allen* v. *El Paso Pipeline GP Co.*, 113 A.3d 167,

183 (Del. Ch 2015), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).  Here, the express terms of the trust instrument gives the Independent Trustees discretion to allocate expenses "between or among two or more … classes" and fix "preferences, voting powers, rights and privileges of such … classes."  (Ex. 1 §§ 2.06, 4.01(p).)  To uphold Plaintiffs' proposed implied covenant would "give [P]laintiffs contractual protections that they failed to secure for themselves." *Winshall* v. *Viacom Int'l, Inc.*, 55 A.3d 629, 636-37 (Del. Ch. 2011) (internal quotation marks omitted), *aff'd*, 76 A.3d 808 (Del. 2013).  *See infra* Section II.

**Fourth**, the Complaint fails to plausibly allege gross negligence, which involves an "extreme departure from the ordinary standard of care," as required to state claims against trustees.  *Greenfield* v. *Miles*, 211 A.3d 1087, 1101 (Del. 2019).  Plaintiffs allege no facts suggesting that (i) auto-conversion is so ubiquitous that its absence from the retail class's structural design indicates that the Independent Trustees acted "without the bounds of reason," *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006), (ii) the few mutual funds with auto-conversion features cherry-picked by Plaintiffs are in fact "comparable" to the Government Fund, *Singh* v. *Deloitte LLP*, 123 F.4th 88, 93-96 (2d Cir. 2024), (iii) there is "a *wide* disparity" between the decision-making *process* that the Independent Trustees employed "and that which would have been rational," *Disney*, 907 A.2d at 750 (emphasis in original), or (iv) the lack of auto-conversion has any negative impact on the "whole body," rather than a subset, of the Fund's shareholders, *Benihana of Tokyo, Inc.* v. *Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).  *See infra* Section III.

**Fifth**, Plaintiffs' claims are preempted by the regulatory regime enacted pursuant to the Investment Company Act of 1940 (the "'40 Act").  In promulgating a rule permitting multi-class

funds, the SEC stated that the rule "permits, but does not require, different classes to have different exchange privileges and conversion rights." (*Exemption for Open-End Management Investment Companies Issuing Multiple Classes of Shares*, 60 Fed. Reg. 11876 (Mar. 2, 1995) ("Multiple-Classes Rule").)  The Supreme Court has held that, where state law would restrain the "range of choices" provided by federal regulation, it is preempted because it would stand "as an obstacle to the accomplishment and execution" of the regulation's objectives.  *Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 875, 881 (2000).  *See infra* Section IV.

## ALLEGATIONS OF THE COMPLAINT[1]

### A.    The Government Fund

The Government Fund is one of a "broad range of" money-market funds that offer "a low-risk, short-term savings alternative [to] provide easy access to [a customer's] cash." (Compl. ¶¶ 37, 63.)  The Fund invests primarily "in cash, U.S. Government securities, and/or repurchase agreements that are fully collateralized" (*i.e.*, collateralized by cash or government securities), with an objective to "[s]eek[] as high a level of current income as is consistent with preservation of capital and liquidity." (*Id.* ¶ 38.)

The Government Fund is structured as a "Series" of the Fidelity Hereford Street Trust (the "Trust"), a Delaware statutory trust and a registered investment company under the '40 Act.

---

[1]    The factual allegations in the Complaint are taken as true solely for purposes of this motion.  Reference is also made to additional materials (attached as exhibits to the Declaration of Marc De Leeuw ("Ex.")) that the Court may consider on this motion, which include "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

(*Id.* ¶ 40.)[2]  The Fund in turn consists of multiple "classes" of shares, each of which is offered through a separate prospectus and has a unique ticker and different structural design, such as the requisite minimum amount of investment and expense structure.   (Ex. 2 (June 29, 2024 prospectuses) (incorporated by reference in Compl. ¶ 44 n.9); Compl. ¶ 64.)

The "Retail Class" and "Premium Class" are two of the Fund's multiple share classes. (Compl. ¶ 65.)  Although they "share a common investment portfolio and investment objective," retail and premium shares are different in important ways.  (*Id.* ¶ 66.)  First, retail shares have no investment minimum, whereas premium shares require an investment minimum of $100,000 for a brokerage account and $10,000 for a retirement account.  (*Id.* ¶ 67.)  Second, the expense ratio (*i.e.*, expenses paid by shareholders as a percentage of the value of their investment) for the retail shares is currently capped at 0.42%, while the expense ratio for the premium shares is capped at 0.32%.  (*Id.* ¶¶ 61, 67.)

The Government Fund is governed by an amended trust instrument, dated May 15, 2002 (the "Trust Instrument"), which has been publicly filed with the SEC since 2002.  (Ex. 1.)  The Trust Instrument does not provide shareholders with any right to have their shares automatically converted from retail shares to premium shares.  On the contrary, it states that "[s]hareholders shall have no preemptive or other right to subscribe to any additional Shares or other securities issued by the Trust or the Trustees, whether of the same or other Series."  (*Id.* § 2.09.)  Similarly, the prospectus for the Retail Class describes in detail the conditions under which Retail Class shareholders may buy, sell, and exchange their shares.  (Ex. 2 at 52, 61-65.)  These descriptions do not in any way suggest that retail shares would automatically convert into premium shares.

---

[2]     For this reason, Plaintiffs allege (and Defendants agree) that Delaware law applies in this action.  (*Id.* ¶¶ 41, 124, 143.)

(*Compare id. with* Compl. ¶ 77 ("The prospectuses for [certain other funds] each describe … 'automatic conversions' of qualifying shareholders to the lower-expense class.").)

The absence of an auto-conversion feature is not unique to the Government Fund. Based on filings with the SEC, many other mutual funds and at least five of the other largest government money-market mutual funds do not provide auto-conversion based on the value of a shareholder's holdings.[3]

### B.    The Parties

Plaintiffs are two individuals holding Retail Class shares in the Government Fund. (Compl. ¶¶ 14, 15.) Plaintiff Bryan Davis alleges he had holdings in the Government Fund that exceeded the applicable investment minimum for the Premium Class "for at least several months," and Plaintiff Ethan Sam alleges his holding exceeded the minimum "for at least several years." (*Id.*)

Defendants Acton, Bishop, Dunwoody, Gartland, Helm, Kenneally, Murray, Zierhoffer, Engler, Arthur Johnson, and Knowles are current or former Independent Trustees of the Trust.

---

[3]    *See* Ex. 3 (prospectuses for SNVXX and SGUXX of Schwab Government Money Fund do not provide for auto-conversion based on the value of a shareholder's holdings); Ex. 4 (same for APCXX and APSXX of Cavanal Hill Government Securities Money Market Fund); Ex. 5 (PMTXX and PRYXX of Pioneer U.S. Government Money Market Fund); Ex. 6 (SALXX and GVVXX of State Street Institutional U.S. Government Money Market Fund); Ex. 7 (WFGXX and NWGXX of AllSpring Government Money Market Fund). Pursuant to Rule 201 of the Federal Rules of Evidence, the Independent Trustee Defendants respectfully request that the Court take judicial notice of these exhibits, which are "public disclosure documents required by law to be filed, and actually filed, with the SEC." *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'" under Fed. R. Evid. 201(b)(2)); *see also ATSI Commc'ns, Inc.*, 493 F.3d at 98 (to the same effect); *Citadel Equity Fund Ltd.* v. *Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006) (in a breach-of-contract case, the district court's "judicial notice of [an SEC] filing was properly within the court's discretion on a motion to dismiss").

(*Id.* ¶¶ 20-30.)  Defendants Abigail Johnson, McAuliffe, and Thompson are "interested" trustees (together with the Independent Trustees, the "Trustees") because of their association with Defendant Fidelity Management & Research Company LLC ("Fidelity").  (*Id.* ¶ 17-19.)  Under the Trust Instrument, the Trustees "have power to conduct the business of the Trust and carry on its operations" (Ex. 1 § 3.01), and may "delegate such authority as they consider desirable to any officers of the Trust and to any investment adviser" (*id.* § 4.01(j)).

As permitted under the Trust Instrument, Defendant Fidelity provides certain investment-management and advisory services for the Government Fund "pursuant to periodically renewed management contracts."  (Compl. ¶ 58.)  Fidelity's currently operative management contract, dated January 1, 2020 (the "Advisory Contract"), sets out Fidelity's responsibilities.  (*Id.* ¶¶ 58-60.)

In exchange for its services, Fidelity collects an annual management fee of 0.25% of the Government Fund's assets.  (*Id.* ¶ 68.)  The Fund's other operating expenses are "passed through to shareholders" and are "directly paid for by shareholders."  (*Id.* ¶ 104.)  Plaintiffs allege that "Fidelity has contractually agreed to cap the overall expense ratios at 0.42% for the Retail Class and 0.32% for the Premium Class," subject to certain exclusions, and "is contractually required to reimburse any expenses passed on to shareholders that exceed the expense ratio caps."  (*Id.* ¶ 69; *see also* Ex. 2, App'x (h)(1).)

The Advisory Contract, including the fees payable to Fidelity (Fidelity's "fee terms"), is subject to "the regular review, negotiation, and renewal" between Fidelity and the Trustees. (Compl. ¶¶ 60, 63; *see also id.* ¶ 92 ("The Trustee Defendants … negotiate the fund's management and expense contracts with Fidelity, including Fidelity's management fee, the expenses allocated to each share class, and the classes' expense ratio caps.").)  In evaluating and

negotiating the Advisory Contract, the Trustees "consider how Fidelity's competitors approach expenses for comparable funds, including the 'competitiveness relative to peer funds of the fund's management fee and the total expense ratio of a representative class (the retail class …)' and the 'broad range of investment choices available to shareholders from [Fidelity's] competitors.'"  (*Id.* ¶ 63.)  As relevant here, the prospectus for the Premium Class provides that Fidelity's reimbursement arrangement "will remain in effect through August 31, 2025," and Fidelity "may extend it in its discretion after that date."  (Ex. 2 at 20.)  The agreement obliging Fidelity to cap the expense ratio for the Retail Class at 0.42% will also "automatically terminate upon termination of the [operative Advisory Contract]."  (*Id.* App'x (h)(1).)

### C.    Plaintiffs' Claims

Plaintiffs assert four claims against the Trustees, Fidelity, and four Government Fund officers on behalf of a putative class that consists of Retail Class shareholders who "(1) have held such shares at any time between three years prior to the filing date of this action through the present and (2) whose Retail Class investment was $10,000 or greater (if held in a retirement account) or $100,000 or greater (if held in a taxable brokerage account) at any point during this period" (collectively, the "Putative Class Shareholders").  (Compl. ¶ 111.)  With respect to the Trustees, the Complaint pleads two causes of action:  (i) breach of fiduciary duty; and (ii) breach of an implied covenant of good faith and fair dealing.  (*Id.* ¶¶ 122-40.)[4]  Both claims are premised on the fact that Plaintiffs' Retail Class shares do not automatically convert into Premium Class shares when the shareholder meets the applicable Premium Class's investment minimum.  (*E.g.*, *id.* ¶¶ 3-6.)

---

[4]    Plaintiffs assert claims against Fidelity for aiding and abetting fiduciary-duty breaches and for unjust enrichment.  (*Id.* ¶¶ 141-58.)

### 1.    Count I:  Breach of Fiduciary Duty

In Count I, Plaintiffs allege that "[t]he Trustee and Officer Defendants owe fiduciary duties of care to Plaintiffs and the [Putative] Class Shareholders" (*id.* ¶ 125) and breached those duties by "taking no action" to effectuate a fund design that would automatically transfer qualifying Retail Class shareholders "to the Government Fund's lower expense, otherwise identical Premium Class" (*id.* ¶ 127).

Plaintiffs allege that "providing auto-conversion to a lower-expense, otherwise identical share class for qualifying shareholder" is "purely beneficial … for *those shareholders*," and as a result of the Trustees' inaction, "*Plaintiffs and the [Putative] Class Shareholders* were harmed in the form of overpayment of expenses."  (*Id.* ¶¶ 127, 129 (emphasis added).)  The Complaint pleads no facts regarding the impact of auto-conversion (or the lack thereof) on shareholders who are not in the putative class or on the shareholder body in general.  In describing how auto-conversion would operate, the Complaint acknowledges that a "periodic review-and-conversion process" would be necessary "to ensure qualifying shareholders in higher-expense share classes pay the lower expenses … once they become eligible" (*id.* ¶ 78); that this process would "come at a cost … to the [F]und's contracted investment manager, Defendant Fidelity, which collects the expenses paid by shareholders as its management fee" (*id.* ¶ 5); and that "operating expenses, including Fidelity's management fee, [would be] passed through to shareholders, directly paid for by shareholders, and reduce … shareholders' income from their Government Fund investments" (*id.* ¶ 104).

Plaintiffs allege that the Trustees "were grossly negligent or recklessly uninformed of the effects of their inaction on Plaintiffs and the [Putative] Class Shareholders."  (*Id.* ¶ 128.)  To support this contention, Plaintiffs assert in conclusory fashion that auto-conversion is "commonplace" among money-market funds.  (*Id.* ¶¶ 3, 72, 94, 127.)  But the Complaint does

not specify how many money-market funds provide auto-conversion or whether any such funds are comparable to the Government Fund.  Plaintiffs point to certain cherry-picked Vanguard, T. Rowe Price, and Fidelity funds out of the many thousands of mutual funds and hundreds of money-market funds available to investors.  (Compl. ¶¶ 82-89; *see* SEC, *Money Market Fund Statistics, Filings Through December 11, 2024*, https://www.sec.gov/files/investment/mmf-statistics-2024-11.pdf.)  Nothing in the Complaint suggests that even these cherry-picked funds are comparable.  For instance, Plaintiffs do not allege that these funds and the Government Fund share similar investment objectives, have comparable expense ratios, or are even offered to similar groups of potential investors.   In fact, the Complaint alleges that (i) the investment minimums for premium classes of the Fidelity Municipal Funds, Vanguard Federal Fund, and T. Rowe Price Government and U.S. Treasury Money Funds are *five- to five-hundred-times higher* than that for the Premium Class of the Government Fund (*id*. ¶¶ 77 n.30, 88, 89), and (ii) the premium classes of certain "Fidelity Disruptor Funds" have *holding-period* minimums rather than *investment-amount* minimums (*id.* ¶ 79).

## 2.    Count II:  Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count II, Plaintiffs allege that "implicit in the Trust Agreement" is a term "requiring the Trustee Defendants to avoid operating the Government Fund in a manner where they or their delegees are collecting higher expenses from shareholders than required for those shareholders to make the identical investment in a fund."  (*Id*. ¶¶ 136-37.)  Plaintiffs allege that "[t]he Trustee Defendants violated this implied covenant" by not requiring auto-conversion in the Government Fund's structural design, even if the shareholders never bargained for auto-conversion, and regardless of the impact of such a feature on the Fund's expenses that would be borne by the putative class and all shareholders.  (*Id*. ¶ 138.)

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead facts, which if "accepted as true … 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible if it provides enough facts to support "the reasonable inference that 'the defendant is liable for the misconduct alleged,' and presents 'more than a sheer possibility' of liability."  *City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*, 92 F.4th 381, 390 (2d Cir. 2024) (quoting *Iqbal*, 556 U.S. at 678).  "The factual allegations must, at the very least, 'raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555-56).  "Legal conclusions," "naked assertions," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Thus, a court deciding a motion to dismiss for failure to state a claim should disregard "'conclusory allegations or legal conclusions couched as factual allegations.'"  *Dixon* v. *von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (quoting *Rothstein* v. *UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

## ARGUMENT

### I.    THE COURT SHOULD DISMISS COUNT I BECAUSE THE TRUSTEES DO NOT HAVE A FIDUCIARY DUTY TO REQUIRE AUTO-CONVERSION.

Plaintiffs' fiduciary-duty claim (Count I) is premised on the contention that the Trustees owe the *Putative Class Shareholders* a fiduciary duty to force the Fund to auto-convert *their* shares into Premium Class shares.  (Compl. ¶ 127.)  This assertion is inconsistent with (i) Delaware law, which provides that the Trustees owe fiduciary duties to the Fund and *all* of its shareholders rather than *a subset* such as the Putative Class, and (ii) the Trust Instrument, which gives the Independent Trustees "sole discretion" to determine the rights of each share class.

### A.    Plaintiffs' Asserted Fiduciary Duty Is Contrary to Delaware Law.

### 1.    Plaintiffs Seek to Impose on Trustees an Obligation to a Subset of Shareholders That Is Not Supported by Delaware Law.

Delaware caselaw makes clear that "the directors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups." *Gilbert I*, 1988 WL 124325, at *9.[5] This is true even where some shareholders have "interests opposed to those of the class plaintiffs" because "[a]ny duty owed by [the corporation]'s directors to the plaintiffs had to be considered in light of their duty to the corporation and all its shareholders." *Gilbert* v. *El Paso Co. (Gilbert II)*, 575 A.2d 1131, 1148 (Del. 1990); *see also Klaassen* v. *Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) ("[C]orporate directors do not owe fiduciary duties to individual stockholders; they owe fiduciary duties to the entity and to the stockholders as a whole.").

Delaware caselaw in the context of common law trusts is consistent with this approach. Courts have held that although a trustee owes "a duty to act impartially in his [or her] treatment of the Trusts' varying beneficiaries," this duty "does not require an equal balancing of diverse interests but a balancing of those interests in a manner that shows due regard for—*i.e.*, is consistent with—the beneficial interests and the terms and purposes of the trust." *Tigani* v. *Tigani*, 2021 WL 1197576, at *15 (Del. Ch. Mar. 30, 2021), *aff'd*, 271 A.3d 741 (Del. 2022).

Here, the Complaint nowhere alleges that implementing auto-conversion of eligible Retail Class shareholders would benefit the Fund and shareholders *generally*, or that the

---

[5]    Title 12, Section 3806 of the Delaware Code provides:  "Except to the extent otherwise provided in the governing instrument of a statutory trust, trustees of a statutory trust that is registered as an investment company … shall have the same fiduciary duties as directors of private corporations for profit organized under the general corporation law of the State."  Del. Code Ann. tit. 12, § 3806(l).

Trustees' alleged inaction is in any way inconsistent with the best interests of the Trust and the shareholders *as a whole*.  (*Cf.* Compl. ¶¶ 5, 127 (alleging only that auto-conversion would benefit "eligible" or "qualifying" shareholders); ¶ 104 ("Because the Class Shareholders specifically suffered the harm from these overcharges, they—and not any other shareholders, the Government Fund, or the Trust—will directly receive the benefit of any recovery.").)

The Complaint instead alleges that implementing auto-conversion would benefit a *subset* of shareholders—those who (i) have invested in the Retail Class and (ii) held at any time (even if for only a day) sufficient shares to qualify them for the Premium Class.  (Compl. ¶ 111 (definition of the putative class), ¶ 125 ("[T]he Trustee and Officer Defendants owe fiduciary duties of care to *Plaintiffs and the Class Shareholders*."), ¶ 127 ("The Trustee and Officer Defendants breached their fiduciary duties of care because they failed to act in the best interests of *Plaintiffs and the Class Shareholders* by … taking no action to provide for auto-conversion of their shares" to the Premium Class), ¶ 128 ("The Trustee and Officer Defendants were grossly negligent or recklessly uninformed of the effects of their inaction on *Plaintiffs and the Class Shareholders*.") (emphases added).)

Plaintiffs' theory has no basis in Delaware law.  As discussed above, "[t]he duty to act for the ultimate benefit of stockholders does not require that directors fulfill the wishes of a particular subset of the stockholder base." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 38 (Del. Ch. 2013).  Instead, Delaware law provides that the Trustees' duty must be considered "in light of their duty to the [Trust] and *all* its shareholders." *Gilbert II*, 575 A.2d at 1148 (emphasis added); *see also Gilbert I*, 1988 WL 124325, at *9; *Klaassen*, 2013 WL 5967028, at *11.

This is for good reason.  Plaintiffs' interpretation of fiduciary duty could extend to any number of categories of shareholders, who have multiple different investment goals, holding

periods, tax situations, and other personal circumstances that could be improved by specific hypothetical elements of fund design.  But Delaware law does not "require an equal balancing of [these] diverse interests," and thus Trustees fulfill their fiduciary duties by overseeing the management of the Fund "in a manner that shows due regard for—*i.e.*, is consistent with—the beneficial interests and the terms and purposes" of the Fund and the best interests of the shareholders as a whole.  *See Tigani*, 2021 WL 1197576, at *15.  Because Plaintiffs' theory is premised entirely on a supposed duty owed to a subset of shareholders, as opposed to "the entire body of shareholders generally," *Gilbert I*, 1988 WL 124325, at *9, the Complaint fails to state a fiduciary-duty claim as a matter of law.

### 2. Plaintiffs' Proposal Is Contrary to the Interests of Other Shareholders.

The Complaint not only fails to allege that adopting auto-conversion would be in the best interests of shareholders generally, but in fact acknowledges that shareholders who are *not* in Plaintiffs' putative class—*i.e.*, shareholders in the Premium Class and shareholders in the Retail Class who have never qualified for the Premium Class—have a competing interest in *not* instituting the auto-conversion Plaintiffs propose.

The Complaint acknowledges that to implement auto-conversion, Defendants would need to cause the Fund "to implement and maintain a periodic review-and-conversion process to ensure qualifying shareholders in higher-expense share classes pay the lower expenses associated with another share class in the same fund once they become eligible."  (Compl. ¶ 78; *see also id.* ¶ 84 (alleging that "Vanguard funds" that offer auto-conversion also "periodically review a shareholder's holdings to determine eligibility for the lower-expense … class.").)  Plaintiffs admit that this periodic review-and-conversion process would come at a cost "to the fund's contracted investment manager, Defendant Fidelity, which collects the expenses paid by

shareholders as its management fee." (*Id.* ¶ 5.) Later in the Complaint, Plaintiffs recognize that "operating expenses, including Fidelity's management fee, are passed through to shareholders, directly paid for by shareholders, and reduce only these shareholders' income from their Government Fund investments." (*Id.* ¶ 104.)[6]

Plaintiffs thus acknowledge the obvious: the auto-conversion they propose (which requires a "periodic review-and-conversion process") would come at a cost that would be "passed through" to shareholders, including shareholders not in Plaintiffs' putative class. The additional costs of auto-conversion could exceed any reduced expenses enjoyed by Plaintiffs' putative class, and thus could lead to higher overall expenses for shareholders as a whole. The Complaint simply alleges no facts to suggest that the additional cost of auto-conversion would be *less* than the reduced expenses. As the Supreme Court has said, "[i]t is not proper" on a motion to dismiss "to assume that the plaintiff can prove facts that it has not alleged." *Twombly*, 550 U.S. at 563 n.8; *see also Costabile* v. *N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020) (even on a motion to dismiss, a court "cannot invent factual allegations that [the plaintiff]

---

[6]   It is of no moment that "Fidelity has contractually agreed to cap the overall expense ratios" and "reimburse the difference to the shareholders of the class" if the "total operating expenses for a share class exceed the cap." (Compl. ¶ 152.) The Complaint recognizes that the Fund's "management and expense contracts with Fidelity, including Fidelity's management fee, the expenses allocated to each share class, and the classes' expense ratio caps" are subject to "the regular review, negotiation, and renewal" between Fidelity and the Trustees. (*Id.* ¶¶ 60, 63, 92.) Nothing in the Complaint suggests that Fidelity would not or could not re-negotiate its expense-ratio caps and reimbursement arrangements to account for auto-conversion's additional costs. Indeed, the Premium Class prospectus states that the reimbursement arrangement will expire on "August 31, 2025," and Fidelity may extend the arrangement "*in its discretion* after that date." (Ex. 2 at 20 (emphasis added).) The expense-ratio cap for the Retail Class will also "automatically terminate upon termination of the [operative Advisory Contract]." (*Id.* App'x (h)(1).) Therefore, if the Trustees were to force Fidelity to implement auto-conversion, Fidelity could seek to increase the current expense ratio caps and/or re-negotiate the reimbursement arrangements to pass through the increased expenses to shareholders. (*See* Compl. ¶¶ 5, 60, 78, 104.)

has not pled"); *Citadel Sec. Americas LLC* v. *Portofino Techs. AG*, 2024 WL 4635452, at \*3-\*4 (S.D.N.Y. Oct. 31, 2024) (a court cannot "draw argumentative inferences" favorable to a plaintiff where there is "no basis" in the complaint).[7]

### B.    Plaintiffs' Asserted Fiduciary Duty Is Contrary to the Trust Instrument.

Plaintiffs' assertion that the Trustees owe the Putative Class Shareholders a duty to require the Fund to provide auto-conversion also contradicts the express terms of the Trust Instrument.  The Delaware Code provides that "the terms of a governing instrument may expand, restrict, eliminate, or otherwise vary any laws of general application to fiduciaries," including "a fiduciary's powers, duties, [and] standard of care."  Del. Code Ann. tit. 12, § 3303(a)(5); *see also New Enter. Assocs. 14, L.P.* v. *Rich*, 295 A.3d 520, 545 (Del. Ch. 2023) ("Delaware trust law currently authorizes a trust agreement to modify nearly every aspect of a trustee's duties.").

Consistent with Delaware law, the Trust Instrument gives the Trustees discretion over a wide range of matters, including:

1. "The Trustees shall have full power and authority, in their ***sole discretion*** … to fix such preferences, voting powers, ***rights and privileges*** of such Series or classes thereof as the Trustees may from time to time determine."  § 2.06 (emphasis added).

2. "The Trustees shall have power and authority … [t]o establish separate and distinct Series with separately defined investment objectives and policies … and ***to establish classes of such Series having relative rights, powers and duties as they may provide***."  § 4.01(o) (emphasis added).

The Delaware Supreme Court has held that, where, as here, an agreement gives a party "discretion," there is no "affirmative duty on [that] party to consider or negotiate" with respect to

---

[7]    Plaintiffs' theory suggests that the Fund's "periodic review-and-conversion" process would also involve converting Premium Class shareholders to Retail Class, which would result in those shareholders paying *greater* expenses.  This too demonstrates that Plaintiffs' theory is based on a purported fiduciary duty to benefit a subset of shareholders even if it would harm other shareholders.

that matter.  *Blaustein* v. *Lord Baltimore Cap. Corp.*, 84 A.3d 954, 958 (Del. 2014) (dismissing shareholder's fiduciary-duty claim because the shareholders' agreement gave the company and the stockholder "discretion as to whether to engage in a transaction").

Here, nothing in the Trust Instrument gives shareholders a right to automatically convert their Retail Class shares to Premium Class shares.  (*Cf.* Ex. 1 § 2.09.)  Instead, the decision of whether to grant shareholders a "right" or "privilege" to auto-conversion is within the Trustees' "sole discretion."  (*Id.* §§ 2.06, 4.01(o).)  Plaintiffs' claim that the Trustees have a fiduciary duty to provide auto-conversion for the Putative Class Shareholders is contrary to the Trust Instrument's grant of discretion, which "may restrict, eliminate, or otherwise vary … a fiduciary's powers, duties, [and] standard of care."  Del. Code Ann. tit. 12, § 3303(a)(5); *see Blaustein*, 84 A.3d at 958.

## II.     THE COURT SHOULD DISMISS COUNT II BECAUSE PLAINTIFFS' ASSERTED IMPLIED COVENANT WOULD IMPERMISSIBLY ALTER THE EXPRESS TERMS OF THE TRUST INSTRUMENT.

### A.     The Implied Covenant of Good Faith and Fair Dealing Can Only "Fill a Gap" in a Contract.

"[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."  *Fisk Ventures, LLC* v. *Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) (emphases in original).  "When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."  *Allen*, 113 A.3d at 183.  "During this phase, the court decides whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."  *Id*.

In other words, the implied covenant cannot be used to "infer language that contradicts a clear exercise of an express contractual rights," *Nemec* v. *Shrader*, 991 A.2d 1120, 1127 (Del. 2010), or "give plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table,'" *Winshall*, 55 A.3d at 636-37 (Del. Ch. 2011). For these reasons, "the implied covenant is only rarely invoked successfully." *Kuroda* v. *SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

### B.  The Implied Covenant Asserted by Plaintiffs Would Alter the Express Terms of the Trust Instrument.

The Complaint alleges that the Trustees violated the "implied covenant" to affirmatively "avoid operating the Government Fund in a manner where they or their delegees are collecting higher expenses from shareholders than required for those shareholders to make the identical investment in a fund, under the policies set by the Trustee Defendants." (Compl. ¶ 136.)[8] This "implied covenant" would alter the express terms of the Trust Instrument in two ways.

*First*, the implied covenant asserted by Plaintiffs contradicts the "rights and privileges" provision of the Trust Instrument. Section 2.06 of the Trust Agreement provides: "The Trustees shall have full power and authority, in their *sole discretion* … to fix such preferences, voting powers, *rights and privileges of such series or classes* thereof as the Trustees may from time to time determine." (Ex. 1 § 2.06.) Plaintiffs assert that Retail Class shareholders have an

---

[8]     The Complaint nowhere explains what constitutes an "identical investment in a fund." To the extent that Plaintiffs argue that investments in the Fund with the same monetary value are "identical" regardless of their respective classes, Plaintiffs ignore the structure of the Fund (*see* Ex. 1 § 2.01 ("The beneficial interest in the Trust shall be divided into such transferable Shares of one or more separate and distinct Series or classes of a Series as the Trustees shall from time to time create and establish.")), and the fact that different classes of shares are marketed through separate prospectuses as different securities (*see* Ex. 2 at 49 ("In this [Retail Class] prospectus, the term 'shares' (as it relates to a multiple class fund) means the class of shares offered through this prospectus.")).

"implied" right to auto-conversion and an "implied" privilege to enjoy the lower expense ratio as shareholders of another class. But "the language of the [Section 2.06] expressly covers" Plaintiffs' claim by reserving the determination of these rights and privileges to the Trustees' sole discretion, "in which case the implied covenant will not apply." *See Allen*, 113 A.3d at 183. To hold otherwise would impermissibly "award [Plaintiffs] new contract rights." *Allied Cap. Corp.* v. *GC-Sun Holdings*, 910 A.2d 1020, 1024 (Del. Ch. 2006).

*Second*, the implied covenant asserted by Plaintiffs directly contradicts the "expenses" provision of the Trust Instrument. Section 4.01(p) of the Trust Instrument states that "the Trustees shall have the power and authority … to apportion [expenses] between or among two or more Series or classes," as long as expenses incurred by a particular Series or class "shall be payable solely out of the assets belonging to that Series." (Ex. 1 § 4.01(p).) It simply does not require the Trustees to ensure that shareholders making identical amounts of investment pay identical expenses, even if they hold different classes of shares, as Plaintiffs allege (Compl. ¶ 136). That decision is committed to the Trustees' "power and authority." (Ex. 1 § 4.01(p).)

"Rather than filling a gap, [Plaintiffs' proposed] application of the covenant would alter the terms of the [Trust] Agreement. The implied covenant cannot do that." *See Allen*, 113 A.3d at 191; *Nemec*, 991 A.2d at 1125-26 ("One generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement.").

## III. THE COURT SHOULD DISMISS COUNTS I AND II BECAUSE PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT THE TRUSTEES ACTED WITH WILLFUL MALFEASANCE, BAD FAITH, GROSS NEGLIGENCE, OR RECKLESS DISREGARD.

### A. The Trust Instrument Requires Plaintiffs to Allege Willful Malfeasance, Bad Faith, Gross Negligence, or Reckless Disregard.

As noted above, a trust instrument under Delaware law may "restrict, eliminate, or otherwise vary any laws of general application to fiduciaries," including "a fiduciary's powers,

duties, [and] standard of care." Del. Code Ann. tit. 12, § 3303(a)(5).  Here, the Trust Instrument provides that "a Trustee … shall [not] be liable for *any act or omission or any conduct whatsoever* in his capacity as Trustee  … of the Trust [unless] by reason of *willful misfeasance, bad faith, gross negligence or reckless disregard of the duties* involved in the conduct of the office of Trustee or Officer hereunder."  (Ex. 1  § 10.01 (emphases added)); *see also Disney*, 907 A.2d at 750 ("duty of care violations are actionable only if the [fiduciary] acted with gross negligence").

Plaintiffs do not plead that anyone acted with willful malfeasance or bad faith.  Instead, they allege that the Trustees were "grossly negligent or recklessly uninformed of the effects of their inaction on Plaintiffs and the Class Shareholders."  (Compl. ¶¶ 127-128.)  To support this conclusory assertion, Plaintiffs were required to plead facts plausibly satisfying these high standards.

"For purposes of Delaware entity law, a showing of gross negligence requires conduct akin to recklessness." *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 371-72 (Del. Ch. 2023); *see also Zimmerman* v. *Crothall*, 2012 WL 707238, at *7 & n.34 (Del. Ch. Mar. 5, 2012) (same).  Therefore, "gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are without the bounds of reason." *Disney*, 907 A.2d at 750.  It is an "extreme departure from the ordinary standard of care that signifies more than ordinary inadvertence or inattention."  *Hecksher* v. *Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1199 (Del. 2015) (citations omitted); *see also Greenfield*, 211 A.3d at 1101.  "By using this standard, Delaware entity law protects fiduciaries by requiring a greater showing for liability than what is required in other areas of civil law, as

well as an even greater showing than what is required to obtain a conviction for criminal negligence." *McDonald's*, 289 A.3d at 372 n.17.

"Second-guessing about whether a board's strategy was 'reasonable' or 'appropriate' … does little to assist a plaintiff in meeting its obligation to set forth facts from which one could infer that the defendants' lack of care was so egregious as to meet Delaware's onerous gross negligence standard." *McMillan* v. *Intercargo Corp.*, 768 A.2d 492, 505 n.56 (Del. Ch. 2000). Instead, "on a motion to dismiss, in order for a plaintiff to successfully plead that the directors acted with gross negligence (as opposed to regular negligence), the plaintiff should articulate 'facts that suggest a *wide* disparity between the process the directors used and that which would have been rational.'" *Disney*, 907 A.2d at 750 n.429 (emphasis in original) (quoting *Guttman* v. *Huang*, 823 A.2d 492, 507 n.39 (Del. Ch. 2003)); *see also Brehm* v. *Eisner*, 746 A.2d 244, 264 (Del. 2000) ("Due care in the decision-making context is *process* due care only." (emphasis in original)).

### B.    The Complaint Alleges No Facts Representing the Extreme Departure From the Ordinary Standard of Care Required for Gross Negligence.

Plaintiffs do not come close to pleading *facts* plausibly alleging that the Trustees acted so far "outside of the bounds of reason" that their conduct constituted "an extreme departure from the ordinary standard of care." *Hecksher*, 115 A.3d at 1199.

*First*, Plaintiffs point to certain Vanguard, T. Rowe Price, and Fidelity mutual funds that implemented an auto-conversion design.  But aside from these cherry-picked examples, out of the many thousands of mutual funds and hundreds of money-market funds available to investors, Plaintiffs do not plead any facts suggesting that auto-conversion is "commonplace" (*cf.* Compl. ¶¶ 3, 72, 94, 127), let alone that it is so ubiquitous in the mutual-fund industry that its absence in the Government Fund indicates an "extreme departure from the ordinary standard of care" on the

part of the Trustees, *Greenfield*, 211 A.3d at 1101.  Nor could they.  SEC filings indicate that at least five of the other largest government money-market mutual funds do not offer auto-conversion based on the value of a shareholder's holdings.  *See supra* n.3.  This alone refutes any assertion that the Trustees acted with "extreme departure from the ordinary standard of care."  *Greenfield*, 211 A.3d at 1101.

*Second*, failing to plausibly allege that auto-conversion is a common practice, the Complaint also pleads no facts to suggest that the Vanguard, T. Rowe Price, and Fidelity funds that Plaintiffs cherry-picked are comparable to the Government Fund.  For example, the Complaint labels the Vanguard and T. Rowe Price funds as "competitor funds," but fails to allege that these funds share similar investment objectives, provide similar services, have comparable expense ratios, or are offered to a similar demographic of potential investors compared to the Government Fund.  (Compl. ¶ 82.)  Similarly, the Complaint does not allege any facts regarding any similarities between the Fidelity Municipal Funds and the Government Fund, aside from the fact that the Fidelity Municipal Funds also have multiple share classes and that some Trustees also serve on the board of the Fidelity Municipal Funds.  (*Id.* ¶ 75, 77.)  Indeed, the Complaint itself acknowledges that these funds are distinguishable from the Government Fund.  For instance, the investment minimums for the lower expense classes of the Vanguard, T. Rowe Price, and Fidelity funds are *five- to five-hundred-times higher* than that for the Premium Class.  (Compl. ¶¶ 77 n.30, 88, 89.)  And certain Fidelity funds that Plaintiffs identified as comparators have *holding-period* minimums rather than *investment-amount* minimums like the Government Fund.  (*Id.* ¶ 79.)

Without plausibly pleading that the comparison is "apples to apples," Plaintiffs cannot rely on the differences from the Vanguard, T. Rowe Price, and other Fidelity funds they cite to

support a gross-negligence claim. *See Singh*, 123 F.4th at 91-94 (Second Circuit holding that a court cannot plausibly infer imprudence from allegation that fees plaintiffs paid were excessive compared to those of "comparator" plans, where the complaint fails to allege that such plans are, in fact, comparable to defendants' plan).

*Third*, gross negligence is a "process" inquiry, *Brehm*, 746 A.2d at 264, but the Complaint's sole process-related allegation is that the Trustees were "uninformed of the overcharges to the Class Shareholders." (Compl. ¶¶ 98, 99.) This conclusory allegation does not suggest "a wide disparity between the *process* the [Trustees] used and that which would have been rational." *Disney*, 907 A.2d at 750 n.429 (emphasis added). If anything, the Complaint acknowledges that, in reviewing and negotiating the "Advisory Contracts and … fee terms" with Fidelity, "the Trustees consider how Fidelity's competitors approach expenses for comparable funds, including the 'competitiveness relative to peer funds of the fund's management fee and the total expense ratio of a representative class (the retail class …)' and the 'broad range of investment choices available to shareholders from [Fidelity's] competitors'" (*id*. ¶ 63), and further makes clear that the Trustees possess "the knowledge, capability, and infrastructure" to facilitate auto-conversion from higher-expense to lower-expense share classes (*id*. ¶ 78). Without more, the Complaint fails to allege any process deficiencies that were "outside the bounds of reason" constituting an extreme departure from process due care. *Cf. In re: Old Bpsush, Inc.*, 2021 WL 4453595, at *8 (D. Del. Sept. 29, 2021) (affirming the bankruptcy court's dismissal of plaintiff's Delaware-law gross-negligence claim against former officers even when plaintiff alleged what the officers did "[wa]s not how prudent officers should handle an audit").

*Fourth*, Delaware law defines gross negligence as "reckless indifference to or a deliberate disregard of *the whole body of stockholders*." *Benihana*, 891 A.2d at 192; *Disney*, 907 A.2d

at 750 (same).  As described *supra* (at pp. 12 to 14), the Complaint only contains allegations concerning the impact of their proposed action on a *subset* of shareholders—Plaintiffs and the Putative Class Shareholders.  (*Cf.* Compl. ¶¶ 126-28 (discussing the Trustees' duties and conduct with respect to "Plaintiffs and the Class Shareholders").)

In contrast, the Complaint pleads no facts as to what effect auto-conversion (or the lack thereof) may have on "the whole body of stockholders," including shareholders other than the Putative Class Shareholders.  *McDonald's*, 289 A.3d at 372 n.17; *cf.* Compl. ¶ 104 ("Because the Class Shareholders specifically suffered the harm from these overcharges, they—and *not any other shareholders, the Government Fund, or the Trust*—will directly receive the benefit of any recovery." (emphasis added).)  And as discussed above (*supra* Section I.A.2), the Complaint itself acknowledges that forcing the Fund to auto-convert some shares would increase the "operating expenses … passed through to shareholders" (Compl. ¶ 104) and would therefore harm shareholders generally.  Thus, Plaintiffs fail to plausibly allege gross negligence under settled Delaware law.

## IV.  THE COURT SHOULD DISMISS COUNTS I AND II BECAUSE THEY ARE PREEMPTED BY THE '40 ACT'S REGULATORY REGIME.

Under the doctrine of "conflict preemption," state law conflicts with federal law if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of that law.  *Hum. Servs. Council of N.Y.* v. *City of New York*, 2024 WL 4792004, at *22 (S.D.N.Y. Nov. 14, 2024) (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 96-97 (2d Cir. 2013).  Conflict preemption arises when a state law conflicts with a "regulation promulgated by a federal agency acting within the scope of its congressionally delegated authority."  *Lanier* v. *Bats Exch., Inc.*, 838 F.3d 139, 151 (2d Cir. 2016).  Where the "comments" accompanying a federal regulation "make clear that the standard deliberately

provided [the regulated entity] with a range of choices," state law restricting that range of choices "present[s] an obstacle to the variety and mix of [options] that the federal regulation sought" and therefore "is preempted." *Geier*, 529 U.S. at 875, 881.

In *Geier*, plaintiffs brought a state-law tort action "claim[ing] that manufacturers had a duty" to "install airbags" in cars they produced. *Id.* at 881. Defendants contended that this claim conflicted with a Department of Transportation ("DOT") rule that "required auto manufacturers to equip some but not all of their … vehicles with passive restraints." *Id.* at 864-65. The Supreme Court noted that the DOT's "comments, which accompanied the [rule], make clear that the standard deliberately provided the manufacturer with a range of choices among different passive restraint devices," such as "airbags" and "automatic seatbelts." *Id.* at 874-75. Relying on "the language" of the rule and DOT's "contemporaneous … explanation," the Supreme Court held that plaintiffs' "no airbag" lawsuit was preempted because the "rule of state tort law" asserted by plaintiffs would present an obstacle to the accomplishment of the regulation's objectives. *Id.* at 881, 883, 886.

Here, the Trust is a registered investment company that is subject to the '40 Act. (Compl. ¶ 124.) Pursuant to the '40 Act, the SEC adopted Rule 18f-3, which "permit[s] funds to issue multiple classes of shares." (Multiple-Classes Rule at 11876.) With respect to auto-conversion, Rule 18f-3(f)(2) provides that a company is "not prohibit[ed]" from auto-converting shares from one share class to another, subject to certain requirements. 17 C.F.R. § 270.18f-3(f)(2). And in promulgating Rule 18f-3(f)(2), the SEC explained that the rule "*permits, but does not require, different classes to have different exchange privileges and conversion rights.*" (Multiple-Classes Rule at 11878 (emphasis added).) The SEC also made clear that its rule was designed to "decrease the amount of time and expense involved in creating these structures" and "reduce the

Commission's burden of reviewing the applications." (*Id.* at 11876); *see* 15 U.S.C. § 80a-2(c) (providing that, when "engaged in rulemaking," the SEC will consider "whether the action will promote efficiency, competition, and capital formation").

The SEC's regulation and accompanying comments deliberately provided the Trustees "with a range of choices" regarding conversion of shares in a multi-class fund—"permit[ting], but … not requir[ing] … conversion rights" (*id*. at 11878)—because that flexibility would decrease the time and expense in creating such funds and thus promote capital formation. (*Id.* at 11876); 15 U.S.C. § 80a-2(c). But Plaintiffs' claims would *require* that the Trustees "provide for auto-conversion." (Compl. ¶¶ 127, 136.) Thus, as in *Geier*, Plaintiffs' claims are preempted because they would present "an obstacle to the variety and mix of [options] that the federal regulation sought." 529 U.S. at 881.[9]

## CONCLUSION

The Court should dismiss with prejudice Counts I and II of the Complaint against the Independent Trustees.

---

[9]    Plaintiffs suggest, as an alternative to auto-conversion, that the Trustees could "otherwise prevent the Class Shareholders from paying higher Retail Class fees"—*i.e.*, charging Plaintiffs Premium Class expenses even though they are Retail Class shareholders. (Dec. 23, 2024 J. Ltr. (Dkt. No. 22) at 1.)  That approach would directly conflict with the requirements of Rule 18f-3, which requires the Fund to charge expenses "on a consistent basis" throughout "each class."  17 C.F.R. § 270.18f-3(c)(1)(i)-(iii), (v) (permitting companies to allocate "Fundwide Expenses" to "*each class*" in one of four methods "*on a consistent basis*" (emphasis added)); *id.* § 270.18f-3(c)(1)(iv) (permitting allocation of "Fundwide Expenses" on a "*per share*" basis only under limited circumstances (emphasis added)); § 270.18f-3(a)(1)(i) (for class-specific expenses, requiring that "*[e]ach class … shall pay all of the expenses of [class-specific] arrangement[s]*" (emphasis added)).

Dated: New York, New York
January 28, 2025

Respectfully submitted,

*/s/  Marc De Leeuw*

Marc De Leeuw
Stephen Ehrenberg
Matthew T. Souza
Joe Hong
Maximilian Y.M. Frank
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel.: (212) 558-4000
Fax: (212) 558-3588
deleeuwm@sullcrom.com
ehrenbergs@sullcrom.com
souzam@sullcrom.com
hongjoe@sullcrom.com
frankm@sullcrom.com

*Counsel for Defendants Elizabeth S. Acton, Laura M. Bishop, Ann E. Dunwoody, John Engler, Robert Gartland, Robert W. Helm, Arthur E. Johnson, Michael E. Kenneally, Marie Knowles, Mark A. Murray, and Carol J. Zierhoffer*

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum (i) complies with the type-volume limitations of section II(B)(2) of the Court's Individual Rules and Practices because it contains 8,396 words, excluding the exempted parts of the memorandum; and (ii) complies with section II(B)(2)'s typeface requirements because it is formatted with one-inch margins, double-spaced, and in Times New Roman 12-point font.

Dated: New York, New York
        January 28, 2025

                                          /s/ Joe Hong
                                          Joe Hong