UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BRYAN DAVIS & ETHAN SAM, directly on
behalf of themselves and all others similarly
situated,

                        Plaintiffs,     :      1:24-cv-08142 (MMG)

                v.                 :      **ORAL ARGUMENT**
                                         **REQUESTED**

FIDELITY MANAGEMENT & RESEARCH
COMPANY LLC, et al.,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF THE
## FIDELITY DEFENDANTS' MOTION TO DISMISS

James R. Carroll (*pro hac vice*)
Eben P. Colby (*pro hac vice*)
Marley Ann Brumme
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
james.carroll@skadden.com
eben.colby@skadden.com
marley.brumme@skadden.com

Scott D. Musoff
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
scott.musoff@skadden.com

*Counsel for Defendants Fidelity
Management & Research Company LLC,
Abigail P. Johnson, Jennifer Toolin
McAuliffe, Christine J. Thompson, Laura
M. Del Prato, John J. Burke III,
Christopher M. Gouveia, and Kenneth B.
Robins*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................. 5

    A.    The Fund, The Board, And Fidelity .............................................................. 5

    B.    SPAXX And FZCXX Are Distinct Securities ............................................. 6

    C.    SPAXX Shareholders Can Convert Their Shares To FZCXX ..................... 8

    D.    The Complaint ................................................................................................ 8

LEGAL STANDARD....................................................................................................... 8

ARGUMENT .................................................................................................................... 9

I.      THERE IS NO LEGAL OBLIGATION TO IMPLEMENT AUTO-
CONVERSION................................................................................................... 9

II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY
DUTY (COUNT I)............................................................................................. 11

    A.    Plaintiffs Do Not Allege Any Facts Showing That The Trustees And
Officers' Process Was Deficient ................................................................. 11

    B.    The Complaint Does Not Allege Facts Demonstrating Gross Negligence
Or Reckless Disregard Of Duty .................................................................. 13

          1.    Plaintiffs' Allegations That They Are Being Treated Differently
Than Other "Identical" Shareholders Do Not Show Wrongdoing............13

          2.    Allegations That Other Fidelity And Third-Party Funds Have
Used Auto-Conversion Are Insufficient To Show A Breach Of
Duty................................................................................................15

          3.    Plaintiffs' Allegations That Auto-Conversion "Only Benefits" And
"Does Not Harm" SPAXX Shareholders Are Insufficient .......................17

          4.    Allegations That Auto-Conversion Would Reduce Expenses Are
Contradicted By Plaintiffs' Own Factual Allegations ..............................20

    C.    Plaintiffs Are The Cause Of Their Own Purported Injury.....................................22

    D.    Plaintiffs Fail to Allege Any Injury .......................................................................22

III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE IMPLIED
       COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT II) .........................23

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING
       BREACH OF FIDUCIARY DUTY (COUNT III)............................................................24

V.     PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT
       (COUNT IV)....................................................................................................................25

CONCLUSION................................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Adelaide Productions, Inc. v. BKN International AG,*
38 A.D.3d 221 (1st Dep't 2007) ......................................................................26

*In re Affiliated Computer Services, Inc. Shareholders Litigation,*
2009 WL 296078 (Del. Ch. Feb. 6, 2009) ........................................................16

*Airborne Health, Inc. v. Squid Soap, LP,*
984 A.2d 126 (Del. Ch. 2009)...........................................................................23

*Apollo Management, Inc. v. Cernich,*
202 A.D.3d 527 (1st Dep't 2002) ......................................................................25

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................................9

*Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC,*
2018 WL 3326693 (Del. Ch. July 6, 2018) *aff'd, Davenport v. Basho
Technologies Holdco B, LLC,* 221 A.3d 100 (Del. 2019).................................22

*Binks v. DSL.net, Inc.,*
2010 WL 1713629 (Del. Ch. Apr. 29, 2010) ....................................................24

*Blaustein v. Lord Baltimore Capital Corp.,*
84 A.3d 954 (Del. 2014) ...................................................................................11

*Brehm v. Eisner,*
746 A.2d 244 (Del. 2000) ............................................................................11, 12

*Buckler v. Craft Beekman, LLC,*
2024 WL 3274509 (S.D.N.Y. July 2, 2024) ......................................................9

*Chill v. Calamos Advisors LLC,*
417 F. Supp. 3d 208 (S.D.N.Y. 2019)................................................................7

*Corsello v. Verizon New York, Inc.,*
18 N.Y.3d 777 (2012) .......................................................................................25

*DeBlasio v. Merrill Lynch & Co., Inc.,*
2009 WL 2242605 (S.D.N.Y. July 27, 2009) ...................................................18

*Eaton Vance Senior Income Trust v. Saba Capital Master Fund, Ltd.,*
2024 WL 4579652 (Mass. Super. Oct. 1, 2024) ................................................7

i

*In re Elan Corp. Securities Litigation*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)........................................................5

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
    694 F.2d 923 (2d Cir. 1982)...................................................................5

*Geier* v. *American Honda Motor Co.*,
    529 U.S. 861 (2000)............................................................................23

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)..............................................................12

*Hecksher v. Fairwinds Baptist Church, Inc.*,
    115 A.3d 1187 (Del. 2015) ............................................................15, 17

*In re Hennessy Capital Acquisition Corp. IV Stockholder Litigation*,
    318 A.3d 306 (Del. Ch. 2024)..............................................................24

*Hogan v. Fischer*,
    738 F.3d 509 (2d Cir. 2013)................................................................. 9

*Keller Foundations, LLC v. Zurich American Insurance Co.*,
    252 F. Supp. 3d 319 (S.D.N.Y. 2017)...................................................23

*Leder v. American Traffic Solutions, Inc.*,
    630 F. App'x 61 (2d Cir. 2015) ...........................................................26

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173 (2011) .........................................................................26

*McGowan v. Ferro*,
    2002 WL 77712 (Del. Ch. Jan. 11, 2002) ............................................24

*In re Mindbody, Inc. Stockholder Litigation*,
    2024 WL 4926910 (Del. Dec. 2, 2024) ...........................................24, 25

*Murawski v. Pataki*,
    514 F. Supp. 2d 577 (S.D.N.Y. 2007)...................................................18

*Paulsen v. Stifel, Nicolaus & Co.*,
    2019 WL 2415213 (S.D.N.Y. June 4, 2019) ..........................................5

*Remuda Jet Five LLC v. EMBRAER-Empresa Brasileira De Aeronautica, S.A.*,
    2012 WL 1142296 (S.D.N.Y. Mar. 27, 2012) .......................................17

*Schuyt v. Rowe Price Prime Reserve Fund*,
    663 F. Supp. 962 (S.D.N.Y), *aff'd*, 835 F.2d 45 (2d Cir. 1987).....................5, 21

*Smith v. Chase Manhattan Bank, USA, N.A.*,
    293 A.D.2d 598 (2d Dep't 2002) ...................................................................26

*Solash v. Telex Corp.*,
    1988 WL 3587 (Del. Ch. Jan. 19, 1988) .......................................................15

*In re Telecommunicaticns, Inc.*,
    2003 WL 21543427 (Del. Ch. July 7, 2003) ..................................................25

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    2024 WL 4476088 (S.D.N.Y. Oct. 11, 2024) ................................................18

*In re Walt Disney Co. Deriv. Litigation*,
    907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).......................11, 12, 13, 15

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ..........................................................18

## STATUTES

15 U.S.C. § 80a-1 ........................................................................................5

15 U.S.C. § 80a-15(c) ..................................................................................6

15 U.S.C. § 80a-18(f) ...................................................................................6

## REGULATIONS

17 C.F.R. § 240.15c3-3(a)(17) .....................................................................18

17 C.F.R. § 270.18f-3 ..................................................................................6

17 C.F.R. § 270.18f-3(d) ..........................................................................12, 20

17 C.F.R. § 270.18f-3(e)(2) ........................................................................10

17 C.F.R. § 270.18f-3(f)(2) .........................................................................10

Exemption for Open-End Management Investment Companies Issuing Multiple Classes
    of Shares, 60 Fed. Reg. 11876 (Feb. 23, 1995) ...........................................10

Defendants Fidelity Management & Research Company LLC ("Fidelity"); Abigail P. Johnson, Jennifer Toolin McAuliffe, and Christine J. Thompson ("Management Trustees"); and Laura M. Del Prato, John J. Burke III, Christopher M. Gouveia, and Kenneth B. Robins ("Officers") (collectively, "Fidelity Defendants") respectfully submit this Memorandum of Law.

## PRELIMINARY STATEMENT

Plaintiffs' claims hinge on a single question of law: in mutual funds with multiple share classes, do fund trustees and officers have a fiduciary duty or other legal obligation to ensure that the holders of one share class are *automatically converted* to another, lower-expense share class upon becoming eligible to buy shares in the lower-expense class? The answer is no.

Plaintiffs allege that they are shareholders in the Fidelity Government Money Market Fund ("Fund"). The Fund offers multiple share classes to investors, including the retail class ("SPAXX") and the Premium class ("FZCXX"). FZCXX shares have a slightly lower annual expense ratio than SPAXX shares, but require a significant minimum investment ($100,000 for brokerage accounts or $10,000 for retirement accounts). Each share class is its own separate security, with its own trading symbol, disclosures, purposes, and features. They are separate products. The expense ratio for each share class is disclosed in the Fund's publicly filed offering materials. The Complaint does not allege that any of the Fund's offering materials stated, or otherwise led investors to believe, that the Fund would automatically convert any shareholder's SPAXX holdings for FZCXX shares if the shareholder met the eligibility criteria. Nor could it: the Fund does not include such a feature. But while the Fund does not automatically convert shares, SPAXX shareholders who meet the eligibility criteria to purchase FZCXX shares may convert their shares themselves at any time if they choose to do so—the Fund just does not make that choice for them.

Plaintiffs held SPAXX shares, received the return associated with SPAXX shares, and paid the expense ratio associated with SPAXX shares. The Complaint alleges that, at certain times, the value of Plaintiffs' SPAXX holdings met the required investment minimum to purchase FZCXX shares. The Complaint does not allege, however, that Plaintiffs ever sought to exercise their right to convert their SPAXX shares to FZCXX shares. In other words, at all relevant times, Plaintiffs got exactly what they bought and paid for: SPAXX shares.

By their Complaint, Plaintiffs now claim they were "needlessly overcharged," asserting that the Fund's trustees and officers had a legal duty to implement a SPAXX-to-FZCXX auto-conversion feature in the Fund so that eligible shareholders could benefit from FZCXX's lower expense ratio. Although Plaintiffs had the choice to convert their shares any time they had the minimum balance, they insist the Fund should do it for them. At bottom, although Plaintiffs never bought FZCXX shares, they want to be treated as if they had—they purchased one security (SPAXX), but now argue they are entitled to receive the rights of *an entirely different security* that they did not purchase and have never owned (FZCXX), simply because they *could have* purchased it if they wanted.

This fundamental premise of the Complaint is not supported by *any* legal precedent. In fact, the only legal authority addressing share class conversion in mutual funds is Investment Company Act of 1940 ("ICA") Rule 18f-3, which provides that auto-conversion is *optional*, and the Fund's governing trust agreement gives trustees "sole discretion" to determine conversion rights for each share class. This alone is fatal to Plaintiffs' claims.

Each of Plaintiffs' claims fails as a matter of law and should be dismissed.

***Breach of Fiduciary Duty (Count I).*** Under Delaware law, trustees and officers are *presumed* to make good faith, informed business judgments. Courts will not second-guess those

judgments unless a plaintiff can allege facts showing that their decision-making *process* was so irrational that it amounted to gross negligence, reckless disregard of duty, or bad faith. Plaintiffs do not even try to allege facts challenging the Trustees and Officers' process, instead alleging only that the Trustees and Officers made the wrong decision by not implementing an auto-conversion mechanism in the Fund. This is the precise second-guessing the law forbids.

While legally irrelevant, Plaintiffs' substantive criticisms of the Fund's design are also unsupported by factual allegations and do not permit the inference that the lack of auto-conversion was grossly negligent or reckless. For example, SPAXX shareholders eligible to purchase FZCXX shares, like Plaintiffs, are not "identical" or "similarly situated" to actual FZCXX shareholders as Plaintiffs assert. Instead, as the Complaint recognizes, SPAXX and FZCXX are different securities, and their shareholders pay the expenses associated with the security they chose to purchase. Plaintiffs' allegation that they were harmed by the lack of auto-conversion is undercut by the undisputed fact that they could themselves convert their shares—but made no effort to do so. And Plaintiffs' assertion that auto-conversion would only be beneficial to shareholders (with no downside) conflicts with the fact that SPAXX shares are a "core position" for Fidelity brokerage accounts (*i.e.*, a cash management program that holds the customer's uninvested cash, which can then be used to trade or pay bills) while FZCXX is not.[1] If a customer's SPAXX shares automatically converted to FZCXX as soon as they hit the minimum balance, it would zero out their core position, undermine their access to their cash, and leave them holding an entirely different security that cannot be used in the same way as the security they originally bought (SPAXX).

When the Complaint is stripped of its conclusory and contradictory allegations, Plaintiffs

---

[1] As explained below, at n.19, the Court may take judicial notice of this fact.

are left with the allegation that a few other funds use some form of auto-conversion. That may be so, but the fact that a few other funds may have auto-conversion—out of the literally thousands of mutual funds available in the market—does not support the inference that the Trustees and Officers breached any duties by not including auto-conversion in the Fund. Instead, this underscores the obvious: different funds have different features, and Plaintiffs could have purchased shares in a fund with auto-conversion if auto-conversion were important to them. While Plaintiffs may now wish they owned FZCXX shares (or shares in a fund that offers auto-conversion), they cannot use the Court to foist non-existent duties on Defendants in lieu of making their own investment decisions.

*Breach of Implied Covenant of Good Faith and Fair Dealing (Count II)*. Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is also legally insufficient. They ask the Court to imply a term in the Fund's trust agreement that would require the Fund to charge shareholders fees based on the size of their investment, no matter what share class they actually held. But such a term would directly contradict the express language of the agreement, which gives the trustees sole discretion to set the rights of share classes and apportion expenses.

*Aiding and Abetting Breach of Fiduciary Duty (Count III)*. Plaintiff also fails to state a claim for aiding and abetting against Fidelity. There can be no aiding and abetting when there is no underlying breach of fiduciary duty, and Plaintiffs fail to adequately allege a breach here. And Plaintiffs also fail to allege any facts suggesting that Fidelity knowingly and actively participated in the alleged breach.

*Unjust Enrichment (Count IV)*. Plaintiffs' claim for unjust enrichment against Fidelity fails because it is duplicative of the aiding and abetting claim, and because the fees paid to Fidelity were not "unjust" in any way. Shareholders paid the expenses that were disclosed in the

Fund's prospectuses, and Fidelity received only what it was owed.

## BACKGROUND

### A.    The Fund, The Board, And Fidelity

The Fund is a Delaware statutory trust registered as an open-end investment company (*i.e.*, mutual fund) with the Securities and Exchange Commission ("SEC") under the ICA, 15 U.S.C. § 80a-1 *et seq.*  ¶¶ 38-40.[2]  It is governed by a trust agreement and overseen by a board of trustees that allegedly consists of 11 trustees (eight independent trustees and three Management Trustees affiliated with Fidelity) ("Board").  ¶¶ 40, 43-46; Ex. 1 ("Trust Instrument").[3]  Under the Trust Instrument, the Board has appointed certain officers and delegated them the authority to manage the Fund day-to-day.  ¶¶ 48, 52; Ex. 1 §§ 4.01 (f), (j).

The Fund is a money market fund investing in "low-risk short-term debt securities, like government bonds and Treasury bills."  ¶ 36.  The goal of money market funds is to provide low risk and high liquidity: because they are often used for short-term cash management, they operate "more like a bank account than the traditional investment in securities."  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 925 (2d Cir. 1982).  Thus, investor balances in money market accounts "often fluctuate widely, with frequent deposits and withdrawals."  *Schuyt v. Rowe Price Prime Rsrv. Fund*, 663 F. Supp. 962, 963, n.4 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987).[4]

---

[2] Citations to "¶ __" are to the Complaint, ECF No. 1.

[3] Because the Trust Instrument is incorporated by reference in the Complaint and is directly at issue in Plaintiffs' claims (*e.g.*, ¶¶ 6, 40-42, 48-51, 57, 64, 133-40), the Court may consider it on a motion to dismiss.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008).

[4] *See also* Ex. 3 (SPAXX Prospectus) at 22 (the Fund's shares are "purchased and sold frequently because a money market fund is designed to offer a liquid cash option").  The Fund's prospectuses are incorporated by reference in the Complaint, *e.g.*, ¶¶ 44 n.9, 67 n.28, and in any event are publicly available SEC filings that are subject to judicial notice.  *See Paulsen v. Stifel,*

Fidelity, a registered investment adviser, provides investment advisory services to the Fund pursuant to a written investment management agreement ("IMA") negotiated with the Board.  ¶¶ 57-60.  Under the IMA, Fidelity is responsible for managing the Fund's portfolio of investments and overseeing the Fund's administrative operations.  *Id.*  In exchange for these services, the Fund pays Fidelity a management fee of 0.25% of the value of the assets in the Fund, which is ultimately passed through to shareholders along with other Fund operating expenses.  ¶¶ 61-62.[5]  Under the ICA, the IMA is subject to annual review, negotiation, and renewal (or non-renewal) by the Fund's independent trustees.  ¶ 60; 15 U.S.C. § 80a-15(c).

### B.    **SPAXX And FZCXX Are Distinct Securities**

As permitted by Section 18(f) of the ICA and Rule 18f-3, the Fund offers seven distinct share classes to investors.  15 U.S.C. § 80a-18(f); 17 C.F.R. § 270.18f-3; ¶¶ 64-65; Ex. 2 (2024 Annual Report) at 4.[6]  As required by Rule 18f-3, each of the Fund's authorized share classes— and their respective rights, features, and obligations—are set forth in a written plan approved by the Board and publicly filed with the SEC.

Two of these share classes are the subject of Plaintiffs' Complaint: SPAXX and FZCXX. Like any share classes of the same fund, they share a common investment portfolio and investment objective.  ¶ 66.  Importantly, however, they are two separate and distinct securities. They have different ticker symbols, different CUSIP numbers,[7] and different prospectuses.  ¶¶ 64-

---

*Nicolaus & Co.*, 2019 WL 2415213, at *3 (S.D.N.Y. June 4, 2019) ("Courts in this Circuit have routinely taken notice of public disclosure documents filed with the SEC.").

[5] Fidelity is a wholly owned subsidiary of FMR LLC, a family of companies known as Fidelity Investments, which offers investment management, retirement planning, brokerage, and other financial products and services.  ¶ 16.

[6] Exhibit 2 is relied on in the Complaint at ¶ 38 and publicly filed with the SEC and may therefore be considered on a motion to dismiss.

[7] A "CUSIP number" is a unique nine-digit identifier assigned to publicly traded securities.

71; Ex. 3; Ex. 4 (FZCXX Prospectus).  SPAXX and FZCXX also have different purposes and target investor populations.  SPAXX shares are marketed to "retail" investors, ¶ 37, who "invest for their own personal accounts and often trade in smaller amounts."[8]  There is thus no minimum investment required to purchase SPAXX shares.  ¶ 67.  FZCXX is marketed to high net worth investors with larger holdings, and therefore requires a minimum investment of $100,000 for brokerage accounts or $10,000 for retirement accounts.  *Id.*

SPAXX and FZCXX also have different fees.  SPAXX's current expense ratio is 0.42%, consisting of the 0.25% management fee to Fidelity and 0.17% of other operating expenses. ¶¶ 67-68; Ex. 2 at 32-33.  Nearly all these expenses are for transfer agent services, *e.g.*, keeping records of the shareholders, maintaining and servicing shareholder accounts, and processing purchases and redemptions of shares.[9]  Ex. 2 at 33.  FZCXX's expense ratio is 0.32%, meaning FZCXX shareholders pay 0.1% per dollar—or one-tenth of one penny—less than SPAXX shareholders.  ¶ 101.  This consists of the 0.25% management fee, plus 0.11% in other operating expenses, minus a 0.4% reduction because of an expense cap negotiated with Fidelity.  ¶¶ 67-68; Ex. 4 at 2.[10]  Again, nearly all of the additional operating expenses are for transfer agent services. Ex. 2 at 33.  This difference in transfer agent fees makes sense: logically, it costs a fund less to service and process transactions for a smaller number of higher balance account than it does for a greater number of lower balance accounts.

---

[8] *Eaton Vance Senior Income Tr. v. Saba Cap. Master Fund, Ltd.*, 2024 WL 4579652, at *3 (Mass. Super. Oct. 1, 2024).

[9] *See Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 224 (S.D.N.Y. 2019).

[10] Fidelity contractually agreed to cap the FZCXX expense ratio at 0.32% and limit SPAXX operating expenses to 0.42%.  If total expenses exceed those amounts, Fidelity will reimburse the difference.  ¶¶ 107-08.

### C.    SPAXX Shareholders Can Convert Their Shares To FZCXX

The Fund does not have any mechanism to automatically convert a shareholder's SPAXX shares to FZCXX shares when their account balance reaches the eligibility minimum.  ¶¶ 72-73. As long as they satisfy the investment minimum, however, SPAXX shareholders wishing to access FZCXX's lower expense ratio can convert to FZCXX shares on their own by redeeming their SPAXX shares and buying FZCXX shares.  The Complaint does not allege otherwise.

### D.    The Complaint

On October 25, 2024, Plaintiffs Bryan Davis and Ethan Sam filed this putative class action against 11 current and former independent trustees of the Fund ("Independent Trustees"), the Management Trustees, the Officers, and Fidelity.  Mr. Davis holds SPAXX shares in both a Fidelity brokerage account and a Fidelity retirement account, and Mr. Sam holds SPAXX shares in a Fidelity retirement account.  ¶¶ 14-15.  Both Plaintiffs allege that, for at least some portion of the last three years (the alleged "class period"), their account balances exceeded the minimum required to buy FZCXX shares.  *Id.*  Neither Plaintiff, however, alleges that they ever purchased, attempted to purchase, or owned FZCXX shares.  *Id.*

The Complaint alleges that the Trustees and Officers had a legal duty to cause the Fund to automatically convert SPAXX shares to FZCXX shares whenever a SPAXX shareholder reaches the FZCXX's eligibility minimum—and that their failure to do so resulted in Plaintiffs being "needlessly overcharged" for their investment in the Fund.  ¶¶ 100, 122-58.  It asserts four claims for relief: (i) breach of fiduciary duty (against the Trustees and Officers); (ii) breach of the implied covenant of good faith and fair dealing (against the Trustees); (iii) aiding and abetting (against Fidelity); and (iv) unjust enrichment (against Fidelity).  ¶¶ 122-58.

### LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, "a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Hogan v. Fischer*, 738 F.3d 509, 514 (2d

Cir. 2013) (same).  A claim is only "plausible" if "the plaintiff pleads *factual content* that allows

the court to draw the *reasonable* inference that the defendant is liable."  *Iqbal*, 556 U.S. at 678

(emphases added).  The Court must accept well-pleaded facts as true, but "need not credit

conclusory statements unsupported by assertions of facts or legal conclusions and

characterizations presented as factual allegations."  *Buckler v. Craft Beekman, LLC*, 2024 WL

3274509, at *2 (S.D.N.Y. July 2, 2024).  The Court is also "not constrained to accept as truth

conflicting pleadings that make no sense, or that would render a claim incoherent, or that are

contradicted either by statements in the complaint itself or by documents upon which its

pleadings rely, or by facts of which the court may take judicial notice."  *Id.*

## **ARGUMENT**

### I.    **THERE IS NO LEGAL OBLIGATION TO IMPLEMENT AUTO-CONVERSION**

As an initial matter, the Complaint should be dismissed in its entirety because the

underlying legal theory for all of Plaintiffs' claims is unsupported by *any* source of law.

According to Plaintiffs, the Trustees and Officers had a legal duty to cause the Fund to

automatically convert SPAXX shares to FZCXX shares whenever a SPAXX shareholder's

holdings reached FZCXX's investment minimum.  *E.g.*, ¶¶ 126-27.[11]  The Complaint, however,

does not identify any statute, rule, regulation, contract, or caselaw that imposes such an

obligation.  That is because there is none.  In fact, the opposite is true: under both federal law and

the Trust Instrument, automatic conversion between share classes is *optional*, and its use in a

---

[11] Presumably Plaintiffs also argue that whenever a FZCXX shareholder's balance falls below
the minimum, they should be automatically converted to SPAXX, and there is no limitation to
how many times this back-and-forth buying and selling of securities may occur.

fund is a business judgment that falls within the discretion of the Board.

Rule 18f-3, promulgated by the SEC under the ICA, sets forth the requirements for a mutual fund to establish multiple share classes. *See* 17 C.F.R. § 270.18f-3(f)(2). The Rule expressly states that share class conversion is optional: "*[n]othing in this section prohibits* a company from offering any class with . . . a conversion feature providing that shares of one class . . . will be exchanged automatically for shares of another class," as long as certain conditions are met. *Id.* (emphasis added). But "nothing in th[at] section" *requires* automatic conversion either. As the SEC's commentary accompanying the Rule makes clear, "the rule permits, but does not require, different classes to have different exchange privileges and conversion rights." Exemption for Open-End Mgmt. Inv. Companies Issuing Multiple Classes of Shares, 60 Fed. Reg. 11876 (Feb. 23, 1995).[12] Because this regulatory regime clearly contemplates that auto-conversion is one potential option that a fund could have, but is not required to have, the absence of auto-conversion cannot constitute a *de facto* breach of fiduciary duty.

The Trust Instrument likewise makes automatic conversion optional. It provides that "[t]he Trustees shall have full power and authority, in their sole discretion . . . to establish" different share classes, and "to fix such preferences, voting powers, rights and privileges of such . . . classes." Ex. 1 § 2.06; *see also id.* § 4.01(o) (Trustees have power "to establish classes of such Series having relative rights, powers and duties as they may provide consistent with applicable law"). This includes the authority to apportion expenses among share classes, along

---

[12]  Plaintiffs' insinuation that the Trustees and Officers are obligated to ensure that shareholders always pay the lowest possible expense (*e.g.*, ¶¶ 6, 126) is also refuted by the SEC's commentary. Under some circumstances, "conversions that occur when a shareholder ceases to be eligible to invest in a class" are *not* required to occur in a way that the shareholder pays "the same or lower expenses." 60 Fed. Reg. at 11880 (discussing 17 C.F.R. § 270.18f-3(e)(2)).

with the authority to set a minimum investment requirement for certain classes. *Id*. § 4.01(p), (t). In other words, the Trust Instrument grants the Trustees broad discretion to set the rights of each share class, including conversion rights. But nothing in the Trust Instrument requires automatic conversion or promises that shareholders of different classes will pay the same fees.

In short, automatic conversion is a tool in the mutual fund design toolbox, which fund sponsors and trustees can decide to use—or not use—based on the specific circumstances of each fund and each share class. Because automatic conversion is optional, the Defendants cannot have committed wrongdoing for not exercising that option here. *See, e.g.*, *Blaustein v. Lord Baltimore Cap. Corp.*, 84 A.3d 954, 958 (Del. 2014) (alleged failure to repurchase shares not a breach of fiduciary duty, because law did not require repurchase and governing agreement gave "discretion as to whether to engage in a transaction").

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY (COUNT I)

Because federal law and the Trust Instrument provide no authority for Plaintiffs' theory that the Trustees and Officers are obligated to implement automatic conversion, the Complaint tries to create such an obligation under the guise of Delaware fiduciary duty law. ¶¶ 122-30. But Plaintiffs' fiduciary duty claim fails for several reasons.

### A. Plaintiffs Do Not Allege Any Facts Showing That The Trustees And Officers' Decision-Making Process Was Deficient

Under Delaware law, directors and officers are presumed to make decisions in good faith and on an informed basis. *See In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Courts do not override their business judgment lightly, and will not "expose [them] to substantive second-guessing by ill-equipped judges or juries" after the fact. *Id*. at 750; *see also Brehm v. Eisner*, 746 A.2d 244, 260 (Del. 2000) ("It is the essence of the business judgment rule that a court will not apply 20/20 hindsight to second guess a board's

decision . . .").  Accordingly, to state a claim for breach of the fiduciary duty of care, both Delaware law and the Trust Instrument require Plaintiffs to allege facts showing that the Trustees and Officers acted with "willful misfeasance, bad faith, gross negligence or reckless disregard of [their] duties."  Ex. 1 § 10.01; *see also Disney*, 907 A.2d at 750.  This is a heavy burden, and "duty of care violations are rarely found."  *Disney*, 907 A.2d at 750.

Importantly, "[d]ue care in the decision-making context is *process* due care only." *Brehm*, 746 A.2d at 264.  To adequately allege gross negligence or reckless disregard of duty, a plaintiff must articulate "facts that suggest a *wide* disparity between *the process* the [trustees] used . . . and that which would have been rational."  *Guttman v. Huang*, 823 A.2d 492, 507 n.39 (Del. Ch. 2003) (second emphasis added).  The question is not whether the fiduciary's decision was right or wrong—or even reasonable—but whether the plaintiff can allege facts showing that the deliberative process used to reach that decision was so egregious and irrational that it should not be considered a good faith, informed business judgment.[13]

The Complaint does not allege any facts that challenge the good faith and diligence of the Trustees and Officers' process, let alone facts showing a "wide disparity" between their process and a rational one.[14]  While Plaintiffs repeatedly make the conclusory allegation that the Trustees and Officers were "grossly negligent or recklessly uninformed," ¶¶ 6, 128, the Complaint lacks facts to support that assertion.  At most, the Complaint alleges the unremarkable fact that the Trustees and Officers knew that automatic conversion was a potential option.  ¶¶ 74-81.  This

---

[13] *See Brehm*, 746 A.2d at 260 ("Courts do not measure, weigh, or quantify directors' judgments. We do not even decide if they are reasonable . . ."); *Disney*, 907 A.2d at 749-50 (duty of care claim does not turn on "the content of the board decision," but "the good faith or rationality of the process employed," even if decision were "substantively wrong," "stupid," or "egregious").

[14] Indeed, Plaintiffs do not allege that the Officers had any role in the decision-making process. ¶¶ 52-56.  Nor could they.  Under Rule 18f-3(d), it is the board—not the officers—that is required to approve the Fund's share class structure.

does not suggest a deficient process.  In fact, it *refutes* an inference of gross negligence because it shows that the Trustees and Officers were well-informed.  ¶¶ 74, 93, 128 (alleging the Trustees were "knowledgeable about, and experienced with, auto-conversion," and had "all material information" to do it).[15]

Plaintiffs otherwise focus entirely on the substance of the decision itself—*i.e.*, the lack of automatic conversion and its impact on putative class members' fees—and posit that the alleged unfairness of that decision must mean there was gross negligence or reckless disregard.  *E.g.*, ¶¶ 6, 94-95, 128.  But those allegations are pure speculation, and in any event say nothing about the Trustees and Officers' decision-making process.

### B.    The Complaint Does Not Allege Facts Demonstrating Gross Negligence Or Reckless Disregard Of Duty

Rather than challenging the good faith of the Trustees and Officers' process, Plaintiffs make four main allegations to argue that the Trustees and Officers' ultimate decision was wrong. Not only is this precisely the kind of "hindsight" "second-guessing" that Delaware law forbids, but none of Plaintiffs' allegations create a plausible inference of wrongdoing.

#### 1.    Plaintiffs' Allegations That They Are Being Treated Differently Than Other "Identical" Shareholders Do Not Show Wrongdoing

Plaintiffs first allege that it was grossly negligent for the Trustees and Officers to approve a structure for the Fund that did not include automatic conversion because "the Class Shareholders are disadvantaged relative to the other shareholders because they needlessly pay higher fees compared to other similarly situated investors."  ECF No. 22 at 2 (emphasis omitted); ¶¶ 1, 100-03, 127, 129.  In other words, Plaintiffs assert it is a breach of duty to allow allegedly

---

[15] *See Disney*, 907 A.2d at 762 (rejecting duty of care claim because plaintiff did not show that defendant "failed to inform himself of all material information reasonably available").

"identical" investors to pay different fees.  ¶ 5.  The Complaint, however, does not allege any well-pleaded facts to support these conclusory allegations, let alone sufficient facts to permit an inference of gross negligence or reckless disregard of duty.

While they may have made a similar financial investment in the Fund, SPAXX shareholders who can satisfy the minimum balance to purchase FZCXX shares, like Plaintiffs, are simply not "identical" or "similarly situated" to FZCXX shareholders.  As the Complaint and the Fund's SEC filings make clear, SPAXX and FZCXX are *two different securities*.  They have different CUSIPs, different ticker symbols, different prospectuses, different eligibility requirements, different expense structures, and different target investor populations.  ¶¶ 64-71; Ex. 3; Ex. 4.  These differences are not mere formalities: investors choose which share class best suits their individual circumstances, and they are entitled to receive the rights and features of the specific security they purchase.  They are not, however, entitled to receive the rights and features of a security they did *not* purchase.  In other words, the Complaint incorrectly conflates investors *eligible* to purchase FZCXX shares—*i.e.*, SPAXX shareholders like Plaintiffs who could have bought FZCXX shares, but did not—with investors that *actually* own FZCXX shares.  It makes no difference that they *could have* bought FZCXX shares; a shareholder's rights must be based on reality, not hypotheticals.

Given that they are not "similarly situated" or "identical" to FZCXX shareholders, Plaintiffs cannot be "disadvantaged" relative to FZCXX shareholders.  Setting aside the Complaint's rhetoric and conclusions, Plaintiffs' allegations describe a reasonable structure: SPAXX shareholders pay the SPAXX expense ratio, FZCXX shareholders pay the FZCXX expense ratio, and any SPAXX shareholder who has the minimum balance can convert their shares to FZCXX if they wish.  All material information is accurately disclosed—the Complaint

does not allege otherwise—and investors can choose the share class that best fits their needs. Any suggestion that this setup was "outside the bounds of reason" or an "extreme departure from the ordinary standard of care" defies common sense. ¶ 127; *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1199 (Del. 2015); *Disney*, 907 A.2d at 750.

### 2. Allegations That Other Fidelity And Third-Party Funds Have Used Auto-Conversion Are Insufficient To Show A Breach Of Duty

Plaintiffs next allege that a handful of other Fidelity and third-party mutual funds have used various forms of automatic conversion, and that the Trustees and Officers were aware of this fact. ¶¶ 74-90. The Complaint then leaps to the inference that the Trustees and Officers' failure to implement automatic conversion here must mean that they were grossly negligent or acted with reckless disregard for their duties. This inference is implausible for several reasons, and Plaintiffs' allegations fall far short of pleading a breach of fiduciary duty.

*First*, the fact that a few other funds out of the thousands of mutual funds offered in the United States[16] may have included some form of auto-conversion does not mean that it is outside "the bounds of reason" for a fund to be designed without it. ¶ 127; *Disney*, 907 A.2d at 750. To the extent that Plaintiffs are asserting that automatic conversion is required for *every* fund that has multiple share classes, that is plainly not the law. *See* Part I, *supra*.[17]

*Second*, the fact that other funds may have included automatic conversion says nothing about the good faith deliberative process undertaken by the Trustees and Officers here. At best, it

---

[16] *See* Registered Fund Statistics, SEC Division of Investment Management Analytics Office, November 2024, https://www.sec.gov/files/investment/im-registered-fund-statistics-20241106.pdf, at 4 (reflecting more than 8,000 mutual funds as of mid-2024).

[17] Plaintiffs allege that auto-conversion is "commonplace" in the industry, ¶ 3, but offer no facts to support that conclusion. Plaintiffs' limited examples do not suggest that it is so universal that its absence is "so grossly off-the-mark as to amount to a reckless indifference or gross abuse of discretion." *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988).

is one data point available to the Trustees and Officers, informing them that other boards may have approved products that were designed differently. But "[i]n the absence of well-pleaded allegations of [trustee] interest or self-dealing, failure to inform themselves, or lack of good faith"—none of which are present in the Complaint—"the business decisions of the board are not subject to challenge because in hindsight other choices might have been made instead." *In re Affiliated Comp. Servs., Inc. S'holder Litig.*, 2009 WL 296078, at *10 (Del. Ch. Feb. 6, 2009).

*Third*, Plaintiffs' cherry-picked examples are not analogous and do not support the inferences that Plaintiffs ask the Court to draw. For example:

- None of the funds cited by Plaintiffs actually promises that a shareholder will be automatically converted upon reaching a certain asset threshold. Instead, they state that a shareholder *may* be automatically converted.[18]

- The T. Rowe Price "Summit Program" cited by Plaintiffs is not a fund-level automatic conversion process, but a loyalty program that offers conversion to lower-cost shares for households with qualifying T. Rowe Price accounts that exceed $500,000 total. ¶ 85; Ex. 6 (Website cited at ¶ 85). It is not a feature built into any specific fund or share class, but a loyalty perk offered by T. Rowe Price to all of its customers. Ex. 6.

- The Fidelity Disruptor Funds employed auto-conversion based on how long the shares were held, a static measure that involves very different costs and burdens than real-time monitoring of asset balances that can fluctuate substantially. ¶¶ 79-80.

- The Fund's auto-conversion of Class K6 shares (which are only available to employer-

---

[18] ¶ 77 (Fidelity "*may* conduct periodic reviews of account balances and *may* convert"), ¶ 83 (Vanguard: "you *may* be converted automatically"); ¶ 85 (T. Rowe: "*in most cases*, your shares will be automatically converted"); Ex. 5 (T. Rowe Govt. Money Fund Prospectus excerpts) at 33-34 (T. Rowe "*may*, *but is not required to*, automatically convert your . . . shares") (emphases added).

sponsored retirement plans) is irrelevant. ¶ 81. It is not an ongoing monitoring-and-conversion process based on asset balances; it applies only if a plan becomes ineligible to offer K6 shares and the Fund needs to replace them with another class. *Id.*

In the end, Plaintiffs' examples only confirm the obvious: the marketplace of mutual funds is diverse, with many products that incorporate different features, structures, and pricing models. Some have flavors of automatic conversion, and some do not—and those that do often vary greatly in how they work. Fund sponsors and boards can decide which features best fit their funds (further illustrated by the differences in each of the products discussed above), and investors can decide which features are important to them. If Plaintiffs wanted automatic conversion, they could have and should have bought a fund that offered it. But it is not plausible to allege that the mere absence of automatic conversion, without more, is an "extreme departure from the ordinary standard of care." *Hecksher*, 115 A.3d at 1199.

### 3. Plaintiffs' Allegations That Auto-Conversion "Only Benefits" And "Does Not Harm" SPAXX Shareholders Are Insufficient

Next, Plaintiffs allege that automatic conversion "only benefits" and "does not harm shareholders," and therefore any failure to include automatic conversion in the Fund's structure "demonstrates gross neglect or reckless disregard for the best interests of the Class Shareholders." ¶¶ 1, 5-6, 127. Not only is this allegation conclusory, but it is also contradicted by Plaintiffs' own acknowledgment that expenses would increase (*see* Part II.B.4 below) and a single indisputable fact for which the Court may take judicial notice: SPAXX is used as a "core position" for Fidelity brokerage accounts, while FZCXX is not. Ex. 7 (fidelity.com excerpt).[19]

---

[19] The Court may take judicial notice of this fact, which is publicly disclosed on Fidelity's website and is not subject to reasonable dispute. *See Remuda Jet Five LLC v. EMBRAER-Empresa Brasileira De Aeronautica, S.A.*, 2012 WL 1142296, at *2 n.2 (S.D.N.Y. Mar. 27, 2012) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly

It is well-known that brokerage accounts include cash management programs, often called "cash sweep" programs, which "permit any cash in the account that is sitting idle" to be deposited into accounts or investments "where the cash can accrue interest until it is invested in something else." *Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2024 WL 4476088, at *3 (S.D.N.Y. Oct. 11, 2024). As FINRA and the SEC have explained, these programs provide "short-term resting places" for uninvested cash, which can generate returns while also ensuring that the funds are "available to you when you're ready to invest it or use it for something else, like paying bills." Ex. 8 (FINRA Guidance); Ex. 9 (SEC Guidance). Some programs even "let you pay your expenses directly or provide you with a debit card and check writing." Ex. 9. One of the "typical options" for uninvested cash is "sweeping it to a money market mutual fund." *Id.*; *see also DeBlasio v. Merrill Lynch & Co., Inc.*, 2009 WL 2242605, at *1 (S.D.N.Y. July 27, 2009).[20]

In a Fidelity brokerage account, a customer's cash management program is known as their "core position." Any cash inflows into the account—deposits, dividends, trade proceeds—are invested in the customer's designated core position. Ex. 7. When the customer later wants to use those funds—to purchase other securities, pay bills, write checks, or make debit card withdrawals—the core position provides instant liquidity to satisfy those obligations without the need for a sell order. *Id.*; *see also Valelly*, 2024 WL 4476088, at *3 (a sweep program provides

---

announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination."); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (taking judicial notice of information on stakeholder's websites). Plaintiffs also repeatedly rely on fidelity.com in the Complaint to assert facts related to this Fund and other funds managed by Fidelity. *E.g.*, ¶¶ 36-38, 79; *see Murawski v. Pataki*, 514 F. Supp. 2d 577, 589 (S.D.N.Y. 2007) (court may take judicial notice of documents that plaintiff relies on in complaint).

[20] *See also* 17 C.F.R. § 240.15c3-3(a)(17) (a "[s]weep [p]rogram" is "a service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances . . . to either a money market fund . . . or an account at a bank").

"the ability to trade quickly with available cash" because funds are "readily available so that they can be reinvested without delay").[21]  There are several investment options for a customer's core position; SPAXX is one of the eligible options, but FZCXX is not.  Ex. 7.[22]

Plaintiffs' conclusory assertion that automatic conversion from SPAXX to FZCXX "only benefits" SPAXX shareholders makes no sense when considered in this context.  If a customer's SPAXX shares were automatically converted to FZCXX shares as soon as they hit the eligibility minimum, that conversion would zero out their core position.  In other words, the customer's designated cash management account would be left with no cash, and other positions would need to be liquidated for the customer to trade, pay bills, or meet other financial obligations.  The customer would instead own a non-core position in FZCXX, which functions like any other investment holding and does not have the seamless "sweep" features of the core position.

The potential negative consequences of this change are self-evident.  A SPAXX core position is a critical component of how a brokerage account works and a primary tool for cash management.  *See* Exs. 7-9.  Automatic conversion would fundamentally disrupt how inflows and outflows of cash are managed, interfering with the regular functioning of an investor's brokerage account.  Given this, it is implausible to infer that not including automatic conversion in the Fund constitutes "failing to act in the best interests" of shareholders.  ¶ 1.  Shareholders have inherently different personal circumstances affecting what investments best suit their needs,

---

[21] *See* Ex. 7 ("Opening a Fidelity account automatically establishes a core position, used for processing cash transactions and for holding uninvested cash. . . .  When you sell a security, the proceeds are deposited in your core position.  When you buy a security, cash in your core position is used to pay for the trade.  This happens automatically—you do not have to 'sell' out of your core account to make a purchase. . . .  Your core position is also used for processing: Checks/Electronic funds transfers (EFTs)/Wire transfers/Direct deposits . . . /Bill Pay.").

[22] By their nature, core position balances are always fluctuating, with constant inflows and outflows.  It would make no sense to have a core position with a $100,000 minimum, given the risk that the customer could easily become ineligible to hold that position.

and investment decisions about which share class to own should be left to them.

### 4. Allegations That Auto-Conversion Would Reduce Expenses Are Contradicted By Plaintiffs' Own Factual Allegations

Finally, Plaintiffs repeatedly allege that if the Fund had automatic conversion, it would "benefit[] eligible shareholders by reducing the expenses they pay" and "remedy these overcharges." ¶¶ 5, 93. But this ignores two critical facts, both of which are acknowledged elsewhere in the Complaint.

*First*, the Board cannot and did not design the share classes on its own. For multi-class funds like this one, fund sponsors (here, Fidelity) propose a share class structure to the board, and the board approves it. 17 C.F.R. § 270.18f-3(d). The expenses—the most relevant component of a fund's design for purposes of the Complaint—are not set unilaterally by the board, but through arm's-length negotiations with the fund's adviser. ¶¶ 50, 63, 92. If the Board rejected a proposed design and insisted that Fidelity include auto-conversion, there would have to be a new negotiation of the expense ratios that accounts for the additional services. It would be an entirely different product, and it is not plausible to infer that the expense ratios for a revised structure would stay the same.

*Second*, Plaintiffs tacitly acknowledge that the addition of automatic conversion *would* increase expenses for shareholders. Plaintiffs allege that automatic conversion would require setting up a "review-and-conversion process," which would "monitor account balances, notify qualifying shareholders of eligibility, and then automatically convert an eligible holder's shares to the lower-expense class." ¶¶ 78, 83-84, 89. There would have to be an opt-out mechanism, and a transaction confirmation sent to shareholders after each conversion was complete. ¶ 83. With $323 billion of assets held in SPAXX shares, ¶ 65, this would be a massive administrative undertaking, requiring the constant monitoring of account balances for *millions* of accounts—

20

which "fluctuate widely" in money market funds, *Schuyt*, 663 F. Supp. at 963 n.4—and the processing of countless transactions each day in SPAXX and FZCXX shares to effectuate the conversions.  If all these costly new services were added, Fidelity would almost certainly negotiate different fees with the Board to account for its increased costs, and those fees would be passed on to shareholders.  ¶ 104 ("operating expenses . . . are passed through to shareholders").

Tellingly, Plaintiffs allege no facts to suggest that any shareholder savings that might result from auto-conversion would exceed the increased costs that would be generated by implementing auto-conversion.  Rather, their conclusory allegation that auto-conversion would reduce expenses assumes a hypothetical world in which automatic conversion could be added without changing anything else in the structure.  But that assumption is contradicted by Plaintiffs' own allegations about how the process would work.[23]

In short, Plaintiffs challenge one isolated feature of the Fund's design (the lack of automatic conversion), but the Board's obligation is to review and approve *the product design as a whole*, including all of its inextricably intertwined components.  *See* 17 C.F.R. § 270.18f3-(d).  In assessing a breach of fiduciary duty claim, that approval is the relevant decision to be analyzed.  But Plaintiffs do not even try to allege facts showing that the Board's approval of the overall structure was reckless or grossly negligent, instead focusing exclusively on the absence of automatic conversion.  ¶¶ 3-5, 72-73, 93-95, 128.

---

[23] If the Board refused to approve the Fund's proposed design, there is a wide range of possible outcomes: perhaps the new structure would include auto-conversion, but at higher expense ratios; perhaps the allocation of expenses between share classes would be different; or perhaps there would not be multiple share classes at all, and all Fund shareholders would pay the higher SPAXX expense ratio.  The alternative alleged by Plaintiffs, however—auto-conversion is added, but the share classes and expense ratios otherwise remain the same—is just not plausible.

### C.    <u>Plaintiffs Are The Cause Of Their Own Purported Injury</u>

Under Delaware law, breach of fiduciary duty claims require "a causal linkage" between the alleged breach and the alleged injury. *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018), *aff'd, Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019). Plaintiffs fail to allege facts that would establish such a causal link, because the alleged breach—not implementing auto-conversion—did not prevent Plaintiffs from securing the lower FZCXX expense ratio.

Plaintiffs do not dispute that if they met the investment minimum, they were free to convert their SPAXX shares to FZCXX shares themselves. The Complaint does not allege, for example, that: (i) any Defendant refused to make FZCXX shares available to Plaintiffs; (ii) any Defendant interfered with Plaintiffs' ability to purchase FZCXX shares; or (iii) any material information was misstated or omitted in the Fund's disclosures. Rather, Plaintiffs had complete and accurate information, and could have bought FZCXX shares—and secured the lower FZCXX expense ratio—whenever they wished if eligible. They did not. Thus, any alleged harm was caused by Plaintiffs' own inaction, not by any act or omission of Defendants.

### D.    <u>Plaintiffs Fail to Allege Any Injury</u>

To state a claim for breach of fiduciary duty, Plaintiffs must also allege facts showing that they suffered injury. *See Basho Techs.*, 2018 WL 3326693, at *24. Here, Plaintiffs allege they were "needlessly overcharged" because the Board did not implement automatic conversion. ¶¶ 100-03.

The Complaint acknowledges, however, that Plaintiffs bought SPAXX shares, received the returns generated by SPAXX, and paid the SPAXX expense ratio. ¶¶ 14-15, 100-03. In other words, Plaintiffs allege that they received precisely what they were entitled to as SPAXX shareholders. The SPAXX expense ratio was disclosed in the SPAXX prospectus, Ex. 3 at 3, and

Plaintiffs had no reasonable expectation of paying anything different as long as they continued to hold SPAXX shares.  Thus, Plaintiffs were not "overcharged" as a matter of law.

*                *                *

For all of the above reasons, Plaintiffs fail to state a claim for breach of fiduciary duty under Delaware law, and Count I of the Complaint should be dismissed.[24]

## III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT II)

The Complaint fails to state a claim against the Trustees for breach of the implied covenant of good faith and fair dealing (Count II) for the reasons set forth in the Independent Trustees' brief, which the Management Trustees adopt and incorporate by reference here.

In sum, a claim for breach of the duty of good faith and fair dealing is "a limited and extraordinary legal remedy," *Keller Founds., LLC v. Zurich Am. Ins. Co.*, 252 F. Supp. 3d 319, 324 (S.D.N.Y. 2017) (applying Delaware law), applicable only where "the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *Airborne Health, Inc.* v. *Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).  Here, however, requiring the Board to implement auto-conversion would not fill any gaps in the Trust Instrument.  Instead, it would alter and directly contradict the Trust Instrument's explicit provisions, which give the Board "sole discretion" to set the rights and privileges of each share class—including conversion rights—and to apportion expenses among classes.  Ex. 1 §§ 2.06, 4.01(o)-(p).

---

[24] The Management Trustees and Officers also adopt and incorporate by reference all of the arguments set forth in the Independent Trustees' Memorandum of Law as to why Count I should be dismissed, including that (i) fiduciaries owe duties to the Fund's shareholder body as a whole, and are not required to act for the benefit of any particular subset of shareholders, especially where doing so would harm other shareholders; and (ii) Plaintiffs' claim is preempted by the ICA and Rule 18f-3 under *Geier* v. *American Honda Motor Co.*, 529 U.S. 861, 875, 881 (2000).

**IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING**
<u>**BREACH OF FIDUCIARY DUTY (COUNT III)**</u>

Plaintiffs' claim for aiding and abetting against Fidelity (Count III) also fails as a matter

of law.  To state a claim for aiding and abetting a breach of fiduciary duty, Plaintiffs must allege:

"(i) the existence of a fiduciary relationship, (ii) a breach of that relationship, (iii) knowing

participation in the breach by a defendant who is not a fiduciary, and (iv) damages proximately

caused by the breach."  *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002).

As a threshold matter, Plaintiffs' aiding and abetting claim should be dismissed because

the Complaint fails to adequately allege the underlying breach of fiduciary duty claim against the

Trustees and Officers.  *In re Hennessy Cap. Acquisition Corp. IV S'holder Litig.*, 318 A.3d 306,

329 (Del. Ch. 2024) (aiding and abetting claim "cannot survive" if predicate claim dismissed).

Count III is also insufficient because Plaintiffs fail to allege facts showing Fidelity's

"knowing participation" in the alleged breach.  The "knowledge" prong is a "stringent" standard

that requires "proof of scienter."  *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *10 (Del. Ch. Apr.

29, 2010).  The defendant must "know that the *primary party's* conduct constitutes a breach," *and*

"know that *its own* conduct . . . was legally improper."  *In re Mindbody, Inc. S'holder Litig.*, 2024

WL 4926910, at *32 (Del. Dec. 2, 2024).  The "participation" prong requires a showing of

"substantial assistance," rather than "passive awareness."  *Id*. at *32-33.

Plaintiffs do not allege facts sufficient to show either knowledge or participation.  The

Complaint lacks factual allegations suggesting that Fidelity knew the Trustees and Officers

breached their fiduciary duty, or that its own conduct was improper.  Plaintiffs' generalized

allegations about Fidelity's "knowledge and experience" with auto-conversion do not support an

inference that Fidelity somehow knew the absence of automatic conversion would be against the

law.  ¶¶ 78, 80, 96, 145.  Similarly, the allegation that Fidelity had access to holdings and

24

expense information does not support an inference of scienter; it shows only that Fidelity knew SPAXX shareholders were paying the SPAXX expense ratio, just as the prospectus disclosed that they would.  ¶ 93, 145; *see In re Telecomms, Inc.*, 2003 WL 21543427, at *3 (Del. Ch. July 7, 2003) (dismissing aiding and abetting claim where plaintiffs alleged that defendant was aware of certain facts, but not that the fiduciaries breached a fiduciary duty).

Similarly, Plaintiffs' allegation of substantial assistance is merely a list of ordinary responsibilities and tasks performed by any investment adviser: managing and operating the Fund, advising on Fund policies, and accurately calculating and deducting expenses from shareholder accounts.  ¶ 145.  None of this comes close to supporting an inference of knowing participation or assistance in a breach of fiduciary duty.  Plaintiffs also allege that Fidelity is liable because it "has taken no action to remedy" the lack of auto-conversion.  ¶¶ 94, 96, 145. But in the corporate governance context, aiding and abetting requires "active participation," not "passive awareness" or "inaction."  *Mindbody*, 2024 WL 4926910, at *33.

## V.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT (COUNT IV)

Plaintiffs' claim for unjust enrichment against Fidelity (Count IV) should be dismissed for three reasons.

*First*, it is duplicative of Plaintiffs' claim for aiding and abetting.  While unjust enrichment can sometimes be pleaded in the alternative, it cannot be pleaded as an alternative to other tort claims based on the same facts and seek the same damages.  *See Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790-91 (2012); *Apollo Mgmt., Inc. v. Cernich*, 202 A.D.3d 527, 528 (1st Dep't 2022).  Plaintiffs' unjust enrichment allegations are virtually identical to their aiding and abetting allegations.  *Compare* ¶¶ 146-47 *with* ¶¶ 152-54.

*Second*, as a matter of law, an unjust enrichment claim is unavailable where a valid contract

governing the same subject matter exists. *Adelaide Prods., Inc. v. BKN Int'l AG*, 38 A.D.3d 221,

225-26 (1st Dep't 2007). Plaintiffs do not dispute that they bought SPAXX shares, got the returns

associated with those shares, and paid the disclosed expense ratio for those shares. The Trust

Instrument expressly gives the Trustees the sole discretion to apportion expenses among the

Fund's share classes, and to set the rights and other obligations of shareholders. Ex. 1 §§ 2.06,

4.01(o)-(p). Thus, Plaintiffs cannot allege unjust enrichment.

*Third*, Plaintiffs fail to allege any facts showing that Fidelity's receipt of the SPAXX

expense ratio for SPAXX shareholders was "unjust" in any way. To state a claim for unjust

enrichment, Plaintiffs must plead facts showing the defendant's retention of a benefit is an

"equitable injustice requiring a remedy to balance a wrong." *Mandarin Trading Ltd. v.

Wildenstein*, 16 N.Y.3d 173, 182-83 (2011).

There are no allegations remotely resembling an "equitable injustice" here. Rather, the

Complaint pleads the unremarkable facts that Fidelity received the SPAXX expense ratio for

SPAXX shareholders, and the FZCXX expense ratio for FZCXX shareholders. ¶¶ 67, 103, 105.

These expense ratios were fully disclosed to shareholders, and shareholders paid the Fund the

applicable expense ratio for the security they held. *Id.*; Ex. 3; Ex. 4. Plaintiffs do not allege that

they were misled about auto-conversion, or prevented from converting their SPAXX shares to

FZCXX shares on their own to obtain access to FZCXX' s lower expense ratio. Under these

circumstances, equity and good conscience in no way demand that Fidelity return any fees to

Plaintiffs. *See Smith v. Chase Manhattan Bank, USA, N.A.*, 293 A.D.2d 598, 600 (2d Dep't 2002)

(affirming dismissal where there was no allegation that plaintiffs "received less than what [they]

bargained for"); *Leder v. Am. Traffic Sols., Inc.*, 630 F. App'x 61, 63-64 (2d Cir. 2015) (affirming

dismissal where "payments [were] voluntarily made with full knowledge of the facts, and in the

absence of fraud or mistake").

## **CONCLUSION**

For all these reasons, the Court should dismiss the Complaint in its entirety.

Dated: New York, New York
      January 28, 2025

Respectfully submitted,

/s/ *Scott D. Musoff*
Scott D. Musoff
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000
scott.musoff@skadden.com

James R. Carroll (*pro hac vice*)
Eben P. Colby (*pro hac vice*)
Marley Ann Brumme
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800

james.carroll@skadden.com
eben.colby@skadden.com
marley.brumme@skadden.com

*Counsel for Defendants Fidelity*
*Management & Research Company LLC,*
*Abigail P. Johnson, Jennifer Toolin*
*McAuliffe, Christine J. Thompson, Laura*
*M. Del Prato, John J. Burke III,*
*Christopher M. Gouveia, and Kenneth B.*
*Robins*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Scott D. Musoff, an attorney duly admitted to practice before this Court, hereby certify

pursuant to Local Rule 7.1(c) and Rule II.B.2 of this Court's Individual Rules and Practices that

the foregoing Memorandum of Law was prepared using Microsoft Word and contains 8,718

words.

Dated: New York, New York          /s/ *Scott D. Musoff*
       January 28, 2025              Scott D. Musoff