USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/25/2026___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRYAN DAVIS and ETHAN SAM, directly on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

FIDELITY MANAGEMENT & RESEARCH COMPANY LLC, et al.,

Defendants.

---

24-CV-08142 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs Bryan Davis and Ethan Sam are shareholders in the Fidelity Government Money Market Fund (the "Fund"). Plaintiffs own "Retail Class" shares, which trade under the ticker symbol "SPAXX." The Fund has no minimum investment requirement to purchase Retail Class shares. The Fund also issues "Premium Class" shares, which trade under the ticker symbol "FZCXX." Premium Class shares require shareholders to maintain an investment balance of at least $10,000 (for retirement accounts) or $100,000 (for non-retirement accounts). The Fund charges shareholders in both the Retail and Premium Class for expenses in proportion to the value of the shareholder's investment in the fund. Retail Class shareholders can be charged up to 0.42% of the value of their investment; Premium Class shareholders are charged up to 0.32% of the value of their investment.

Plaintiffs are Retail Class shareholders whose account values have reached the minimum investment amount required to purchase Premium Class shares. Plaintiffs bring claims on behalf of a putative class of Retail Class shareholders who have similarly achieved the investment minimum required to purchase Premium Class shares. They allege that current and former

1

trustees and officers of the Fund ("the Trustee and Officer Defendants") breached their fiduciary duty by not automatically converting Plaintiffs' shares to Premium Class shares or implementing a mechanism to address the higher expenses charged to Retail Class shareholders who otherwise qualify to purchase Premium Class shares. Plaintiffs also allege that current and former trustees of the Fund ("the Trustee Defendants") breached the implied covenant of good faith and fair dealing. In addition, Plaintiffs bring two claims against Fidelity Management & Research Company LLC ("Fidelity"), the Fund's investment manager. Plaintiffs allege that Fidelity aided and abetted the Trustee and Officer Defendants' breach of fiduciary duty and that Fidelity was unjustly enriched by the expenses collected from Plaintiffs. All Defendants moved to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motions are GRANTED.

## BACKGROUND

### I.    RELEVANT FACTS[1] & PROCEDURAL HISTORY

The Fund is a money-market mutual fund with approximately $351 billion in net assets. Compl. ¶¶ 1, 14–15. Mutual funds are professionally managed investment vehicles that pool assets of investors to invest in a portfolio of securities. *Id.* ¶ 36. Defendant Fidelity is the investment manager of the Fund. *Id.* ¶ 7. Fidelity collects a percentage of each shareholder's investment as expenses for holding the shares. *Id.* ¶ 66. The percentage that Fidelity collects is called the "expense ratio." *Id.* These collected fees cover the Fund's operating expenses, which include a management fee for Fidelity. *Id.* ¶ 104.

---

[1] The following facts are taken from the allegations in the Complaint ("Compl."), Dkt. No. 1, and are assumed true for the purpose of resolving the motions to dismiss.

The Fund is governed by a trust agreement (the "Trust Agreement").[2] *Id.* ¶ 40. By purchasing shares of the Fund, shareholders agree to be bound by the Trust Agreement's terms. *Id.* The Trust Agreement grants the Fund's trustees legal title to, and control over, the assets of the Fund. *Id.* ¶ 41. The Trust Agreement authorizes the Fund's trustees to enter into investment advisory or management contracts with an investment manager and to delegate authority to the selected manager. *Id.* ¶ 57. Consistent with that authorization, the trustees delegated investment management and advisory services to Fidelity. *Id.* ¶ 58. The management contract that formalizes that delegation is negotiated and approved by the trustees. *Id.*

Both the trustees and Fidelity regularly review and negotiate the management contract to determine whether it should be renewed and on what terms. *Id.* ¶¶ 58, 60, 63. To determine whether the management contract should be renewed, the trustees consider: "how Fidelity's competitors approach expenses for comparable funds, including the competitiveness relative to peer funds of the fund's management fee and the total expense ratio of a representative class (the retail class)." *Id.* ¶ 63. The trustees also consider "the broad range of investment choices available to shareholders from Fidelity's competitors." *Id.* In other words, each time Fidelity's contract is renewed, the renewal is made following consideration by the trustees of Fidelity's competitiveness in comparison to its peers, including with regard to the fees charged to shareholders and the management fee Fidelity collects.

As authorized under the Trust Agreement, the trustees of the Fund created a multi-class fund structure and issued shares for each share class. *Id.* ¶ 64. The vast majority of the Fund's assets are held in two classes of shares: the Retail Class (with ticker symbol SPAXX) and the

---

[2] The Trust Agreement also governs other Fidelity-managed funds that are not at issue in this litigation.

Premium Class (with ticker symbol FZCXX). *Id.* ¶ 65. As of September 30, 2024, approximately $323 billion of the Fund's assets were held in Retail Class shares and $11.4 billion were held in Premium Class shares. *Id.*

The Retail and Premium Classes differ in two key respects. First, while the Retail Class has no investment minimum, the Premium Class requires a minimum initial investment of $10,000 for retirement accounts and $100,000 for taxable brokerage accounts. *Id.* ¶ 67. Second, the share classes have different maximum expense ratios. *Id.* For Retail Class shareholders, Fidelity has capped the expense ratio at 0.42% of the shareholder's investment. *Id.* ¶ 69. For Premium Class shareholders, Fidelity has capped the expense ratio at 0.32% of the shareholder's investment. *Id.* The funds collected by Fidelity serve two purposes. First, they contribute to Fidelity's annual management fee of 0.25% of the value of all Fund assets. *Id.* ¶ 65. Second, they cover the operating expenses of the Fund. *Id.* If any of the expenses charged to shareholders exceed the expense cap of 0.42% for Retail Class shareholders or 0.32% for Premium Class shareholders, Fidelity is required to reimburse the shareholders for any expenses charged in excess of the relevant cap. *Id.* ¶ 69.

Plaintiffs are Retail Class shareholders whose balances have exceeded the investment minimum required to purchase Premium Class shares. *Id.* ¶¶ 14–15. They bring this action on behalf of a putative class of fellow Retail Class shareholders whose balances since the three years before this action was filed reached the investment minimum required to purchase Premium Class shares. *Id.* ¶ 111. Plaintiffs allege that the "Fund's lack of a mechanism to convert eligible Retail Class shareholders" to the Premium Class "contributes to an artificially high concentration of assets in the Retail Class that is out of line with comparable funds and has resulted in millions of dollars in overcharged expenses." *Id.* ¶ 90. Plaintiffs bring four claims

against Defendants in connection with their alleged inaction.  As for the Trustee and Officer Defendants, Plaintiffs allege that they breached their fiduciary duties "because they failed to act in the best interests of Plaintiffs and the Class Shareholders by allowing them to continue paying higher expenses as Retail Class shareholders and taking no action to provide for auto-conversion of their shares (or the functional equivalent) to the . . . Premium Class." *Id.* ¶ 127.  They also allege that, as to the Trustee Defendants, this inaction breached the implied covenant of good faith and fair dealing.  *Id.* ¶ 138.  Plaintiffs further allege that Defendant Fidelity aided and abetted the Trustee and Officer Defendants' breach of fiduciary duty and were unjustly enriched by their inaction.  *Id.* ¶¶ at 141–48.

Plaintiffs filed this lawsuit on October 25, 2024.  *See* Dkt. No. 1.  The Independent Trustee Defendants moved to dismiss Counts I and II of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on January 28, 2025.  *See* Dkt. Nos. 25–27.  The Fidelity Defendants, which consist of Fidelity, the Management Trustees, and the Fund's Officers, moved to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6).  *See* Dkt. Nos. 28–30.  The motions are now fully briefed and before the Court for decision.  *See* Dkt. Nos. 35, 38–39.

## DISCUSSION

### I.    LEGAL STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[3]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. The Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."). However, the Court need not accept conclusory assertions. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).

On a Rule 12(b)(6) motion, a court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). That universe includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

To bring a claim for breach of fiduciary duty under Delaware law, a plaintiff must allege "(1) the existence of a fiduciary duty, and (2) the breach of that duty." *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012).[4] "The directors and officers of a Delaware corporation owe two overarching fiduciary duties—the duty of care and the duty of loyalty." *DrugCrafters, L.P. v. Loh*, No. 2024-0111 (PAF), 2025 WL

---

[4] The parties' briefs apply Delaware law to the fiduciary duty, aiding and abetting fiduciary duty, and breach of the implied covenant claims. "[S]uch implied consent is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

3438408, at *12 (Del. Ch. Nov. 26, 2025) (quoting *United Food & Com. Workers Union &*

*Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg,* 262 A.3d 1034, 1049

(Del. 2021)).

Plaintiffs allege that Defendants breached the duty of care.  Dkt. No. 35 at 20.  The duty

of care requires corporate officers and directors to "use that amount of care which ordinarily

careful and prudent men would use in similar circumstances, and consider all material

information reasonably available in making business decisions."  *CVC Claims Litig. LLC v.*

*Citicorp Venture Cap. Ltd.*, No. 03-CV-07936 (DAB), 2007 WL 2915181, at *3 (S.D.N.Y. Oct.

4, 2007).  To allege a breach of the duty of care, a plaintiff must show that the defendant "failed

to inform himself of all material information reasonably available or that he acted in a grossly

negligent manner."  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 762 (Del. Ch. 2005),

*aff'd*, 906 A.2d 27 (Del. 2006); *see also KDW Restructuring & Liquidation Servs. LLC* , 874 F.

Supp. 2d at 221; *In re Cyber Litig. Inc.*, No. 20-12702, 2026 WL 363146, at *4 (Bankr. D. Del.

Feb. 9, 2026).  Gross negligence reflects "a higher level of negligence representing an extreme

departure from the ordinary standard of care."  *In re Sols. Liquidation LLC*, 608 B.R. 384, 398

(Bankr. D. Del. 2019).  To establish gross negligence, "a plaintiff must plead that the defendant

was recklessly uninformed or acted outside the bounds of reason."  *Id.*  In Delaware corporate

law jurisprudence, "[t]he definition of gross negligence" is "extremely stringent."  *In re Lear*

*Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008).

Plaintiffs' complaint fails to allege facts sufficient to show that Defendants engaged in

conduct that breached the duty of care.  Plaintiffs do not substantively argue that Defendants

failed to inform themselves of material information concerning the charges imposed on Retail

Class shareholders.  *See* Dkt. No. 35 at 24.  Nor could they.  The Complaint is replete with

allegations that Defendants periodically considered the charges imposed on Retail Class shareholders in comparison to those charged by other funds (and were specifically required to do so), and were well-aware that Retail Class investors were paying higher fees and were not being automatically converted when eligible. *See* Compl. ¶ 63 (alleging that the trustees consider "the total expense ratio" of the retail class and the choices offered by Fidelity's competitors when conducting periodic reviews of the advisory contract with Fidelity); *id.* ¶ 3 (noting Trustee and Officer Defendants "provide for auto-conversion in other Fidelity mutual funds"); *id.* ¶ 82 ("Competitor funds outside Fidelity, which the Trustee Defendants consider in negotiating and approving expense policies for the Government Fund, also provide for automatic share class conversion to serve the best interests of their shareholder"). These allegations are incompatible with a claim that Defendants failed to inform themselves of material information (and, tellingly, Plaintiffs do not press this argument in their opposition to the motions to dismiss). Accordingly, to sufficiently plead a breach of the duty of care, Plaintiffs must show that Defendants acted with gross negligence by acting "outside the bounds of reason." *In re Sols. Liquidation LLC*, 608 B.R. at 398.

Plaintiffs' Complaint fails to allege conduct that falls within the "stringent" definition of gross negligence under Delaware law. *In re Lear Corp. S'holder Litig.*, 967 A.2d at 652. Plaintiffs argue that Trustee and Officer Defendants acted outside the bounds of reason by failing to implement a mechanism to convert "a shareholder's Retail Class shares to Premium Class shares (or otherwise ensuring that the shareholder is charged lower expenses)" if the shareholder's total investments would satisfy the Premium Class investment minimums. Compl. ¶ 73. However, there is no basis for finding that the absence of an auto-conversion or similar mechanism lies outside the bounds of reason. As an initial matter, Plaintiffs do not even attempt

to allege that the multi-class structure chosen for the Fund has no conceivable rational basis. Additionally, Plaintiffs do not dispute that they were able to readily convert Retail Class shares to Premium Class shares themselves if their investments reached the minimum investment required to Purchase Premium Class shares. *See* Dkt. No. 35 at 41. Nor do they allege that Defendants concealed information concerning the expense ratios Plaintiffs would be charged as shareholders of either class. Based on Plaintiffs' own allegations, the Fund was designed with two separate and distinct share classes, with different ticker symbols, with a fee structure tied to the required minimum balances of each class of share, and full disclosure in SEC filings and elsewhere of the fees that Retail Class and Premium Class shareholders are charged. *See, e.g.,* Compl. ¶¶ 64, 67 n.28. There is likewise no allegation that these disclosures are misleading in any way about steps the Fund would or would not take regarding conversion between share classes. Plaintiffs thus seek to fault Defendants for not taking actions that Plaintiffs could have taken entirely on their own. And the economic consequences of taking or not taking such actions were fully disclosed to Plaintiffs. Against this backdrop, it was not "outside the bounds of reason," *In re Sols. Liquidation LLC*, 608 B.R. at 398, for Defendants to design the Fund without an automatic conversion feature or other mechanism to affirmatively alert Plaintiffs they were eligible to convert their shares to Premium Class shares.[5]

---

[5] Plaintiffs allege that implementing the mechanisms that Plaintiffs seek would "not even come at a cost to the [Fund] or the Trust." Compl. ¶ 5. Plaintiffs argue that because the fund "is already equipped to process a high volume of transactions . . . adding conversion transactions to the Fund's already massive trading volume would not materially increase operating expenses." Dkt. No. 35 at 42. This is not plausible. There is a difference between processing trading transactions and implementing, at minimum, a monitoring and notification system for when Retail Class shareholders have reached the minimum investment amount required to purchase Premium Class shares (and then when such accounts, which may have briefly passed over the $10,000 or $100,000 threshold, fell below and needed to be converted back to Retail Class shares), which would inevitably incur additional expenses. Although those expenses theoretically could, as Plaintiffs claim, be absorbed by Fidelity, it is not plausible that Fidelity would willingly agree to absorb those expenses rather than negotiating a new (higher) fee structure that accounts for these additional services to shareholders. On a motion to dismiss, "[w]hile allegations in a complaint are deemed to be true . . . this Court need not credit such allegations where they are wholly conclusory or

Plaintiffs have not sufficiently alleged a breach of the duty of care for several other reasons. First, the expenses charged to Plaintiff appear to be the product of an arm's-length negotiation. Plaintiffs allege that the Trustee Defendants negotiate and regularly review the contracts with Fidelity. Compl. ¶ 63. The Trustee Defendants also negotiate with Fidelity terms such as "Fidelity's management fee, the expenses allocated to each share class, and the classes' expense ratio caps." *Id.* ¶ 92. Such "arm's-length negotiations are inconsistent with participation in a fiduciary breach." *In re Hechinger Inv. Co. of Del.,* 327 B.R. 537, 550 (D. Del. 2005), *aff'd sub nom. In re Hechinger Inv. Co. of Delaware, Inc.,* 278 F. App'x 125 (3d Cir. 2008). Second, Plaintiffs do not allege that all the Fund's competitors implement auto-conversion or some other method that would address Plaintiffs' complaints. Rather, they argue that "at least two of Defendants' competitors" employ the type of "monitoring, notification, and conversion processes" that they believe Defendants should also have employed. Dkt. 35 at 9. Merely showing that a preferred remedy is *possible* or exists within an industry does not demonstrate that choosing not to offer that feature is grossly negligent or outside the bounds of reason.[6]

---

rely on unreasonable inferences and unwarranted deductions." *Schorr v. Dopico,* 205 F. Supp. 3d 359, 363 (S.D.N.Y. 2016), *aff'd,* 686 F. App'x 34 (2d Cir. 2017). However, the Court need not rely on rejecting this allegation, as there is ample ground to grant the motion without considering this issue.

[6] The parties dispute whether the business judgment rule applies to Plaintiffs' claims as a further basis to dismiss the case. The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." !*Globis Partners, L.P. v. Plumtree Software, Inc.,* No. CV 1577-VCP, 2007 WL 4292024, at *4 (Del. Ch. Nov. 30, 2007). The parties' dispute stems, in part, from a disagreement over whether Plaintiffs allege that Defendants made "a conscious decision to refrain from acting," in which case the business judgment rule would apply, or whether Defendants "failed to act" without a conscious decision, in which case it would not. *Mann v. GTCR Golder Rauner, L.L.C.,* 483 F. Supp. 2d 884, 901–02 (D. Ariz. 2007); *see also* Dkt. No. 35 at 43. The Court need not resolve this dispute because Plaintiffs fails to state a claim for breach of fiduciary duty regardless of whether the business judgment rule applies.

A comparison of the cases Plaintiffs cite in which courts have found a breach of the duty of care to Plaintiffs' allegations clearly illustrates why Plaintiffs' claims do not meet the standard required to allege gross negligence under Delaware law.   Plaintiffs cite *In re Greater Southeast Comity. Hospital Corp. I*, 353 B.R. 324, 342 (Bankr. D.D.C. 2006), *see* Dkt. No. 35 at 23. There, the court found that Defendants breached the duty of care by "sign[ing] documents in their capacity as officers of the various debtors without fully informing themselves of the consequences of those actions and at a time when the defendants knew or should have known that their actions would harm the companies they purported to represent," *In re Greater Se. Cmty. Hosp. Corp. I*, 353 B.R. at 339.  These actions "plunged the debtors deeper and deeper into insolvency," increasing their joint insolvency by $255 million over the course of three years. *Id.* at 342.  The defendants also signed agreements that required "the issuance of patently false solvency certificates." *Id.*  Taken together, the court found that the allegations reflected "egregious" conduct that "constitute[d] gross negligence of the highest order." *Id.* at 341–42. Here, Plaintiffs do not allege anything approaching such "egregious" conduct. *Id.* at 341.  They do not argue that Defendants took actions "without fully informing themselves of the consequences of those action" nor that they took actions that expanded their fiduciaries' financial losses in a manner that was outside of the fiduciaries' control. *Id.* at 349.  And their conduct did not expose Plaintiffs to any charges beyond those Plaintiffs had already agreed to pay.  Further, Plaintiffs do not allege that Defendants conducted themselves egregiously such as through issuing false documents or concealing the consequences of their actions.

Next, Plaintiffs cite *In re Vanguard Chester Funds Litigation*, No. CV 22-955, 2023 WL 8091999 (E.D. Pa. Nov. 20, 2023).  *See* Dkt. No. 35 at 23.  The case concerned a 2020 decision by Vanguard to lower by $95 million the minimum investment amount required to access one of

its funds. *In re Vanguard Chester Funds Litig.*, 2023 WL 8091999, at *2. The fund had "the same trustees, officers, target retirement date, investment strategy, and proportion of shares in the same underlying index funds" as a different Vanguard fund, but a lower expense ratio. *Id.* Because both funds were essentially identical in all but the expense ratio and minimum investment, "[i]nvestors seized the no-brainer opportunity to move their money and benefit from the reduced expense ratio," resulting in an "elephant stampede of redemption requests." *Id.* at *2. The magnitude of these requests led to "unexpected, sizable capital gains tax liabilities" for certain shareholders, who then "had to sell off other assets to cover the surprise tax bills" or "faced IRS and state law penalties for failing to pay the amount owed in 2021 capital gains taxes." *Id.* at *3. Vanguard employees were aware that these unexpected tax liabilities could result from the decision to lower the minimum investment amount but still went through with the decision. *Id.* The court reasoned that Vanguard's decisions reflected a "we don't care about the risks [to shareholders]" attitude. *Id.* at *10. It held that Vanguard acted "outside the bounds of reason by disregarding alternatives" that did not have such harmful tax consequences. *Id.* at *11.

Plaintiffs in this case argue that Defendants employed a similar "we don't care about the risks" attitude. Dkt. No. 35 at 24, 28. But this argument ignores a crucial difference: the *Vanguard* shareholders were saddled with significant "unexpected" financial and even legal penalties resulting from the defendants' decisions, over which they had no say and no notice. *In re Vanguard Chester Funds Litig.,* 2023 WL 8091999 at *3. Here, by contrast, Plaintiffs had full notice of the structure of the Fund, including the different share classes, corresponding expense ratios, and lack of auto-conversion, when they purchased Retail Class shares. In other words, they are in precisely the same financial position that they signed up for at the outset—a circumstance that bears no factual relationship to that faced by the *Vanguard* plaintiffs.

12

The remaining cases Plaintiffs cite present similarly distinct sets of factual and legal circumstances and thus do not support a finding that Defendants breached the duty of care.  The court in *In re Signature Apparel Group. LLC*, No. 09-15378 (RG), 2015 WL 1009452 (Bankr. S.D.N.Y. Mar. 4, 2015), *see* Dkt. No. 35 at 24, considered on summary judgment whether a defendant breached the duty of care by allegedly acquiescing to the improper termination of a license instead of seeking to negotiate a better deal for the debtor.  *In re Signature Apparel Grp. LLC*, 2015 WL 1009452, at *11.  It ruled that genuine issues of material fact precluded summary judgment on this claim because the record did not allow the court to determine whether the defendant "engaged in an appropriate, good faith process" in deciding to agree to the license termination.  *Id.* at *11.  The case is readily distinguishable because it involved an "improper termination" that Defendants failed to protect against and a reasonable person would have recognized as harmful.  *Id.* Plaintiffs are unable to point to the same kind of impending "improper" event here that any reasonable person would have recognized as unacceptable and harmful.  Instead, Plaintiffs can only point to a system they themselves knew about before purchasing shares and which derived from repeated arms' length transactions and negotiations.

In *Albert v. Alex. Brown Management Services*, Inc., No. Civ.A. 762-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005), Dkt. No. 35 at 21–22, the court found that the plaintiffs "(just barely) raise[d] a duty of care claim." *Albert*, 2005 WL 2130607, at *5.  The claim concerned fund managers who had an "allegedly, almost nonexistent" response to their funds "being faced with exceptional challenges" and who "failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges." *Id.* at *6.  The court explained that "[t]hese alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds

plummeted." *Id.* These circumstances differ significantly from Defendants' actions in this case because, as discussed above, Defendants fully disclosed the information relevant to Plaintiffs' investment decisions. Finally, the court in *In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005), *see* Dkt. No. 35 at 34, found that plaintiffs' allegation that "directors' alleged rubber-stamping of major capital expenditures" by "signing large checks without comment" was sufficient to survive a motion to dismiss. *In re Tower Air, Inc.*, 416 F.3d at 240.

Defendants' conduct in this case is a far cry from the conduct that courts applying Delaware law have found to breach the duty of care. Unlike the defendants in *In re Greater Se. Cmty. Hosp. Corp. I* and *In re Vanguard Chester Funds Litig.*, Defendants did not make a business decision without failing to consider an undisclosed financial consequence for Plaintiffs. Unlike in *Albert*, Defendants did not fail to adequately respond to challenges nor to disclose material information to Plaintiffs that would have impacted the value of their investments. Unlike the defendants in *In re Tower Air, Inc.*, Defendants did not "rubber-stamp[]" major financial decisions concerning the Fund. And unlike in *In re Signature Apparel Grp. LLC.*, Defendants considered the rates charged and practices of competitor funds and then set expense ratios for each class of shares in the Fund through a negotiated arm's-length contract, undercutting any argument that Defendants failed to engage in a reasonable or good faith decision-making process. Nor is the Court aware of *any* case where the design of an investment vehicle, fully-disclosed to investors prior to their purchase of shares, has been found to satisfy the standard for gross negligence under Delaware law. For these reasons, and those set forth above, Plaintiffs have not alleged that Defendants engaged in conduct that was outside the bounds of reason and breached the duty of care.[7]

---

[7] Defendants raised several other arguments in support of their arguments that Plaintiffs fail to state a claim for breach of the fiduciary duty. These arguments include that Plaintiffs' claim is preempted

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

Because Plaintiffs have failed to allege a breach of fiduciary duty, their aiding and abetting breach of fiduciary duty claim against Fidelity must also be dismissed. "Under Delaware law, a successful claim for aiding and abetting a breach of fiduciary duty requires proof of four elements: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary." *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008). Plaintiffs are unable to establish this claim because, as set forth above, they have not alleged that a fiduciary breached its duty. Without this element, Plaintiffs' claim fails. *See, e.g.,* *Flannery v. Genomic Health*, Inc., No. CV 2020-0492 (JRS), 2021 WL 3615540, at *1 (Del. Ch. Aug. 16, 2021) ("[B]ecause Plaintiff has failed to state breach of fiduciary duty claims, she likewise has failed to state claims for aiding and abetting breaches of fiduciary duty.").

## IV.   PLAINTIFFS FAIL TO ALLEGE THAT FIDELITY WAS UNJUSTLY ENRICHED

To state a claim for unjust enrichment under New York law, Plaintiffs must allege: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."[8] *Wargo v. Hillshire Brands Co.*, 599 F. Supp. 3d 164, 178 (S.D.N.Y. 2022) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d. Cir. 2000)). Plaintiffs

---

as well as arguments based on documents that Defendants request the Court take judicial notice of. The Court need not address these arguments because Defendants' motion is granted on other grounds.

[8] The parties briefed this claim under New York law, *see* Dkt. No. 29 at 25, Dkt. No. 35 at 54, which is "sufficient to establish choice of law," *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004). Furthermore, there is "no material difference between common law unjust enrichment claims in New York and Delaware." *FCX Solar, LLC v. FTC Solar, Inc.*, No. 21-CV-3556 (RA), 2022 WL 355606, at *7 (S.D.N.Y. Feb. 7, 2022).

allege that Fidelity was enriched because it retained "millions of dollars in unwarranted profits from not making expense reimbursements that they otherwise should have to Plaintiffs and the Class Shareholders, had their Retail Class shares been properly converted to Premium Class shares." Compl. ¶ 155. This benefit came at Plaintiffs' expense, Plaintiffs allege, because Fidelity's "additional profits" were collected "from the expenses that Plaintiffs and the Class Shareholders needlessly overpaid." *Id.* ¶ 157.

Plaintiffs' unjust enrichment claim fails because multiple valid contracts govern the charges and payments that are the subject of their claim. Plaintiffs do not dispute that the Trust Agreement, which governs the ability of the trustees to charge expenses to Plaintiffs, is binding on Plaintiffs. *See* Compl. ¶ 41. Nor do they allege that Fidelity's contract with the Fund, which sets Fidelity's management fee, the expenses allocated to each share class, and the classes' expense ratio caps, is invalid. *See id.* at ¶ 92. Together, these contracts govern the expenses that are the subject of Plaintiffs' unjust enrichment claim. Because "the existence of a valid and binding contract governing the subject matter at issue in a particular case . . . preclude[s] a claim for unjust enrichment even against a third party non-signatory to the agreement," *Network Enters., Inc. v. Reality Racing*, Inc., No. 09-CV-04664 (RJS), 2010 WL 3529237, at *7 (S.D.N.Y. Aug. 24, 2010), Plaintiffs cannot state a claim for unjust enrichment. *See also L. Debenture v. Maverick Tube Corp.*, No. 06-CV-14320 (RJS), 2008 WL 4615896, at *12 (S.D.N.Y. Oct. 15, 2008), *aff'd sub nom. L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir. 2010) ("[C]ourts in New York state and in this District have found that the existence of a valid and binding contract governing the subject matter at issue in a particular case *does* act to preclude a claim for unjust enrichment even against a third party non-signatory to the agreement") (collecting cases).

## V.    PLAINTIFFS FAIL TO ALLEGE A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs allege that the Trustee Defendants breached the implied covenant of good faith and fair dealing "by failing to operate the [Fund] in a way that avoids Plaintiffs and the Class Shareholders being needlessly overcharged expenses." Compl. ¶ 138.  For this claim to survive a motion to dismiss, Plaintiffs "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage." *Madhu v. Socure Inc.*, 693 F. Supp. 3d 405, 423 (S.D.N.Y. 2023).  Courts analyzing this claim under Delaware law conduct a three-step analysis.  The first step is to consider "whether the relevant contract contains a gap that needs to be filled." *Gabriels Tech. Sols., Inc. v. PNJP*, LLC, No. 17-CV-6410 (AT), 2018 WL 11309883, at *5 (S.D.N.Y. Sept. 7, 2018).  To make that assessment, the Court must consider "whether the language of the contract expressly covers a particular issue." *Id.*  If it does, there cannot be a breach of some implied covenant.

Plaintiffs' claim cannot survive the first step of this inquiry because the conduct at the heart of the claim is expressly covered by the Trust Agreement.  The basis of Plaintiffs' implied covenant claim is that they were "overcharged expenses" by Defendants.  Compl. ¶ 138; Dkt. No. 35 at 48.  But the Trust Agreement expressly authorizes the expenses that Plaintiffs were charged.  Section 4.01(p) of the Trust Agreement grants the trustees the "power and authority" to "allocate assets, liabilities and expenses of the Trust to a particular Series or class." Dkt. No. 30-1 at 8; *see also* Compl. ¶ 136 ("The Trust Agreement authorizes the Trustee Defendants to . . . set expenses for each class of shareholders . . . .").  Thus, the Trust Agreement expressly authorized the trustees to set the expenses that Plaintiffs were charged.  "One generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." *Nemec*, 991 A.2d at 1125–26; *see also Zornoza v. Terraform Glob., Inc.*, 419 F. Supp. 3d 715,

17

738 (S.D.N.Y. 2019) ("The implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand."). Plaintiffs' implied covenant claim, at bottom, takes issue with the charges imposed upon Plaintiffs by the trustees. But because the Trust Agreement expressly authorizes the trustee to set those charges, and Plaintiffs were only charged the expenses set for the class of shares they owned, the Agreement cannot be said to be "truly silent" on the issue of expenses charges to Plaintiffs and their implied covenant claim cannot survive a motion to dismiss. *Zornoza*, 419 F. Supp. 3d at 738.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED. Plaintiffs requested leave to file an amended complaint, Dkt. No. 35 at 58, but the Court's Individual Rules clearly provided Plaintiffs with the opportunity to amend in response to Defendants' motions to dismiss rather than opposing the motions. Plaintiffs chose to gamble on whether the motion would succeed rather than address Defendants' arguments through amendment. If Plaintiffs now believe they can cure the defects in the complaint through amendment, they must move for leave to amend and demonstrate clearly why the proposed amendment would not be futile, and why Defendants would not be prejudiced by granting leave to amend. If Plaintiffs wish to file such a

motion, they must do so within thirty (30) days of the date of this Opinion.

The Clerk of Court is respectfully directed to terminate Dkt. Nos. 25 & 28.


Dated: March 25, 2026
      New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge

19